UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

```
                                )
UNITED STATES OF AMERICA,        )
         Plaintiff,              )
                                 )
vs.                              )
                                 ) Criminal Action
BARRY SPENCER,                   ) No. 13-10196-RWZ
         Defendant.              )
                                 )
                                 )
                                 )
```

**JURY TRIAL**
**DAY ONE**

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
Boston, Massachusetts 02210
June 16, 2014
9:00 a.m.

\*   \*   \*   \*

CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

```
       APPEARANCES:

 2

 3     For the Plaintiff:

 4     UNITED STATES ATTORNEY'S OFFICE
       (By: AUSA John A. Wortmann, Jr.)
 5          John J. Moakley Courthouse
            One Courthouse Way, Suite 9200
 6          Boston, MA 02210

 7


 8
       For the Defendant:
 9
       BUTTERS BRAZILIAN, LLP
10     (By: Thomas J. Butters, Esq.)
            One Exeter Plaza
11          12th Floor
            Boston, MA 02116
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

Voir Dire Conference. . . . . . . . . . .  Page 15

Jury Impanelment. . . . . . . . . . . . .  Page 20

Government's Opening Statement. . . . . .  Page 71

Defendant's Opening Statement. . . . . . . Page 83

WITNESS                      DIRECT  CROSS  REDIRECT  RECROSS

SRGT. DET. DONALD KEENAN

   By Mr. Wortmann:       90
   By Mr. Butters:                 --

```
 1              P R O C E E D I N G S
 2         (The following proceedings were held in open court
 3   before the Honorable Rya W. Zobel, United States District Judge,
 4   United States District Court, District of Massachusetts, at the
 5   John J. Moakley United States Courthouse, 1 Courthouse Way,
 6   Boston, Massachusetts, on June 16, 2014.
 7          The defendant Barry Spencer is present with counsel.
 8   Assistant United States Attorney John A. Wortmann, Jr., is
 9   present.)
10    THE FOLLOWING TAKES PLACE OUTSIDE THE PRESENCE OF THE JURY:
11         THE COURT:  Mr. Butters, you need not put on your
12   coat for this purpose.
13         MR. WORTMANN:  Thanks.
14         THE COURT:  Well, neither do you, Mr. Wortmann.
15         COURTROOM DEPUTY CLERK URSO:  This is the United
16   States versus Barry Spencer.  It's Criminal 13-10196.  If
17   counsel could just identify themselves for the record, please.
18         MR. WORTMANN:  Your Honor, John Wortmann for the
19   United States.  Good morning.
20         MR. BUTTERS:  Your Honor, good morning.  Tom Butters
21   for Mr. Spencer.
22         THE COURT:  It's good to see you.
23         MR. BUTTERS:  Good to see you, too.
24         THE COURT:  How much progress have you made to being
25   standby counsel and being actual counsel?
```

1          MR. BUTTERS:  Well, I convinced Mr. Spencer that I
2    would do a better job at the trial than he would.

3          THE COURT:  He believes it?

4          MR. BUTTERS:  Well, I'm very persuasive, as you know.

5          THE COURT:  I know.  Although my recollection is the
6    last case it took about a day or two before your client just
7    departed and let you do it.

8          MR. BUTTERS:  I remember that one.

9          So, I think that he's going to let me conduct the
10   trial and -- but I don't know.  He's a little bit hard to
11   predict.  So -- but I think that we have a game plan and he's
12   going to let me do what we've agreed that I should do.

13         THE COURT:  If we impanel 13 jurors -- I think I need
14   to review the charge -- I mean, the questions with him anyhow.
15   Yes, he needs to be here for that.

16         Lisa, do we have any idea when the sheriff is going
17   to bring him?

18         COURTROOM DEPUTY CLERK URSO:  No.  I just called Matt
19   downstairs in the Marshal's Office and he said they said by
20   10:30, but he'll call me to let me know.

21         MR. WORTMANN:  Your Honor, I spoke to Mr. McLear on
22   Friday.  It sounds like that's about the earliest that we
23   would get a jury panel up here anyway because of Judge Saris'
24   case.

25         COURTROOM DEPUTY CLERK URSO:  Judge Saris has a huge

1    trial.  So...

2            THE COURT:  I'm junior to her now, so I should get

3    first bibs on the jury.  We have this juniority arrangement,

4    that criminal cases go first and civil cases go second and

5    within each category the most junior judge gets to go first.

6            MR. WORTMANN:  Your Honor --

7            THE COURT:  By virtue of being senior, I'm at the

8    bottom of the list now.

9            MR. WORTMANN:  I think Mr. Butters' and my discretion

10   is the better part valor and won't join in this conversation.

11           THE COURT:  I'm sorry?

12           MR. WORTMANN:  I said we won't join in this

13   conversation.

14           Your Honor, one thing -- I spoke to Mr. Gonza

15   (phonetic) during the week just to make sure that the habe got

16   issued and I suppose we should make sure that the habe is

17   issued for the duration of the trial.

18           COURTROOM DEPUTY CLERK URSO:  I know.  I did issue

19   the habe.  It wasn't on the docket, but I did speak to the

20   marshals, but I told them I would tell them today how long,

21   because they wanted to -- they're like, well, put two weeks

22   down.  I said, well, I was going to talk to you guys today and

23   see how long.  So, I'll do it for like Thursday.

24           MR. WORTMANN:  Yes, I think that --

25           COURTROOM DEPUTY CLERK URSO:  Right, just to make

 1   sure.

 2          MR. WORTMANN:  He'll stay closer.

 3          COURTROOM DEPUTY CLERK URSO:  Right, I have that.  I

 4   already spoke to them.  I have that under control.

 5          THE COURT:  Is the case likely to go to the jury

 6   tomorrow?

 7          MR. WORTMANN:  Yes, I think -- well, I think it

 8   really depends -- I've got two witnesses here today that

 9   should be, you know, an hour direct total and I'm sure about

10   the same on cross.

11          MR. BUTTERS:  Or less.  Less is more.

12          MR. WORTMANN:  And then three witnesses tomorrow who

13   are -- the first two are fairly short, will be 15- or 20-

14   minute witnesses, and then the chemist, who is probably half

15   an hour.  So, you know, even if we got started late today,

16   your Honor, and we get through only one of those witnesses, I

17   still think we have a pretty good chance of finishing up --

18          THE COURT:  But the case would go to the jury on

19   Wednesday, then.

20          MR. WORTMANN:  Yes, that's probably right.

21          THE COURT:  I think that means, Lisa, that we need to

22   tell the Framingham people to come in at 2:00 and/or have -- I

23   guess it's better to have them come at 2:00 and then move

24   everything else back or however you want to arrange it.  I

25   don't -- especially since we'll hear the motions tomorrow, but

they have some business to discuss.  This is the multi-district Framingham compounding case and I meet with them once a week -- once a month to get an update of what's going on and to -- they make very good suggestions about what should happen next.

MR. WORTMANN:  Your Honor, I sent a copy of the premarked set of exhibits.  Did you get it?

THE COURT:  I have all of it.

MR. WORTMANN:  A three-ring binder.

THE COURT:  And your lengthy jury instructions as well and equally lengthy voir dire.

MR. WORTMANN:  I think there was a very good writer who once said it's harder to do something shorter than it is longer.  So, I apologize.

THE COURT:  It's okay.

MR. WORTMANN:  Incredibly busy.

THE COURT:  I think this charge is no different from other charges --

MR. WORTMANN:  No.

THE COURT:  -- with these accusations.

MR. WORTMANN:  No.  I think that's right, your Honor.

THE COURT:  Okay.  Then I thought that we would impanel 13 just in case.  We don't need more than that.  14?

MR. WORTMANN:  Why take a chance.  In case somebody gets caught in traffic, somebody else sets sick, you hate like

1   the dickens to start over again.

2         THE COURT:  Okay.  And the part of the voir dire

3   questions that deal with CSI and -- television, CSI and

4   Google, I think I will do that in the preliminary charge

5   rather than as part of the voir dire.

6         MR. WORTMANN:  Okay.

7         THE COURT:  And I guess I need to know before going

8   to the voir dire whether, in fact, Mr. Spencer still adheres

9   to the good judgment of not doing it pro se, because I would

10  need to explain to the jury that he has the right to do that

11  and is there anybody who would have any problems with a

12  criminal defendant representing himself.

13        MR. BUTTERS:  As far as I know, I got the nod for

14  today and maybe tomorrow if I do well today.  You know, it's a

15  rolling thing.

16        THE COURT:  What is the Guideline Range for him, 151

17  to 188?

18        MR. WORTMANN:  Yes.  It's 262 to 324 after trial.

19        THE COURT:  I'm sorry?

20        MR. WORTMANN:  262 to 324 after trial.

21        MR. BUTTERS:  He just barely made the Career Offender

22  by like a month because they got a 15-year-old conviction.

23        THE COURT:  I forgot, I took off three for acceptance

24  of responsibility.

25        MR. BUTTERS:  Yes, it's 151.

1          THE COURT:  That would be 151 to 188.

2          MR. BUTTERS:  That's the Guideline, of course.

3          THE COURT:  That's the Guideline.  There's no

4     mandatory minimum?

5          MR. WORTMANN:  There is not as far as I know, your

6     Honor, but I actually think he -- I actually think that he

7     qualifies quite easily because a number of the old cases have

8     probation violations later on.  Therefore, they get kicked up

9     in terms of the time.

10          MR. BUTTERS:  I think we agree that he's a --

11          MR. WORTMANN:  He's Career Offender.

12          MR. BUTTERS:  He's a Career Offender, even though, of

13     course, Congress had no idea Barry Spencer would be classified

14     that way, since he's such a --

15          THE COURT:  210 to 262 with acceptance of

16     responsibility; is that right?

17          MR. BUTTERS:  -- minor person.

18          MR. WORTMANN:  That sounds right, Judge, actually.

19          THE COURT:  I'm sorry?

20          MR. WORTMANN:  Yes, that sounds right.  The

21     government did not file an §851.

22          THE COURT:  I mean, you can lower it a good deal.

23          MR. BUTTERS:  I told him that I thought you would

24     probably give him the street if he pleaded guilty.

25          THE COURT:  Is he serving a sentence now?  He's not

1    in federal custody at the moment.

2             MR. WORTMANN:  Your Honor, he's being held on -- I

3    believe it's two cases.  He had a -- he has a drug conviction

4    in 2006 that he got five to five and a day on.

5             THE COURT:  But that one got reversed.

6             MR. WORTMANN:  That got reversed because of *Melendez-*

7    *Diaz*.

8             THE COURT:  Right.

9             MR. WORTMANN:  That case is still pending, and he's

10   got another drug case that's pending as well.  So, he's being

11   held on those.

12            THE COURT:  Would those go away if he were convicted

13   in this case?

14            MR. BUTTERS:  Yes.

15            MR. WORTMANN:  I think so.

16            MR. BUTTERS:  I've talked to his court-appointed

17   counsel, Frank Santisi, and he said that he could plead him

18   tomorrow and he would be released from the state sentences,

19   but he hasn't done anything because he's got this pending

20   case.

21            THE COURT:  If he were to plead here and then he

22   would plead there and be sentenced to time served, or what?

23            MR. BUTTERS:  Right.

24            MR. WORTMANN:  Or a concurrent sentence.

25            MR. BUTTERS:  Or probation.

1       MR. WORTMANN:  We talked about it and I indicated

2  that I would agree to a concurrent sentence, but, you know...

3       THE COURT:  If he were to go to trial here and be

4  convicted, would the option -- would he have the same option

5  in the state court that he has had?

6       MR. BUTTERS:  Yes.

7       THE COURT:  So that wouldn't change.

8       MR. BUTTERS:  Yes.

9       MR. WORTMANN:  I think that's right, your Honor.

10      THE COURT:  But going to trial has a longer Guideline

11  Range.

12      MR. BUTTERS:  Right, but he's unfamiliar with the

13  federal system and -- because he's used to the state system

14  where the Court says, okay, if you plead guilty, this is what

15  you get, which happens most of the time.  And so, he's

16  uncomfortable.  Even though I've heaped praise on you, he

17  still is just -- he doesn't want to plead guilty.  I said,

18  yes, that's your right, and I've done everything I can in that

19  regard.

20      THE COURT:  I have no doubt.

21      MR. WORTMANN:  Well, your Honor, I have a copy of the

22  filing.  I just moved the -- I made the witness list track the

23  order in which we anticipate people are going to come in, and

24  also a copy of the indictment filed with the Court just so you

25  have it.

```
1              THE COURT:  I have it.  The second superseding?
2              MR. WORTMANN:  Yes, exactly.
3              THE COURT:  I think you gave me a revised witness
4    list already -- no.  I have an exhibit list.  Okay.  I have a
5    revised exhibit list, I think.  I'll add this to it.
6              MR. WORTMANN:  When I did the original exhibit list,
7    I forgot to include the drugs.  Yet another indication that
8    I'm getting senile.
9              THE COURT:  All right.  Well, there's not much we can
10   do now except wait, right?
11             MR. WORTMANN:  I think that's right.
12             Your Honor, Mr. Butters and I have talked about a
13   number of things, and he's asked me to ask the police officers
14   not to mention the fact that the officers who did the
15   identification procedure were from the Youth Violence Strike
16   Force and I will ask if I have a minute before we start if I
17   could go out and make that very clear to them.  So just say we
18   had other officers, you know, and we've talked with each other
19   about the -- how to handle the fact that Detective Sergeant
20   Keenan who -- knows Mr. Spencer and he will say -- you know,
21   did you recognize him?  Who was it?  How did you know him?  I
22   knew him from prior interactions on the street.  And he will
23   not mention the word "drugs," unless, of course, Mr. Butters
24   was to open that up, and I'm fairly confident that he's not
25   going to do that.
```

```
 1              So, I think we've worked out the, you know -- and

 2     I've given the officers very strict instructions on that.  And

 3     I think there are no exhibits -- there won't be objections to

 4     the exhibits?

 5              MR. BUTTERS:  Well, I don't know yet, but I'll

 6     probably object to everything.

 7              MR. WORTMANN:  I knew it was one way or the other.

 8              MR. BUTTERS:  No, I don't think I will.

 9              THE COURT:  Okay.

10              MR. BUTTERS:  But, again, I don't have my co-counsel

11     with me for guidance.

12              THE COURT:  All right.  Well, as soon as he gets

13     here, we'll start in earnest, assuming that the jurors will be

14     available.  Thank you.

15              MR. WORTMANN:  Thank you, your Honor.

16              (Recess taken.)

17       THE FOLLOWING TAKES PLACE OUTSIDE THE PRESENCE OF THE JURY:

18              THE COURT:  Good morning again.  Please be seated.

19              MR. BUTTERS:  Good morning, your Honor.

20              (Pause.)

21              (Defendant enters courtroom.)

22              THE COURT:  Good morning.

23              THE DEFENDANT:  Good morning, ma'am.

24              THE COURT:  Are we ready to proceed?

25              MR. BUTTERS:  Yes, your Honor.
```

1          THE COURT:  Would counsel and Mr. Spencer please

2     explain to me how we are going to proceed.

3          MR. BUTTERS:  Correct me if I am wrong.  Mr. Spencer

4     has authorized me to conduct the trial and we're going to

5     consult, of course, but we've spent quite a bit of time

6     working on this.  So, we're ready to go.

7          THE COURT:  Okay.  In that case -- I think the jurors

8     are ready very soon, right?

9          COURTROOM DEPUTY CLERK URSO:  Yes.  I just went down

10    to see Jim.  I don't know if he's en route up.

11         THE COURT:  Well, let me review with you very

12    briefly, since they are en route, what I propose to ask the

13    jurors on voir dire.  So, please be seated.

14         VOIR DIRE CONFERENCE:

15         THE COURT:  I will introduce Mr. Wortmann and I will

16    then introduce Mr. Spencer and Mr. Butters.  And Mr. Spencer

17    is of what town?

18         MR. BUTTERS:  Boston.

19         THE DEFENDANT:  Yes.

20         THE COURT:  And I will ask the jurors whether they

21    know any of the participants in this trial.  I will explain to

22    them that Mr. Spencer has been accused in an indictment, which

23    is called the second superseding indictment, although that's

24    irrelevant and I may not even mention it, and that he has been

25    charged in two counts, one with conspiracy to distribute

1    cocaine base on March 20th in 2013 in Boston; and, two, with

2    possessing crack cocaine with the intent to distribute and

3    distributing it on the same day in Boston.

4            MR. WORTMANN:  Your Honor, really, I ask that you

5    include the aiding and abetting because that's really the

6    theory under which the case is going to be tried.

7            THE COURT:  Aiding and abetting, but, you know, again

8    -- okay, aiding and abetting the distribution.

9            MR. WORTMANN:  Correct.

10           THE COURT:  I will ask the jurors whether any of them

11   have any knowledge of the events that gave rise to this

12   lawsuit; whether any of them have -- any of them or members of

13   their immediate families, spouses, children, siblings,

14   parents, and that's it, have any relationship to any law

15   enforcement personnel, local, state or federal; whether any of

16   them have had any experience with law enforcement that was

17   either so bad or so good that they cannot be impartial in

18   judging the credibility of a police officer or anybody who

19   works for law enforcement.

20           I'll ask them whether any of them have ever been

21   involved in a lawsuit against the state or Federal Government

22   or been sued by the state or Federal Government, and we'll

23   have to ferret out if anybody says yes what the nature of that

24   was.  Anybody who answers yes to any of these questions which

25   are put to the whole panel we will speak with at the sidebar

1  privately.

2       I will ask them whether they or any members of their

3  immediate families have ever been accused in a criminal case,

4  either state or federal; whether any of them have feelings

5  about the laws and enforcement of drug laws that would make it

6  difficult for them to be fair and impartial jurors; whether

7  they have any feelings about drugs in general and the use of

8  drugs, that is illegal drugs, that would make it difficult for

9  them to be fair and impartial jurors.

10      I will tell them that Mr. Spencer is African-American

11  and one or more of the witnesses will be African-American

12  and/or Hispanic.  Do any of them have any feelings about

13  African-Americans or Hispanics such that they cannot be fair

14  jurors in this case?

15      I will explain to them that it is the law that the

16  credibility of every witness has to be judged by the juror

17  fairly and impartially and that law enforcement personnel are

18  to be judged in precisely the same way.  That is, that their

19  status as a person in law enforcement gives them neither more

20  nor less believability than anybody else.  Does anybody have a

21  problem with that?

22      I will explain to them the presumption of innocence.

23  It is called the presumption, but what it really means is that

24  the defendant is innocent until the government proves him

25  guilty beyond a reasonable doubt and because he is innocent,

1    he does not have to prove his innocence.  He doesn't have to

2    explain anything he did.  He can say to the government, You

3    have accused me.  Now you prove it.  And does anybody have any

4    problem accepting that principle, very important principle of

5    law?

6           I will read to them the names of the witnesses and

7    ask if they know any of them.

8           The schedule, as I understand it, is that we will

9    finish the case at the latest Wednesday morning and does

10    anybody have a problem with that.

11          And then I will ask them whether there are any

12    reasons that I haven't specifically outlined that cause anyone

13    to believe that they cannot be fair jurors.

14          Any errors or omissions?

15          MR. WORTMANN:  Your Honor, I wonder if you might also

16    ask if there's physical disabilities, either hearing or

17    language problems --

18          THE COURT:  I include that in the other.

19          MR. WORTMANN:  Okay.

20          MR. BUTTERS:  We're fine, your Honor.

21          May I ask if -- may Mr. Spencer accompany me to

22    sidebar if we have a sidebar?

23          THE COURT:  Yes, since he really is part of this.

24          MARSHAL:  Yes, your Honor.

25          THE COURT:  Thank you.

1          Now, the jurors are en route and...

2          (Discussion off the record.)

3          THE COURT:  Mr. Spencer and Mr. Butters, can I have

4    one --

5          MR. BUTTERS:  I'm sorry.

6          THE COURT:  I want to -- Mr. Butters, I don't know

7    that you have been in this courtroom recently.  Since we get

8    the jurors all mixed up already -- that is, the jurors -- a

9    large number of jurors come to the court to be impaneled by

10   all the judges who are impaneling and the computer picks out

11   those who come to this courtroom.  So, they're already mixed up.

12         You will have a list that shows them in the order in

13   which the computer picked them.  There is no other order.  And

14   we will seat them first in the jury box.  The first one on the

15   list will be in Seat No. 1, which is the first row over here,

16   and -- until the jury box is filled and then we'll go to the

17   back of the room.

18         When they -- initially I address them all, as I said.

19   Anyone who answered yes we will, in the order in which they're

20   seated, bring them to the sidebar and I'll ask further

21   questions of them, and anybody who should be excused for cause

22   and it's clear should be excused for cause we will excuse

23   immediately and leave the seat blank so you will be able to

24   identify the persons remaining with the list.  Are you with me?

25         MR. BUTTERS:  Yes, I'm with you.

1           THE COURT:  And then the peremptory challenges we

2      will do starting with the government one, defendant two,

3      government one, defendant two, until you have an even number,

4      because, I'm sure you know, Mr. Spencer, you get ten

5      challenges.  The government only gets six.  So, once we get

6      even, then we go to one one and, hopefully, we'll get it done

7      with dispatch.  And the jurors are en route.  So we should

8      have them very quickly.

9           (Pause.)

10          THE COURT:  Mr. Marshal, what are the chances of the

11     Suffolk people bringing Mr. Spencer on time tomorrow?

12          MARSHALL:  I can check with the supervisor and make a

13     call over to Suffolk County to make sure that he's here by 7

14     o'clock.

15          THE COURT:  I mean, we are actually adding one trial

16     day because of their lateness.

17          MARSHAL:  Right.

18          (Jury panel enters courtroom.)

19     JURY IMPANELMENT:

20          THE COURT:  Thank you very much.

21          MR. McLEAR:  Thank you, your Honor.

22          THE COURT:  Now, those of you sitting in the middle,

23     have you figured out why you had to go from one end of this

24     bench to the other?  You haven't?

25          The reason is that we have a list and we wanted to

1    seat you in the order in which you appear on the list and for

2    those of you on the long bench, the only way to do that is to

3    have you start at one end, because if you started at this end,

4    our list would be meaningless and we don't like meaningless

5    lists.

6           In any event, I am Judge Zobel and we are about to

7    impanel a jury in a very short criminal case.  We anticipate

8    to be done by Wednesday of this week.

9           The impanelment process, that is the choosing of

10   those of you who will be the jurors who will try this case,

11   involves, first of all, my asking you a series of questions,

12   the sole object of which is to make sure that you do not come

13   to this task with any preconceptions, with any biases or

14   prejudices that would affect your ability to try this case

15   fairly and impartially and consider the evidence that will be

16   presented in the case fairly and impartially and reach a fair

17   verdict in the case.

18          So, let me begin by introducing you to the

19   participants in this trial.  In a criminal case, the

20   government is represented by -- it is the government that

21   accuses someone and it is represented by an Assistant United

22   States Attorney, Mr. John A. Wortmann, Jr.  Do any of you know

23   Mr. Wortmann?

24          MR. WORTMANN:  Good morning.

25          (No response.)

1          THE COURT:  The defendant in this case is Mr. Barry

2     Spencer of Boston, and he is represented by Mr. Thomas J.

3     Butters, who practices law in Boston.  Would you please rise?

4     Do any of you know either Mr. Spencer or Mr. Butters?

5          (No response.)

6          THE COURT:  Thank you.

7          Now, the document in which the accusation is

8     contained is called an indictment, and the indictment in this

9     case accuses Mr. Spencer in two counts:

10          One, it says that he conspired with others to

11     distribute crack cocaine in Boston in March of 2013, March

12     20th; and the second count is what is called the substantive

13     count.  It says not that he conspired, but that he aided and

14     abetted the distribution of crack cocaine on that same day in

15     Boston.  They are two different offenses and the elements of

16     these offenses are different and I will explain them to those

17     of you who will serve as the jurors in this case, but those

18     are the accusations in the case.  And the question to you is,

19     do any of you know anything at all about the events that gave

20     rise to this accusation?

21          Now, do any of you or any members of your immediate

22     families -- which means any spouses, siblings, children or

23     parents, but not the cousins and the aunts and the uncles.  Do

24     any of you or your immediate families have any relationship

25     with anyone who works in law enforcement, local, state or

1    federal?

2             Okay.  Let me do it in the order in which my list

3    goes, so I start over here in the jury box.

4             Mr. Hirschfeld, you did not raise your hand?

5             MR. HIRSCHFELD:  Could you repeat the question?

6             THE COURT:  The question is whether you or any member

7    of your immediate family as I defined it has a relationship

8    with law enforcement, family involved in law enforcement.

9             MR. HIRSCHFELD:  Yes.  My brother-in-law is a state

10   police.

11            THE COURT:  Okay.  So, the answer is yes.

12            Anybody else in the first row?

13            (No response.)

14            THE COURT:  Okay.  The second row.

15            COURTROOM DEPUTY CLERK URSO:  Juror No. 8 also, Judge.

16            THE COURT:  Ms. Gath.

17            MS. GATH:  My --

18            THE COURT:  No, don't tell me now.  At the moment --

19   I'm sorry, I wasn't clear.  I just wanted to know for whom the

20   answer is yes and then I'll speak with you further over here.

21            So, Ms. Gath, the answer is yes, right?  And then Mr.

22   McGaffigan.

23            COURTROOM DEPUTY CLERK URSO:  And Juror No. 12 also.

24            THE COURT:  Mr. Goncalves.  Anybody else in the jury

25   box?

1              (No response.)

2              THE COURT:  Okay.  First row on my left over here,

3     your right?  Nobody.  And in the middle?  Mr. Chouinard.

4              MR. CHOUINARD:  Yes.

5              COURTROOM DEPUTY CLERK URSO:  Juror No. 26.

6              THE COURT:  Anybody else in the first row?  Anybody

7     over here on my right?  Anybody in the second row?  Mr.

8     Strauss.

9              COURTROOM DEPUTY CLERK URSO:  Juror No. 37.

10             THE COURT:  See, the system works.

11             Anybody else?

12             (No response.)

13             THE COURT:  Okay.  Have any of you ever had an

14    experience with anybody in law enforcement, police officer or

15    federal or local agent, that was either so bad or so terrific

16    that you cannot be a fair juror in judging police officers or

17    agents in general?

18             COURTROOM DEPUTY CLERK URSO:  Juror No. 2.

19             THE COURT:  Mr. Holland.

20             COURTROOM DEPUTY CLERK URSO:  And Juror No. 8, Judge.

21             THE COURT:  And Ms. Gath.

22             COURTROOM DEPUTY CLERK URSO:  Yes.

23             THE COURT:  Anybody else in the jury box?  Anybody in

24    the back?

25             (No response.)

```
1              THE COURT:  Have any of you or members of your
2    immediate families ever been accused of a crime and convicted
3    of a crime?
4              COURTROOM DEPUTY CLERK URSO:  Juror No. 5.
5              THE COURT:  Mr. Bouchie.
6              COURTROOM DEPUTY CLERK URSO:  Yes.  Juror No. 11.
7              THE COURT:  Anybody else in the jury box?  Mr.
8    McGaffigan.
9              COURTROOM DEPUTY CLERK URSO:  Yes.  And Juror No. 14,
10   Judge, also, Ms. Kirk.
11             THE COURT:  Ms. Kirk.
12             COURTROOM DEPUTY CLERK URSO:  Yes.
13             THE COURT:  That's it in the jury box?
14             In the first row?  Mr. Chouinard -- no.  Mr. Geary
15   and Mr. Maldonado.
16             MR. BUTTERS:  I'm sorry, what number was that, Lisa?
17             COURTROOM DEPUTY CLERK URSO:  I'm sorry?
18             THE COURT:  I missed you?  I'll come back to you in a
19   moment.  Mr. Maldonado, No. 28.
20             MR. WORTMANN:  Is that the only one, your Honor?  I'm
21   sorry.
22             THE COURT:  I'm sorry?
23             MR. WORTMANN:  Was that the only one in the middle?
24             THE COURT:  No.  Mr. Maldonado, No. 28, also.  And
25   now I come back to Ms. Bagley.
```

```
 1              COURTROOM DEPUTY CLERK URSO:  Yes, Juror No. 20.
 2              THE COURT:  Anybody else in the first row on the
 3    right?  Mr. Harrington.
 4              COURTROOM DEPUTY CLERK URSO:  Yes, 31.
 5              THE COURT:  And anybody in the second row?  Ms.
 6    Orben.
 7              COURTROOM DEPUTY CLERK URSO:  Yes, 35.
 8              THE COURT:  And Mr. Strauss.
 9              COURTROOM DEPUTY CLERK URSO:  Yes, 37.
10              THE COURT:  Anybody else?  And Mr. Bachand.
11              COURTROOM DEPUTY CLERK URSO:  Yes, 38.
12              THE COURT:  That's it, right?
13              (No response.)
14              THE COURT:  Okay.  Now, this is a case in which the
15    defendant has been accused of illegal drug transactions.  So,
16    the question is, do any of you have any feelings about our
17    drug laws and the enforcement of the drug laws that are such
18    that you cannot fairly and impartially try this case?
19              Mr. Dufresne.
20              COURTROOM DEPUTY CLERK URSO:  No. 6.
21              THE COURT:  Anybody else?  Anybody in the jury box?
22    Anybody in the back?
23              (No response.)
24              THE COURT:  Do any of you have feelings about illegal
25    drugs in general and the use of illegal drugs that would
```

1    interfere with your being fair jurors?

2         Mr. Harrington.

3         COURTROOM DEPUTY CLERK URSO:  Yes, 31.

4         THE COURT:  We're making progress.

5         Now, the defendant, as you know, is African-American

6    and one or more of the witnesses will be either African-

7    American or Hispanic.  And the question is whether any of you

8    have feelings about that fact that would make it difficult for

9    you to be fair and impartial.  Please be honest.

10        Mr. Dube.

11        COURTROOM DEPUTY CLERK URSO:  Juror No.  --

12        THE COURT:  Anybody else?

13        MR. WORTMANN:  I'm sorry.  What number?

14        COURTROOM DEPUTY CLERK URSO:  36.

15        MR. WORTMANN:  Thank you.

16        THE COURT:  Now, let me explain to you a couple of

17   principles of law under which we operate.  One of those is

18   that you must judge -- one of the things that a jury

19   necessarily does in order to reach a verdict is after hearing

20   the witnesses give their testimony, you make a judgment as to

21   whether you believe that testimony in whole or in part or

22   whether you disbelieve it.

23        Now, it is also a rule of law that says that the

24   status of a person or the job that a person has should not in

25   any way decide whether you believe that person or not.  So, a

police officer, for example, is no more credible or less
credible than an ordinary mortal.

Is there anybody who has any difficulty not only
believing that, but living with it in the context of being a
juror?  That is, you must judge police officers in exactly the
same way that you would anybody else.

Now, another principle is that a defendant is
presumed to be innocent.  That is actually not entirely
correct, because what it really means is that a defendant who
has been accused of a crime is innocent.  He absolutely is
innocent until the government proves him guilty beyond a
reasonable doubt, and what that means as a corollary is that
because he is innocent, he does not have to prove his
innocence.  He does not have to take the stand and explain
anything.  He does not have to bring any witnesses to tell his
side of the story.  He can say to the government, You have
accused me.  Now you prove it.

Is there anybody who does not believe that you can
decide this case in accordance with this principle?

(No response.)

THE COURT:  Now, let me read you the names of the
witnesses who will appear in this case and ask you whether you
know any of them.  These are four police officers for the City
of Boston:

Sergeant Donald Keenan, Officer Richard Casallas,

1    Detective Greg Walsh and Officer Sean Flaherty.  Do any of you

2    know any of these people?

3              (No response.)

4              THE COURT:  And Claire Rimkus, who works at the

5    Massachusetts State Police Crime Lab in Sudbury,

6    Massachusetts.  This is a different outfit from what was in

7    the news for a while earlier.  Do any of you know Ms. Rimkus?

8              (No response.)

9              THE COURT:  Now, the schedule on which we will

10   operate is we will be here today until 1 o'clock.  We will

11   hopefully start promptly at 9:00 tomorrow and suspend at 1:00,

12   unless we finish before that.  And, again, on Wednesday we

13   will start at 9:00 and certainly finish by 1:00.  That,

14   hopefully, is the end of this trial.  That is, we will hear

15   evidence today, tomorrow and then probably the lawyers will

16   argue to you.  Maybe they will sum up the testimony on

17   Wednesday and then I will instruct you on the law and then on

18   Wednesday you will be deciding the case.

19             Does that schedule cause anyone serious

20   inconvenience?  Understanding that you're not likely to find a

21   case shorter than this and less inconvenient and more

22   convenient than this one.

23             (No response.)

24             THE COURT:  I think that's the first.

25             Finally, last question, is there any reason that I

1  have not specifically asked you about why any of you might

2  feel that you are not -- that you should not serve as jurors,

3  cannot serve as jurors?  I mean by that, for example, some

4  physical disability or language disability or something like

5  that.

6          (No response.)

7          THE COURT:  Okay.  Relax while I talk to those of you

8  who answered yes to any questions and then we will finish soon

9  thereafter the seating of the jury and we will proceed and

10  those of you who are not seated will go back to the jury

11  lounge.

12          So, may I see counsel and Mr. Spencer, please.

13     **SIDEBAR CONFERENCE:**

14          THE COURT:  Okay.  Mr. Holland, can we start with

15  you, please.

16          COURTROOM DEPUTY CLERK URSO:  What about juror --

17  excuse me.

18          THE COURT:  I'm sorry, we'll come to you next, Mr.

19  Hirschfeld.

20          COURTROOM DEPUTY CLERK URSO:  Juror No. 1.

21          (Juror approaches sidebar.)

22          THE COURT:  Good morning.

23          JUROR:  Good morning.

24          THE COURT:  You indicated that some member of your

25  family worked for law enforcement?

```
1              JUROR:  Yes.

2              THE COURT:  Who?

3              JUROR:  Brother-in-law is a state trooper.

4              THE COURT:  He is a state police officer now?

5              JUROR:  (Nods).

6              THE COURT:  Where is he located?

7              JUROR:  I think he's in Revere.

8              THE COURT:  That is, he works out of Revere?

9              JUROR:  Yes.

10             THE COURT:  Do you discuss with him what he does as a

11    police officer?

12             JUROR:  Yeah.  Sure.

13             THE COURT:  Has he dealt in drug cases?

14             JUROR:  Yeah, everything.

15             THE COURT:  So, you've talked to him about drug

16    cases?

17             JUROR:  Yes.

18             THE COURT:  Have you as a result of that gained any

19    kind of knowledge about how drug cases are prosecuted?

20             JUROR:  Well, I can see his point of view, yes.

21             THE COURT:  Does that mean -- can you be fair in this

22    case despite what you've learned from him?

23             JUROR:  I think so.

24             THE COURT:  Any questions, Mr. Butters?

25             MR. BUTTERS:  Could I ask his name?
```

```
 1              JUROR:  You know, I -- this is many years ago, but I
 2    was arrested once in the presence of a controlled substance
 3    and it was continued without a finding.  So --
 4              THE COURT:  How long ago was that?
 5              JUROR:  It was, you know, 30 years ago, probably.
 6              THE COURT:  Would that experience in any way affect
 7    your ability to try this case fairly?
 8              JUROR:  I don't think so.
 9              THE COURT:  Mr. Butters?
10              MR. BUTTERS:  I just wanted to know if he could share
11    the name of his brother-in-law, if that's okay.
12              JUROR:  Richard -- is that okay?
13              THE COURT:  Richard?
14              JUROR:  Richard Donovan.
15              THE COURT:  Okay.
16              MR. BUTTERS:  I don't know him.
17              THE COURT:  Any other questions?
18              MR. BUTTERS:  No, your Honor.
19              THE COURT:  Mr. Wortmann?
20              MR. WORTMANN:  None.  Thank you.
21              THE COURT:  Thank you very much.  You can go back to
22    your seat, please.
23              (Juror steps away from sidebar.)
24              THE COURT:  Now Mr. Holland, please.
25              COURTROOM DEPUTY CLERK URSO:  Juror No. 2.
```

```
1              (Juror approaches sidebar.)

2         THE COURT:  Good morning.

3         JUROR:  Good morning.

4         THE COURT:  You indicated that you had a terrible

5   experience with a police officer?

6         JUROR:  Senior in high school I was involved in an

7   incident.

8         THE COURT:  How long ago was that?

9         JUROR:  Four years ago.  Involved in an incident that

10  resulted in me being charged with assault --

11        THE COURT:  You were charged with --

12        JUROR:  Assault on a police officer.  It was complete

13  exaggeration, what happened, and as a result, the charges were

14  dropped, but I feel like that experience really caused a

15  significant amount of prejudice on my part.

16        THE COURT:  Does that mean that you could not fairly

17  judge the believability of another officer?

18        JUROR:  Of the charges that were brought against

19  somebody, perhaps.

20        THE COURT:  But you're not sure?

21        JUROR:  I think that it's always in the back of my

22  mind when it comes to believing the police report or what --

23  the charges brought against somebody just because of my

24  experience.

25        THE COURT:  Mr. Wortmann?
```

1          MR. WORTMANN:  I have no questions, your Honor.

2          THE COURT:  Any questions?

3          MR. BUTTERS:  No questions, your Honor.

4          THE COURT:  If you think that you cannot be fair in

5  this case, then I will excuse you.

6          JUROR:  I don't think I can be 100 percent fair.

7          THE COURT:  Okay.  I assume there's no objection to

8  accusing for cause.  Thank you.

9          (Juror steps away from sidebar.)

10          THE COURT:  Mr. Bouchie.

11          COURTROOM DEPUTY CLERK URSO:  Juror No. 5.

12          (Juror approaches sidebar.)

13          THE COURT:  Good morning.

14          JUROR:  Good morning.

15          THE COURT:  You indicated that someone in your family

16  had been convicted of a crime?

17          JUROR:  Yes.  Myself.

18          THE COURT:  I'm sorry?

19          JUROR:  Myself.  My brother also.

20          THE COURT:  Of what?

21          JUROR:  All misdemeanors.

22          THE COURT:  I'm sorry?

23          JUROR:  They're all misdemeanors.  15 years ago I was

24  charged with assault on a police officer.

25          THE COURT:  And nothing since then?

1           JUROR:  No.

2           THE COURT:  Would that experience make it in any way

3   difficult for you to be a fair juror in this case?

4           JUROR:  I don't think so.

5           THE COURT:  Are you sure?

6           JUROR:  Mm-hmm.

7           THE COURT:  Any questions, Mr. Butters?

8           MR. BUTTERS:  No, your Honor.

9           THE COURT:  Mr. Wortmann?

10          MR. WORTMANN:  Sir, I wonder, were you convicted of

11  assault?

12          JUROR:  I pleaded, but it's a conviction, yes.

13          MR. WORTMANN:  Let me ask you whether you think you

14  were treated fairly by the police.

15          JUROR:  No, I don't think I was.

16          MR. WORTMANN:  Have you had to list that over the

17  years on employment applications, things like that?

18          JUROR:  No.

19          MR. WORTMANN:  You don't think it would have any

20  impact on you?

21          JUROR:  On my life?

22          MR. WORTMANN:  On your service here.

23          JUROR:  No, I don't think so.

24          THE COURT:  Thank you.

25          (Juror steps away from sidebar.)

1            MR. WORTMANN:  Your Honor, I think assault on a

2      police officer is a felony.  I'm not -- I think he may --

3            MR. BUTTERS:  What I was going to say, it was

4      continued without a finding.

5            MR. WORTMANN:  That's why I asked him.

6            MR. BUTTERS:  He probably doesn't even know.  I mean,

7      lots of times it's broken down to simple assault and battery.

8            MR. WORTMANN:  But that's two-and-a-half-year, which

9      is a felony for purposes of the statute.

10            THE COURT:  I will not excuse him for cause.

11            MR. WORTMANN:  Your Honor, I'm suggesting he may not

12      be eligible to sit because of a conviction.

13            THE COURT:  But dismissed without a finding, whatever

14      it is, is not a conviction.

15            MR. WORTMANN:  I thought I heard him say -- did he

16      say it was dismissed without conviction?

17            THE COURT:  Yes.  I thought he said not guilty.

18            MR. WORTMANN:  Your Honor, misdemeanor in the state

19      court can still be punished by more than a year and,

20      therefore, qualifying as a felony.

21            THE COURT:  Really?

22            MR. WORTMANN:  I believe it is.

23            MR. BUTTERS:  I think we should -- maybe we should

24      ask him if it was continued without a finding.

25            MR. WORTMANN:  Yes, I think that's fine.  That makes

1    sense.

2            MR. BUTTERS:  Then there's no conviction.

3            MR. WORTMANN:  I think you should make clear to him

4    when he comes back there's a question of eligibility.

5            THE COURT:  Mr. Bouchie, can I talk to you again,

6    please?  I'm sorry.

7            (Juror approaches sidebar.)

8            THE COURT:  What was the outcome of your experience?

9            JUROR:  Penalty, you mean?

10           THE COURT:  I'm sorry?

11           JUROR:  What was the outcome?

12           THE COURT:  Yes.

13           JUROR:  It was pleaded out and I got probation.

14           MR. BUTTERS:  But that means it was continued without

15    a finding, right?

16           JUROR:  I'm not sure exactly, but I was told

17    basically the same thing, continued without a finding.

18           MR. WORTMANN:  They're only trying to figure out

19    whether you're eligible or not, whether you will be fair or

20    not.

21           Do you recall -- do you know whether or not there was

22    a conviction entered on your record?

23           JUROR:  I'm not sure.  I was under the understanding

24    it's automatically a conviction because I pled guilty to

25    sufficient facts.

```
1              MR. BUTTERS:  But, see, that's not a guilty plea in

2     the state.

3              JUROR:  Okay.

4              MR. BUTTERS:  That's a continued without a finding --

5              MR. WORTMANN:  No.

6              MR. BUTTERS:  -- or probation without a finding might

7     be --

8              MR. WORTMANN:  Probation --

9              MR. BUTTERS:  276 Section 78, or something.  I doubt

10    that -- well --

11             JUROR:  I'm not sure if it's considered a conviction.

12             MR. BUTTERS:  I don't think you do based on what

13    you're saying.

14             JUROR:  But I thought that's what it meant.

15             MR. WORTMANN:  Conviction, but you're not sure?

16             JUROR:  Not sure.

17             MR. WORTMANN:  Okay.  Thanks.

18             THE COURT:  Thank you.

19             (Juror steps away from sidebar.)

20             MR. WORTMANN:  I don't know what to do.

21             THE COURT:  I honestly don't know the answer.

22             MR. WORTMANN:  The only way we could find out, you

23    could run his BOP.

24             THE COURT:  What do you want me to do?

25             MR. WORTMANN:  I think we should probably get a date
```

1    of birth and run his BOP.  It will take five minutes.

2            THE COURT:  I'll write a question mark at the moment

3    and go on.  Mr. Dufresne.

4            COURTROOM DEPUTY CLERK URSO:  Juror No. 6.

5            (Juror approaches sidebar.)

6            THE COURT:  Good morning.

7            JUROR:  Good morning.

8            THE COURT:  You indicated that you had some feelings

9    about drug laws?

10           JUROR:  Yeah.  Just basically the crime doesn't

11   really fit the bill sometimes.  That is, drug offenders --

12   non-violent drug offenders can get up to ten years or more and

13   rapists and child molesters can get out in two and a half

14   years.  Makes no sense to me whatsoever.  People's lives are

15   ruined, but someone trying to, you know, protect their family,

16   make some money for their family, gets 15 years and their

17   whole life is gone and non-violent drug offenders fill up our

18   jails.

19           THE COURT:  I'm sorry?

20           MR. WORTMANN:  I thought the whole court can hear.

21           THE COURT:  Does anybody have any questions?

22           MR. BUTTERS:  No.

23           THE COURT:  I assume that means that you don't think

24   that you could fairly judge this case?

25           JUROR:  Not at all.

1          THE COURT:  I will excuse you and please go back to

2    the jury lounge.

3          (Juror steps away from sidebar.)

4          THE COURT:  Lisa points out the question on the jury

5    questionnaire asks them to --

6          MR. WORTMANN:  Your Honor, as long as Mr. Butters is

7    okay with holding him --

8          MR. BUTTERS:  Yes, I think Mr. Spencer and I agree

9    that he can remain on and not -- we don't object if he's --

10         MR. WORTMANN:  I think we'll all make the assumption

11   that had there been a conviction on his record, he would have

12   been screened out.

13         MR. BUTTERS:  Right.

14         THE COURT:  Ms. Gath.

15         COURTROOM DEPUTY CLERK URSO:  Juror No. 8.

16         (Juror approaches sidebar.)

17         THE COURT:  Good morning.

18         JUROR:  Good morning.

19         THE COURT:  You said that both -- you had some law

20   enforcement relationship and also --

21         JUROR:  My nephew, who is a state trooper.

22         THE COURT:  You have --

23         JUROR:  A nephew.

24         THE COURT:  But you also indicated some bad

25   experience with --

1        JUROR:  There were a couple of incidents involving my

2   kids that the police officers involved I believe lied on the

3   police report, and there was another incident where my son was

4   with a friend on four wheelers where they were chased down and

5   one of the cops pulled a gun on his friend.

6        THE COURT:  With respect to the first incident, what

7   was the end result?

8        JUROR:  The end result as far as?

9        THE COURT:  Your kids were concerned.

10        JUROR:  Yeah.  Nothing happened.  They weren't

11   convicted of anything and neither was the cop involved.

12        THE COURT:  And what town did this occur?

13        JUROR:  Tewksbury, where I live.

14        THE COURT:  Would that make it in any way difficult

15   for you to decide fairly and impartially the testimony of --

16        JUROR:  No, it would not.

17        THE COURT:  Mr. Butters, any questions?

18        MR. BUTTERS:  No, your Honor.

19        THE COURT:  Mr. Wortmann?

20        MR. WORTMANN:  How long ago was this, ma'am?

21        JUROR:  Let's see.  My son is 34 now.  So, he was 16.

22        MR. WORTMANN:  Okay.

23        JUROR:  Long time ago.  I was just answering

24   honestly.

25        MR. WORTMANN:  We appreciate it.

```
 1              You think that's just in the past and it's not going
 2     to affect you?
 3              JUROR:  Mm-hmm.
 4              MR. WORTMANN:  Thanks.
 5              THE COURT:  Thank you.
 6              (Juror steps away from sidebar.)
 7              THE COURT:  Mr. McGaffigan.
 8              COURTROOM DEPUTY CLERK URSO:  Juror No. 11.
 9              (Juror approaches sidebar.)
10              THE COURT:  Good morning.
11              JUROR:  Good morning, your Honor.
12              THE COURT:  Now, you indicated both that you had some
13     law enforcement relatives --
14              JUROR:  Yes, I have.
15              THE COURT:  -- and also --
16              JUROR:  My father for 37 years was a police officer
17     in the City of Medford and I've got a brother that's at
18     Harvard University.
19              THE COURT:  He's a Harvard police officer?
20              JUROR:  Yeah, for the University of Harvard.
21              THE COURT:  Is your father still alive?
22              JUROR:  Thankfully, yes.
23              THE COURT:  Do you talk to him about his experience
24     as a police officer?
25              JUROR:  He told me the stories growing up, one of
```

1   seven kids.  We heard him, good and bad.

2            THE COURT:  Would that relationship and what you have

3   learned from your father and your brother make it in any way

4   difficult for you to be a fair juror?

5            JUROR:  I believed the police officers growing up.

6   So, I do have a little higher standard on that end just

7   because he's my father, on that end.

8            THE COURT:  Could you disbelieve a police officer?

9            JUROR:  Oh, yeah.  There's a few bad ones out there.

10  There's a few crooked ones out there.  I've seen that over the

11  years.

12           THE COURT:  Now, you also indicated that someone in

13  your family had been convicted of a crime?

14           JUROR:  Yes, my brother-in-law.  He was -- I think it

15  was last -- it was due to drugs being involved in it.

16  Larceny.  I don't know if he served time.

17           THE COURT:  How long ago was that?

18           JUROR:  Probably three to five years.  He served up

19  in New Hampshire.  I don't think he served any time in

20  Massachusetts, but was on probation because Mass didn't want

21  to deal with him.  They made New Hampshire.

22           THE COURT:  Is he still in trouble?

23           JUROR:  No.  He's on probation.

24           THE COURT:  Is he still part of the family?

25           JUROR:  It wasn't easy.  Those dinners are tough,

1    but --

2            THE COURT:  Would that -- your knowledge of that and

3    the relationship to the defendant in that case make it

4    difficult for you to be a fair juror?

5            JUROR:  No, I don't think so.  The facts are the

6    facts.

7            THE COURT:  Did he plead or did he go to trial?

8            JUROR:  He went to trial.

9            THE COURT:  Any questions, Mr. Wortmann?

10           MR. WORTMANN:  Do you think he was treated fairly by

11   the system?

12           JUROR:  Oh, yes, I do.  He was guilty, plain and

13   simple.

14           THE COURT:  Mr. Butters?

15           MR. BUTTERS:  You said that there was a -- it was

16   because he had a drug problem?

17           JUROR:  Yeah.  He was going to Home Depot, stealing

18   the cooper wire and selling it for money to feed his

19   addiction.

20           MR. BUTTERS:  So, does that -- would that bother you

21   in this case, the fact that we're talking about crack cocaine

22   and street dealing?

23           JUROR:  Depending.  I have to see what the

24   evidence -- I mean, like I said, he rightfully went and did

25   it.  I mean, everything - the evidence -- they presented the

```
 1    case.  I mean, I'm sure he did it.  You could deny what you

 2    want, but evidence that the attorney pulled out showed that he

 3    did it.  So, I mean -- do I think he --

 4              MR. BUTTERS:  They had a film?

 5              JUROR:  Well, it was closed circuit TV showing him

 6    going in and taking out the cooper, and he alleged that that's

 7    why he was doing it, and I was living around and I saw what

 8    happened.  So...

 9              THE COURT:  Do you feel secure that you can be a fair

10    juror in this case?

11              JUROR:  Yeah, I believe I can.

12              THE COURT:  Thank you.

13              (Juror steps away from sidebar.)

14              THE COURT:  Mr. Goncalves.

15              COURTROOM DEPUTY CLERK URSO:  12, Juror No. 12.

16              (Juror approaches sidebar.)

17              THE COURT:  Good morning.

18              JUROR:  Good morning.

19              THE COURT:  You have some law enforcement?

20              JUROR:  I'm a correctional officer.

21              THE COURT:  I'm sorry?

22              JUROR:  I'm a correctional officer.

23              THE COURT:  Where?

24              JUROR:  Bristol County Sheriff's Department.

25              THE COURT:  That's not in jail or is it jail?
```

1           JUROR:  It's in a jail and booking area.  We take in

2    prisoners off the street from police departments.

3           THE COURT:  Do you think you could be a fair juror in

4    a criminal case?

5           JUROR:  It's a revolving door, same guys coming in

6    and out.

7           THE COURT:  What does that mean about fairness?

8           JUROR:  It's tough.  It's tough to judge.

9           THE COURT:  I mean, can you hear the evidence and not

10   think of Mr. Spencer as coming in and out?

11          JUROR:  I hear them talk all day and how everybody is

12   innocent.  In doing my rounds, they're all talking about how

13   when they go back on the street, they're going to do it again.

14   It's the same stuff over and over again.  Like I said, it's a

15   revolving door.  Frequent flier miles when they come in.

16          THE COURT:  What I'm trying to find out is how that

17   will relate to your perception of what the evidence is in this

18   case and whether Mr. Spencer has been proven guilty.

19          JUROR:  I know I'm not there to judge.  I'm there for

20   care, custody and control, but it's stuff -- I don't know.

21          THE COURT:  Well, you are here to judge in a sense.

22   You're here to judge the evidence.  And the question is

23   whether you can do that fairly, leaving behind the revolving

24   door, just hearing what's here.

25          JUROR:  I think I would have a tough time.

```
 1              THE COURT:  Okay.  Counsel agree that we should
 2    excuse you from this case, but we'll find another one for you.
 3    So, please go down to the jury lounge.
 4              (Juror steps away from sidebar.)
 5              THE COURT:  Ms. Kirk.
 6              COURTROOM DEPUTY CLERK URSO:  14.
 7              (Juror approaches sidebar.)
 8              THE COURT:  Good morning.
 9              JUROR:  Good morning.
10              THE COURT:  How are you?
11              JUROR:  I'm fine.  Thank you.
12              THE COURT:  You indicated that you had somebody in
13    your family who had been convicted of a crime?
14              JUROR:  My son, about 20 years ago in Maine.
15              THE COURT:  What did he do?
16              JUROR:  Marijuana.
17              THE COURT:  Did he have to go to jail?
18              JUROR:  Nine months.
19              THE COURT:  How has he been since then?
20              JUROR:  He's been fine.
21              THE COURT:  Would that experience make it in any way
22    difficult for you to decide whether to convict Mr. Spencer or
23    not?
24              JUROR:  No.
25              THE COURT:  No problem?
```

```
1              JUROR:  No problem.

2              THE COURT:  Any questions, Mr. Butters?

3              MR. BUTTERS:  Do you think he was treated fairly?

4              JUROR:  Yes.  He was in minimum security.

5              MR. BUTTERS:  You think the police were on the up and

6    up with him?

7              JUROR:  Yes.

8              MR. BUTTERS:  Do you think the police are usually on

9    the up and up?

10             JUROR:  Yes, because he knows a lot of the policemen

11   up there, but he's been really good.  He doesn't -- he used to

12   drink, too, but he doesn't do anything like that anymore.

13             MR. BUTTERS:  So, you think you probably believe most

14   police officers?

15             JUROR:  Yes, I do.

16             MR. WORTMANN:  Would you be able to consider a police

17   officer's testimony the same as anybody else's?

18             JUROR:  Yes.

19             MR. WORTMANN:  Take it for whatever it's worth.  If

20   it's believable, if it's not believable, however it comes out?

21             JUROR:  Yes.

22             THE COURT:  Thank you very much.  Please return to

23   your seat.

24             (Juror steps away from sidebar.)

25             THE COURT:  Ms. Bagley.
```

1          COURTROOM DEPUTY CLERK URSO:  Juror No. 20.

2          (Juror approaches sidebar.)

3          THE COURT:  Good morning.

4          JUROR:  Hi.

5          THE COURT:  I think you raised your hand in response

6     to a question.

7          JUROR:  I did.  My stepson was arrested and convicted

8     of drug use or breaking and entering.  I'm not really sure of

9     the details.  It was after my husband and I were separated and

10    divorced shortly after.  So -- and I have custody of my kids.

11    So, it was -- I found out about it when five detectives came

12    to my door looking for him and he's in -- I think he's staying

13    at the Salvation Army in Cambridge.  So, he's been in and out

14    a couple of times.

15         THE COURT:  Would that experience make it in any way

16    difficult for you to be fair in this case?

17         JUROR:  I don't believe so, no.

18         THE COURT:  Mr. Wortmann, any questions?

19         MR. WORTMANN:  Do you think he was treated fairly?

20         JUROR:  I don't really know.  I wasn't there during

21    any of it.  I only know what happened.  My ex-husband knows

22    when he came out of jail, but I think -- I believe that he was.

23         MR. WORTMANN:  And do you think the drug laws make

24    sense?

25         JUROR:  I think they try the best they can to help

1    people.

2              MR. WORTMANN:  Okay.  Thank you.

3              THE COURT:  Mr. Butters, any questions?

4              MR. BUTTERS:  I just wondered, do you think -- this

5    is a crack cocaine case.  A small amount of crack cocaine was

6    sold.  Do you think you would have a problem judging --

7              JUROR:  No, I don't have any experience with any of

8    that.  So, no.

9              MR. BUTTERS:  Me neither.

10             THE COURT:  Thank you.

11             (Juror steps away from sidebar.)

12             THE COURT:  Mr. Geary.

13             (Juror approaches sidebar.)

14             COURTROOM DEPUTY CLERK URSO:  24, I didn't have him.

15             THE COURT:  Good morning.  You did raise your hand?

16             JUROR:  Yes.  That was the question on if I have ever

17   been arrested.  I've been arrested.

18             THE COURT:  You or a member of your family, arrested

19   and convicted?

20             JUROR:  Yes, I have been 40 years ago.

21             THE COURT:  What was the charge?

22             JUROR:  Just disturbance, and stuff.  My son has been

23   in jail for -- he's been arrested several times for fighting,

24   fighting with policemen, things of that nature.

25             THE COURT:  Has he ended up in jail?

1           JUROR:  He's out now living with me.

2           THE COURT:  Do you think that you will be able to

3    fairly judge the evidence in this case given your experience

4    with yourself and your son?

5           JUROR:  Mm-hmm.

6           THE COURT:  Yes?

7           JUROR:  Yeah.

8           THE COURT:  The evidence, as you know from the list

9    of witnesses, will be presented largely by police officers.

10   And do you think you can judge that fairly?

11          JUROR:  Yeah, I guess.  I have friends that are

12   police officers now.  I don't know.

13          MR. BUTTERS:  You don't have to be ashamed.

14          JUROR:  I'm not, not at all.

15          THE COURT:  Any questions, Mr. Butters?

16          MR. BUTTERS:  No, your Honor.

17          THE COURT:  Mr. Wortmann?

18          MR. WORTMANN:  Do you think because of your work at

19   the post office, you'll be able to fairly judge?  Because the

20   Federal Government is involved.  Would that affect you in any

21   way?

22          JUROR:  I mean, no.  Because I hate the post office?

23          MR. WORTMANN:  Because you hate the post office,

24   because you love your job, whatever it is.

25          JUROR:  No.  No.

```
1              THE COURT:  Thank you very much.

2              (Juror steps away from sidebar.)

3              THE COURT:  Mr. Chouinard.

4              COURTROOM DEPUTY CLERK URSO:  Juror No. 26.

5              (Juror approaches sidebar.)

6              THE COURT:  How do you pronounce your name?

7              JUROR:  Chouinard.

8              THE COURT:  Okay.

9              JUROR:  Good morning, your Honor.

10             THE COURT:  You had indicated some relationship with

11   law enforcement types?

12             JUROR:  My wife works for the Essex County DA's

13   office.

14             THE COURT:  In what capacity?

15             JUROR:  Receptionist in the court system.

16             THE COURT:  Would that relationship make it difficult

17   for you to be fair?

18             JUROR:  No, it wouldn't.

19             THE COURT:  No problem?

20             JUROR:  No problem.

21             THE COURT:  Any questions, Mr. Wortmann?

22             MR. WORTMANN:  No, thank you.

23             THE COURT:  Mr. Butters?

24             MR. BUTTERS:  No, your Honor.

25             THE COURT:  Thank you very much.
```

```
 1              (Juror steps away from sidebar.)

 2              THE COURT:  Mr. Maldonado.

 3              COURTROOM DEPUTY CLERK URSO:  Juror No. 28.

 4              (Juror approaches sidebar.)

 5              THE COURT:  Good morning.

 6              JUROR:  Good.

 7              THE COURT:  You told us that you were or somebody in

 8    your family had been convicted of a crime.

 9              JUROR:  Father, brother, cousins.  My father and my

10    little brother, yeah.

11              THE COURT:  I'm sorry.  Your father has been?

12              JUROR:  Yeah.  My brother.

13              THE COURT:  And your little brother?

14              JUROR:  Younger brother.

15              THE COURT:  And what was your father convicted of?

16              JUROR:  For drugs.

17              THE COURT:  And your brother?

18              JUROR:  Violated parole.  He had a shotgun.

19              THE COURT:  What got him probation in the first

20    place?

21              JUROR:  He robbed somebody, a few friends, something

22    like that.

23              THE COURT:  How long ago was all this?

24              JUROR:  Probably three, four, five years ago now.

25              THE COURT:  Would that experience with your family
```

```
 1    make it in any way difficult for you to be a fair juror?

 2            JUROR:  Nope.

 3            MR. WORTMANN:  Were all these incidents with the

 4    Boston Police Department?

 5            JUROR:  Yeah.

 6            MR. WORTMANN:  You also said you had cousins who had

 7    been --

 8            JUROR:  Yes.

 9            MR. WORTMANN:  What were -- what was their problem?

10            JUROR:  That was like years back, too.  Drugs and

11    guns, basically.

12            MR. WORTMANN:  Okay.  So, any problems -- any

13    concerns about enforcing the drug laws?

14            JUROR:  No.

15            MR. WORTMANN:  You think they're okay?

16            JUROR:  Yeah.

17            MR. WORTMANN:  Okay.

18            THE COURT:  Mr. Butters, any questions?

19            MR. BUTTERS:  No, your Honor.

20            THE COURT:  Thank you very much.

21            (Juror steps away from sidebar.)

22            THE COURT:  Nobody wants him excused for cause?

23            MR. WORTMANN:  Your Honor, I am going to ask you to

24    excuse him for cause just because of the number of --

25            THE COURT:  I'll put a question mark.
```

1           Mr. Harrington.

2           (Juror approaches sidebar.)

3           THE COURT:  Good morning.

4           JUROR:  Good morning.

5           THE COURT:  Mr. Harrington, you indicated both that

6     somebody in your family had been convicted of a crime and,

7     also, you had feelings about the drug laws.  Tell me about the

8     second piece.

9           JUROR:  Well, both my brothers were hooked on heroin

10    and one of them was shot and killed when he was buying heroin.

11    It was a long time ago, and they were both in jail.  Just -- I

12    think I could be okay, but I'm not sure.

13          THE COURT:  The second brother, what happened to the

14    second brother?

15          JUROR:  I had a younger brother that was on heroin,

16    too, and he was arrested and sent to jail for possession of

17    heroin.

18          THE COURT:  How long ago was that?

19          JUROR:  Long time ago.

20          THE COURT:  So, he's been straight?

21          JUROR:  They're both deceased.

22          THE COURT:  So, he died also, but not --

23          JUROR:  His was a car accident.

24          THE COURT:  Unrelated?

25          JUROR:  Unrelated to drugs, yes.

```
 1              THE COURT:  You also indicated that you had feelings
 2     about the drug laws?
 3              JUROR:  Well, I don't know if I have feelings about
 4     the law itself.  I just have tough feelings to do with drugs.
 5              THE COURT:  Do you think you could sit on this case?
 6              JUROR:  I guess I could.  I don't know what kind of
 7     feelings it would bring up, but I'm not really sure.
 8              THE COURT:  If you would like to be excused, you
 9     could be excused.
10              JUROR:  I do want to be excused.  I think it would
11     make it -- would be simpler, I think.
12              THE COURT:  No objection?
13              MR. WORTMANN:  No objection.
14              THE COURT:  Please go back to the jury lounge.  Thank
15     you very much.
16              (Juror steps away from sidebar.)
17              THE COURT:  Ms. Orben.
18              COURTROOM DEPUTY CLERK URSO:  Juror No. 35.
19              (Juror approaches sidebar.)
20              THE COURT:  Good morning.
21              JUROR:  Good morning.
22              THE COURT:  I think you indicated that somebody in
23     your family had been convicted of a crime?
24              JUROR:  Mm-hmm.  Back in the 70s my husband was
25     convicted of embezzlement.  He didn't serve any time.  It was
```

1    compensation.  There was no jury trial.

2           THE COURT:  Would that experience -- is he still

3    alive?

4           JUROR:  He is.

5           THE COURT:  You're still together?

6           JUROR:  We are.  He's a good man who made a stupid

7    mistake, but I have another more recent.  My adult daughter in

8    Maine about five years ago had an OUI, served a little bit of

9    time, but she has a pending case up in Maine again for another

10   OUI.

11          THE COURT:  Would these experiences of your husband

12   and your children make it in any way difficult for you to be a

13   fair juror in this case?

14          JUROR:  I don't think so.

15          THE COURT:  Mr. Butters, any questions?

16          MR. BUTTERS:  Did anybody go to trial?  Did your

17   husband go to trial?

18          JUROR:  No.  He pled guilty.

19          MR. BUTTERS:  You think you could be fair with the

20   police and judge them --

21          JUROR:  I think I could, yeah, I do.  I mean -- like

22   I said, he was a good man.  He did a stupid mistake.  He

23   admitted it and it's in the past.  We're still together 43

24   years later.

25          MR. WORTMANN:  43 years later.

1          Ma'am, if I could ask you, do you think both your

2     husband and your daughter were treated fairly by the system

3     and fairly by the police?

4          JUROR:  Yes, I do.

5          MR. BUTTERS:  Can I ask?

6          THE COURT:  Of course.

7          MR. BUTTERS:  Do you think if somebody gets arrested,

8     they probably did it?

9          JUROR:  No.

10         MR. BUTTERS:  Okay.

11         THE COURT:  Thank you.

12         MR. BUTTERS:  Stupid question.

13         JUROR:  Stupid question.

14         MR. BUTTERS:  Thank you.

15         (Juror steps away from sidebar.)

16         THE COURT:  Mr. Dube.

17         COURTROOM DEPUTY CLERK URSO:  Juror No. 36.

18         (Juror approaches sidebar.)

19         THE COURT:  Good morning.

20         JUROR:  Good morning.

21         THE COURT:  You answered yes to a question about

22     race.  Can you explain it?

23         JUROR:  I'm hate everybody, all minorities.  Why I

24     don't know.  It's just the way I feel.

25         THE COURT:  Does it have to do with wanting not to be

1   a juror?

2          JUROR:  Yes, it is.  How can I be -- I hate them all.

3   If they're convicted, they should be thrown in jail for the

4   rest of their life.  I've always felt that way.

5          THE COURT:  I will excuse you from further service in

6   this courtroom, but there is another courtroom and another

7   Judge that will probably need your services.

8          (Juror steps away from sidebar.)

9          THE COURT:  Mr. Strauss.

10          COURTROOM DEPUTY CLERK URSO:  37.

11          (Juror approaches sidebar.)

12          THE COURT:  Good morning.  How are you?

13          JUROR:  Good morning, Judge.  I'm well.  Thank you.

14          THE COURT:  You indicated both a relationship with

15   law enforcement and crime?

16          JUROR:  Yes.  The crime first.  My son when he was a

17   kid was arrested for transporting alcohol.  That was 20 years

18   ago.  And the other --

19          THE COURT:  Did anything happen other than the

20   arrest?

21          JUROR:  Continued without a finding.  There was a

22   court appearance and a good talking to.

23          THE COURT:  By you?

24          JUROR:  And by everybody that came in contact with

25   him.

1          THE COURT:  And he actually listened?

2          JUROR:  Well, maybe.  And I'm a retired federal

3   investigator.

4          THE COURT:  For what agency?

5          JUROR:  Office of Personnel Management.  And before

6   that the defense department.

7          THE COURT:  Would your experience as a retired

8   investigator make it in any way difficult for you to be a fair

9   juror?

10          JUROR:  I don't know.

11          THE COURT:  Why is that?

12          JUROR:  Having seen both sides of testimony and

13   representations, I just don't know.

14          THE COURT:  I would think that you would be in a

15   perfect position to know with your experience having seen both

16   sides.

17          JUROR:  Probably could.

18          THE COURT:  Mr. Butters, any questions?

19          MR. BUTTERS:  But are you hesitant because of your

20   experience that a lot of people lie?

21          JUROR:  That's certainly part of it.

22          MR. BUTTERS:  What's the other part?

23          JUROR:  I just -- because of that, mainly I just

24   don't know that I could give a fair interpretation of

25   testimony.

```
1            THE COURT:  Because you would act as investigator?

2            JUROR:  Yeah.

3            MR. BUTTERS:  Well --

4            JUROR:  It's a hard habit to break.

5            MR. BUTTERS:  Skeptical?

6            JUROR:  Yeah.

7            MR. BUTTERS:  Like St. Thomas.

8            Let me -- these are all going to be police officers

9    who testify in this case.  Would you be more inclined to

10   believe them?

11           JUROR:  Not necessarily.  I don't think that would

12   enter into it, no.

13           MR. WORTMANN:  So, it's really talking about just

14   your experiences, analyzing facts and assessing credibility?

15           JUROR:  Yeah.

16           MR. WORTMANN:  And you do that honestly?

17           JUROR:  Yes.

18           MR. WORTMANN:  And try to be as fair as you can?

19           JUROR:  Yes.

20           THE COURT:  Okay.  Thank you.

21           JUROR:  Thank you.

22           (Juror steps away from sidebar.)

23           THE COURT:  Mr. Bachand.

24           (Juror approaches sidebar.)

25           THE COURT:  Good morning.
```

```
 1              JUROR:  How you doing?

 2              THE COURT:  You told me that you or somebody in your

 3     family had been convicted of a crime in the past?

 4              JUROR:  Yeah.  Coke and crack, my brother-in-laws.

 5              THE COURT:  I'm sorry?

 6              JUROR:  My brother-in-laws.  I --

 7              THE COURT:  Two of them?

 8              JUROR:  Two of them.

 9              THE COURT:  What were they convicted of?

10              JUROR:  One was coke and one was crack.

11              THE COURT:  Would that experience make it in any way

12     difficult for you to be fair in this case?

13              JUROR:  It could.

14              THE COURT:  Any objection to excusing Mr. Bachand?

15              MR. WORTMANN:  No.

16              THE COURT:  Please go back to the jury lounge.

17              (Juror steps away from sidebar.)

18              MR. WORTMANN:  Your Honor, one issue I would like you

19     to revisit, Mr. Maldonado.

20              THE COURT:  Maldonado?

21              MR. WORTMANN:  Yes.

22              THE COURT:  I will excuse him.  You don't object, do

23     you?

24              MR. BUTTERS:  I like the guy.  I don't object.

25              THE COURT:  Among other things, he's difficult to
```

1    understand and I think he's not all there.

2            MR. BUTTERS:  I agree.  28?

3            COURTROOM DEPUTY CLERK URSO:  28.  He's for cause.

4    Where is he?  Can I let him go now?

5            THE COURT:  Now, we need 12, plus two, 14.  Plus ten,

6    24.  Plus six.  30 jurors.  And we have one, two, three, four,

7    five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16,

8    17, 18, 19, 20, 21, 22, three, four, five, six, seven, eight,

9    nine, ten.  So, going down to Juror No. 35, we have 30 jurors.

10   So, we have some left over beyond that.

11           MR. WORTMANN:  We need 36, don't we, your Honor?  We

12   need --

13           THE COURT:  14, plus ten is 24, plus six.

14           MR. WORTMANN:  Is 30, plus two for the challenges on

15   the alternates.

16           THE COURT:  That's right.

17           MR. WORTMANN:  32.

18           THE COURT:  32.  So, it's -- we go to 39.  We have

19   one extra juror and that's it.

20           MR. WORTMANN:  Good.

21           THE COURT:  If everybody uses all challenges.  Are

22   you ready to exercise challenges?

23           MR. WORTMANN:  Could we have a few minutes?

24           THE COURT:  You can have a few.  Jim is looking for

25   the jurors.

```
 1              MR. BUTTERS:  May I ask you something?

 2              So, are we starting with these people?

 3              THE COURT:  You can challenge anybody you want,

 4    except I don't think it makes much sense to challenge No. 40

 5    because we won't reach 40 in the worst case scenario.

 6              COURTROOM DEPUTY CLERK URSO:  It's the whole group,

 7    not just in the box.

 8              MR. BUTTERS:  I got you.

 9              (Pause.)

10              MR. WORTMANN:  Your Honor, I wonder -- before we do

11    this, I notice that we have one juror who is from Martha's

12    Vineyard.  I wonder if that transportation is going to create

13    a problem.

14              THE COURT:  She didn't ask to be excused.

15              MR. WORTMANN:  Well --

16              THE COURT:  Maybe she has a flat in Boston.

17              MR. WORTMANN:  Perhaps, if she's taking a ferry every

18    day --

19              THE COURT:  Which juror is it?

20              MR. WORTMANN:  Juror 29, your Honor.

21              THE COURT:  We can always excuse her.

22              COURTROOM DEPUTY CLERK URSO:  If she asks for a hotel

23    room, they do provide a hotel room for two days.

24              THE COURT:  She can do a hotel?

25              COURTROOM DEPUTY CLERK URSO:  They --
```

1          MR. WORTMANN:  Maybe we should just, you know, try to
2     find out.
3          THE COURT:  If she's chosen, then we'll --
4          MR. WORTMANN:  Okay.
5          THE COURT:  In the meantime, one for Mr. Wortmann.
6          MR. BUTTERS:  Before we do that, my client would like
7     to object to the make-up of the jury because there are no
8     black people and there's one Hispanic person.  This looks like
9     my high school graduating class in Iowa.
10         THE COURT:  Your objection is noted.
11         The last time we impaneled, we had six African-
12    Americans and a small jury and I don't know how --
13         MR. BUTTERS:  I know.  I know.
14         THE COURT:  It's very strange.  Okay.
15         MR. WORTMANN:  I challenge Juror No. 4, Joshua Roth.
16         THE COURT:  Two for you, Mr. Butters.
17         MR. BUTTERS:  I would challenge No. 1 and No. 14.
18         THE COURT:  And 14?
19         MR. BUTTERS:  Yes.
20         THE COURT:  One for you, Mr. Butters -- Mr. Wortmann.
21         MR. WORTMANN:  Juror 17, your Honor.
22         THE COURT:  Mr. Butters.
23         MR. BUTTERS:  Juror No. 11 and Juror No. 26.
24         THE COURT:  I'm sorry?
25         MR. BUTTERS:  26.

```
1              THE COURT:  Mr. Butters, you did say 26, right?

2              MR. BUTTERS:  26.

3              THE COURT:  Okay.

4              MR. WORTMANN:  Juror 23, your Honor.

5              THE COURT:  Mr. Butters.

6              MR. BUTTERS:  Did you say 17?

7              MR. WORTMANN:  I did.

8              MR. BUTTERS:  No. 25.

9              THE COURT:  25 you challenged the last time around.

10             MR. BUTTERS:  That was 26.

11             THE COURT:  You challenged 26 before?

12             COURTROOM DEPUTY CLERK URSO:  Yes.  Now 25.  And what

13      else did you say?

14             MR. BUTTERS:  That's all I said so far.

15             COURTROOM DEPUTY CLERK URSO:  I can barely hear you.

16             (Discussion off the record.)

17             MR. BUTTERS:  We're content.

18             MR. WORTMANN:  Your Honor, Juror 24.

19             THE COURT:  Anybody else?  You got two more.

20             MR. WORTMANN:  Juror 29, your Honor.  And, your

21      Honor, I would like to challenge Juror 27.  I'm not sure if

22      he's the Hispanic male.  If he is, I'll say it's because of

23      the proximity of his address to the place where the offense

24      took place, which is on Washington Street in Boston.

25             THE COURT:  He was at work.  The objection is
```

1    overruled.  If you want to challenge him, you go right ahead.

2         MR. WORTMANN:  Yes.

3         THE COURT:  So, 27.

4         Now we start the next one with Mr. Butters.  You have

5    one challenge for any alternate, but let me go through first

6    to see what we have here.

7         Juror No. 3 on the list is one.  Five on the list is

8    two.  Seven on the list is three.  Eight, four.  Nine, five.

9    Ten, six.  13, seven.  15, eight.  16, nine.  18, ten.  19,

10   11.  20, 12.  So, the next two jurors, that is No. 21, 22, 30

11   and 32 are the likely alternates.  That is, anybody beyond 32

12   is not likely to be chosen.

13        MR. BUTTERS:  You said 20, 22?

14        THE COURT:  I finished --

15        COURTROOM DEPUTY CLERK URSO:  20, 21.

16        THE COURT:  The next four that would be eligible are

17   21, 22, 30 and 32.

18        MR. BUTTERS:  I'm content.

19        MR. WORTMANN:  I'm content, your Honor.

20        THE COURT:  Okay.  So, Alternate 1 will be No. 21 and

21   Alternate 2 will be 22, and the rest will be excused.  Thank

22   you very much.

23        MR. WORTMANN:  Thank you, your Honor.

24        MR. BUTTERS:  Thank you.

25        THE COURT:  We'll take a brief recess when you finish

1     this.

2              (End of sidebar conference.)

3              THE COURT:  Members of the jury, we have, as usual,

4     tried to do this as quickly as possible to inconvenience you

5     as little as possible.  These are the jurors who will serve as

6     the jurors in this trial:

7              Mr. Ostrov, you will be Juror No. 1.  Mr. Bouchie,

8     Juror No. 2.  Ms. Ma, No. 3.  Ms. Gath, No. 4.  Mr. Evans, No.

9     5.  Mr. Dunn will be Juror No. 6.  Mr. Lombardi, No. 7.  Ms.

10    Libby, No. 8.  Ms. Bertolino, No. 9.  Ms. Danilchuk, No. 10.

11    Ms. Gately, No. 11.  Ms. Bagley, No. 12.  And Mr. Oliveira,

12    No. 13.  And Mr. Tolleson, No. 14.

13             Those whose names I did not call are excused from

14    further service in this courtroom.  I thank you very much for

15    your patience.  Do not leave without getting a ticket from Ms.

16    Urso and, please, all of you now will get your ticket.  Just

17    wait for a moment to get your ticket and go back to the second

18    floor to the jury lounge.  We have another trial waiting for

19    you.

20             While Ms. Urso is doing that, Mr. Ostrov, would you

21    kindly move down to the first seat and the rest of you on the

22    first row follow and the rest of you -- those of you in the

23    third row take the seat that you're -- okay.

24             (Discussion off the record.)

25             THE COURT:  I think what we will do is take a brief

1    recess.  Ms. Urso will show you where the jury room is and

2    hopefully we can start in five or ten minutes.  There are

3    bathrooms up there.  I think there's even some coffee.  So,

4    just a quick sip and we'll get going in about ten minutes.

5              COURTROOM DEPUTY CLERK URSO:  All rise, please.

6              (Jury excused.)

7      THE FOLLOWING TAKES PLACE OUTSIDE OF THE PRESENCE OF THE JURY:

8              THE COURT:  How long will you be?

9              MR. WORTMANN:  20 minutes, your Honor.

10             THE COURT:  Are you opening now or later?

11             MR. BUTTERS:  Now.

12             THE COURT:  How long will you be?

13             MR. BUTTERS:  Ten.

14             THE COURT:  Okay.  We'll all take a recess.

15             (Recess taken.)

16             (Jury enters courtroom.)

17             THE COURT:  You may be seated and the jurors should

18   kindly stand up for purposes of swearing.

19             COURTROOM DEPUTY CLERK URSO:  Can I please ask you

20   all to raise your right hand, please.

21             (Jury sworn.)

22             THE COURT:  Please be seated.

23             Members of the jury, a trial goes in stages.  We have

24   finished the first stage, which was the selection of you to

25   decide this case, to hear the evidence and decide the case.

1          We will now come to the second stage, which is called

2     the opening statements of counsel.  Mr. Wortmann, who is the

3     prosecutor and who has to persuade you, convince you of the

4     evidence, will go first and he will now outline to you what

5     the evidence is that he expects to present.

6          Mr. Butters has an opportunity to open now or later.

7     He has chosen to open now, and his job, in essence, is to --

8     well, he will do it, but I don't know that he will have any

9     evidence.  He can say to the government, as I told you

10    earlier, You accused me, so you prove it.

11         After counsel finish the opening statements, we will

12    hear the witnesses, today and tomorrow probably, and that,

13    again, goes in order.  Mr. Wortmann who will call these

14    witnesses will conduct the direct examinations, followed by

15    Mr. Butters' cross-examination.  Then we can go back for one

16    more round of redirect and recross and then the witness will

17    be excused.

18         When we finish hearing all of the testimony and

19    receiving all of the testimony, there may be some written

20    evidence or photographs, or whatever, then counsel can again

21    address you, but this time it's different.  Now you have heard

22    the evidence and this time they will argue the evidence to

23    you.  They will sum up the evidence to you to try to persuade

24    you of their respective positions and when they finish that, I

25    will instruct you on the law and then you will retire to

1    deliberate your verdict and ultimately return your verdict to

2    the Court.

3          We, as I told you earlier, anticipate that that last

4    bit will occur on Wednesday and, hopefully, if everybody gets

5    here on time tomorrow, we will be able to start at 9 o'clock

6    and just go through and get it done.

7          So, we will now begin with the opening statement by

8    Mr. Wortmann on behalf of the government.

9          MR. WORTMANN:  Thank you, your Honor.

10         GOVERNMENT'S OPENING STATEMENT:

11         MR. WORTMANN:  Ladies and gentlemen, we're going to

12   be spending some time together, but this is really one of the

13   only -- well, two times I actually get to address you

14   directly.  And so, let me first introduce myself to you as a

15   jury.

16         My name is John Wortmann.  I'm an Assistant United

17   States Attorney, and over the next few days I'll have the

18   privilege of representing the United States of America in the

19   prosecution of its claims against Barry Spencer.

20         THE COURT:  Excuse me, Mr. Wortmann.

21         Could you pull back the lectern just a bit so I can

22   hear you.  Thank you.

23         MR. WORTMANN:  I can, your Honor.

24         Over the next few days -- and you've heard the Judge

25   give the schedule and we hope to be finished by Wednesday --

1   the government is going to prove to you and prove to you

2   beyond a reasonable doubt that Barry Spencer, the man in the

3   green suit right there, is a drug dealer, a fellow who dealt

4   cocaine, along with another man named Michael Morrison, and

5   that Mr. Spencer conspired, that is agreed with Mr. Morrison

6   to sell crack cocaine, that he aided and abetted, that he

7   helped him sell crack cocaine, all on the streets of Egleston

8   Square in Roxbury on March 20th, 2013.

9         On that date you'll learn that it was Mr. Spencer

10  who, upon being approached by an undercover officer named

11  Richard Casallas, who you'll hear during the course of the

12  case.  He was the one who spoke to the undercover officer,

13  immediately agreed to sell crack cocaine, that he was the

14  person who then walked away to get his buddy, Mr. Morrison,

15  and when Mr. Morrison came back, he let Mr. Morrison do the

16  dirty work, which is the actual exchange, while he stood close

17  to the street looking up and forth, making sure there were no

18  police officers coming on the scene.

19        They finished the deal and it was Mr. Spencer who

20  asked the undercover for his telephone number on the chance

21  that they might do some deals in the future.

22        And, you know, after you've heard all the evidence,

23  you've heard the testimony, you've watched the video that was

24  done of the identification procedure, you've seen the drugs,

25  you've heard from the chemist, you've heard from the

1   surveillance officers, all the officers around on the street,

2   we're going to come back and ask you to return a verdict of

3   guilty on Count 1, that on March 20 Barry Spencer conspired

4   with Mr. Morrison to sell crack cocaine or cocaine base, as

5   it's called; and, secondly, that he aided and abetted

6   Morrison's sale of the actual distribution, because, ladies

7   and gentlemen, I submit to you that's what the evidence is

8   going to show.

9          Now, all that is easy to say.  I'm not going to sit

10   here and say anything, but the real question and only question

11   that's important for you is how are we going to do that?

12          Well, you already know from what Judge Zobel has

13   said, it won't be based on anything the lawyers said because

14   anything I say, anything Mr. Butters says, it's not evidence.

15   No, ladies and gentlemen.  The government is going to prove

16   its case to you from one place and one place only.  From that

17   witness stand right there, where you'll hear from the

18   undercover agent who dealt with Mr. Spencer face to face on

19   that blustery day out on Egleston Square; from his supervisor,

20   Sergeant Detective Keenan, who will tell you that he saw Mr.

21   Spencer, that he knew Mr. Spencer from prior interactions on

22   the street, that he went -- drove around and saw them dealing

23   with one another, saw Morrison out there; from other

24   undercover officers, including Detective Greg Walsh, who took

25   video of an identification procedure that was done right after

1    the buy took place of Morrison and Spencer talking to and

2    being identified by two other police officers; and by a

3    forensic scientist from the state police laboratory.

4          What I would like to do over the next few minutes is

5    to summarize the evidence in a little more detail, again, not

6    because what I say is evidence.  You know it's not, but in the

7    hopes that it will help you understand the evidence a little

8    bit better as it comes in.

9          Now, in this case, because of the nature of the

10   charges, to do this I need to at least talk to you very

11   briefly about the law and I do that with a little bit of sense

12   of trepidation, because understand one thing.  When it comes

13   to the law, Judge Zobel is the boss.  So, if there's anything

14   I say that sounds in any way different from what she says, you

15   know who to listen to.  You listen to her.

16         There's two kinds of charges.  The first charge in

17   this case is conspiracy to distribute cocaine base, a/k/a

18   crack cocaine.  Sounds complicated.  It's not.  A conspiracy

19   is just an agreement, either expressed like, Hey, let's go out

20   and do this, or implied when two people start working together

21   to do something illegal, and here to sell crack cocaine.  It

22   doesn't have to be fancy.  It doesn't have to be written.  It

23   doesn't even have to be expressed, as I've said.  And use your

24   common sense, which is what you'll be doing throughout your

25   service as a jury.

1          Drug dealers don't sign contracts to go out and sell

2     drugs.  They don't advertise their businesses.  They don't put

3     tombstones in The Wall Street Journal.  This is an illegal,

4     secretive business and the last thing they want to do is draw

5     attention to themselves.

6          The agreement doesn't have to be for cash.  Nobody

7     has to do anything in furtherance of it.  All they have to do

8     is say, Hey, there was an agreement, based on the conduct and

9     based on what they did, and that's how we're going to prove

10    the conspiracy in this case, based on what Mr. Spencer did

11    when he immediately said, yeah, he's on.  He's ready to sell

12    drugs and asked the undercover how much he wanted, went out

13    and got Mr. Morrison, who then did the deal, and they walked

14    off together.

15         There is a second charge in this case that's

16    completely independent and stands on its own.  And so, at the

17    end of the trial, you'll have to deal with each one of these

18    charges, and that is aiding and abetting the distribution of

19    crack cocaine, cocaine base, and unlike the charge of

20    conspiracy, it requires more than just an agreement.  So, let

21    me tell you just a little bit about that, remembering that if

22    you hear anything different from Judge Zobel, go with her.

23         The thing that -- the first thing we have to prove on

24    an aiding and abetting charge is that there was, in fact, a

25    drug distribution.  That is, the transfer of -- knowing

1  transfer of a controlled substance from one person to another,

2  and it doesn't have to be for money, but in this case you'll

3  find out that it was, and our drug laws make it a crime for

4  someone to go ahead and sell or give or transfer knowingly

5  crack cocaine or any other controlled substance to somebody

6  else.

7          But the law does much more than that.  It also says

8  that people who knowingly assist others to distribute drugs

9  are equally culpable, are equally guilty, even, as in this

10  case, if they never put their hands on the drugs and never put

11  their hands on the money, and what we will have to show is,

12  one, that Barry Spencer provided substantial assistance to Mr.

13  Morrison, the person who actually gave the drugs to him, to

14  the undercover, sold the drugs to the undercover, that he did

15  it knowingly and intending for the drug deal to be able to

16  happen, and that the deal actually took place, and with that

17  in mind, let me tell you about what the evidence is you're

18  going to hear in this case.

19          In the spring of 2013, the Drug Control Unit from

20  Boston Police Department's District D-4 -- and that covers the

21  South End, some areas of downtown.  They were involved in a

22  longer-term operation in certain neighborhoods in Roxbury,

23  including the Egleston Square area.  The operation was to

24  focus on drug activity in these particular neighborhoods,

25  using an undercover officer, a police officer who disguises

himself and tries to make himself look like a drug user, to go out and buy drugs in these neighborhoods.

Now, the remarkable thing is that they were just -- the officers would just go out and walk around and go up and talk to people and say things like, "Are you on," which is drug parlance.  "Are you selling drugs?"  Or, you know, "Is anybody around?"  But the language in this case was -- Officer Casallas is walking up to Barry Spencer and saying, "Are you on?"  And he'll tell you what that meant.

Because the thing that's even more remarkable is that, as in this case on March 20, 2013, they had some success in doing it, buying drugs from a total stranger based on walking up to him, $20 for the crack cocaine, street deal.

So, on March 20, 2013, what was the plan?  Well, the plan was that the District D-4 unit, together with another unit in Roxbury known as B-2, were going to go out into Egleston Square and send Officer Casallas out in an undercover capacity -- and he's been in undercover school and he teaches at undercover courses -- to see if he could buy drugs.  There was no target identified for that day when they drove down there.  It was, as I said, in the course of this longer-term operation that they were doing it.

And the first witness you're going to hear from is Sergeant Detective Donald Keenan, who runs the D-4 Drug Control Unit, you know, long-term experience, made hundreds of

1   buys himself, and he'll tell you basically that they met.

2   They decided where they were going to go.  They decided who

3   was going to be the undercover, and he prepared the undercover

4   officer by doing two things:

5          One, he gives him Boston Police Department pre-

6   recorded buy money, which is copied; and, secondly, he gives

7   him a transmitter, an undercover device that's designed to

8   pick up signals and transmit them to a receiver in Sergeant

9   Detective Keenan's car.  It doesn't record and it doesn't

10  record for the reasons that under state law -- and this was a

11  case down in -- as a state investigation, there's a two-party

12  consent rule.  So, they couldn't record it.

13         And so, after doing these things, Keenan and

14  Casallas, the undercover, drove into Egleston Square.  There

15  were a number of other officers in the area, including Officer

16  Greg Walsh, Detective Greg Walsh, who you're going to hear

17  about, because he was in a van and he had with him a video

18  camera and his job was to do his best to try to videotape

19  whatever it was that he would be able to videotape, because --

20  are there problems in deals like this?  You can probably

21  imagine them because you don't know where the deal is going to

22  take place.  You don't know who the deal is going to take

23  place with.

24         And it's called -- to make matters a little more

25  complicated, the operation in the investigation that day was

1   called a "buy/walk," and you'll learn what that was, but it's

2   pretty much what it sounds like.  You buy from a drug dealer

3   and instead of arresting him right away, you let him walk.

4        Why would they do that?  Because it's an ongoing

5   investigation and if you start arresting people right away,

6   the dealers in the areas will know that there are undercover

7   officers in the area and, more importantly, they'll know who

8   the undercovers officers are and their ability to do these

9   operations.

10        Now, what that creates is a complication and a

11   complication that the police dealt with, and that's they have

12   to make sure they know who they're dealing with.  So, if they

13   make a buy, they got a few minutes to make sure that they stop

14   the person, they identify them, and they do it in a way so

15   that the guy doesn't know that the reason he's stopped is

16   because the police know he just sold drugs to somebody.

17        Now, here it's made a little bit easier because as

18   Keenan and Casallas drove in, they went past the bus stop at

19   1990 Columbus Avenue and standing there looking like --

20   apparently, like he was waiting for the bus, although you'll

21   find out and the evidence will show that wasn't the case at

22   all -- was Barry Spencer and, as I've indicated to you, Keenan

23   knew Barry Spencer from prior involvement in the street.  And

24   he said to Casallas, I know that guy.  He's Barry Spencer.

25   Once you get out, you ought to go up and talk to him and see

1    if you can -- if you have any success.

2         Keenan then drove Casallas around to the other side

3    of Egleston Square where Columbus and Washington -- to where

4    Walnut Park is, and Casallas got out and while Keenan was

5    driving around the neighborhood on roving surveillance and

6    while Detective Walsh was driving around on roving

7    surveillance, he walked back and he approached Barry Spencer

8    at the bus stop, and he said, as I've indicated earlier, "You

9    on?"  I.e., are you selling drugs?  And Mr. Spencer, you will

10   hear, said, "I'm on all the time, and I'm really glad you

11   showed up.  It's a slow day.  What do you want?"  He said, "I

12   want" -- "I got $20.  I want crack cocaine."

13        And they're standing there alone in the bus stop --

14   and you'll see pictures of the bus stop -- and Spencer said,

15   "Come on, follow me."  And he took a couple of steps and then

16   he said, "Wait a minute, stop.  I'll be right back."  And

17   while they were doing that, Keenan did his first loop around

18   and saw the two of them talking, and four, five minutes later

19   Mr. Keenan (sic) comes back with his friend Mr. Morrison and

20   says, "He's going to take care of you."  And Morrison comes up

21   to Mr. Casallas, to Officer Casallas.  They make the exchange,

22   $20 for one bag of crack cocaine.

23        And Mr. Spencer, as I said, is standing watching the

24   cars, looking up and down just to make sure, watching for

25   police cars with the blue and white "Boston Police

1   Department," so they can know, because, as I told you, this is

2   a secretive, illegal little business and they don't want other

3   people to know what's going on.

4          So, the deal is finished.  Mr. Spencer says to

5   Officer Casallas, "Hey, can I have your phone number in case

6   we can do something in the future?"  Gives him his phone

7   number.  Casallas thanks him, puts the drugs in his pocket,

8   and they split off going in different directions.  Officer

9   Casallas goes up to Walnut Park and Walnut Avenue, sends out

10  the message that it's a done deal over the phone.  Tells

11  Keenan.  Keenan picks him up.  They put out on the radio who

12  the two guys are.

13         In the meantime, Mr. Morrison and Mr. Spencer are

14  walking the other way down right into Egleston Square, with

15  Officer Walsh following them, and he follows them all the way

16  to the traffic light at Columbus Avenue and Washington Street.

17  He gets held up by the traffic.  They both turn off.

18         And, in the meantime, in order to do that

19  identification procedure that we talked about, Sergeant

20  Detective Keenan gets two officers from another unit to stop

21  Mr. Spencer and Mr. Morrison and get their identification, and

22  as the officers are doing this, two things happen:

23         One is Officer Walsh comes up with his video camera

24  and he ends up videotaping the identification procedure and

25  there's the picture of Barry Spencer out on the street as he's

1    talking to those police officers doing this identification.

2         And at the same time, they drive by -- Keenan drives

3    by with Officer Casallas in the back seat leaning down and

4    when they get to the corner, he pokes his head up, tinted

5    windows, and says, "Yeah, those are the two guys."  Keenan

6    will tell you that those are the two guys he saw with Casallas

7    at the bus stop.  Walsh will tell you that those were the two

8    guys that he saw at the bus stop.

9         And they finish the video.  The other cops finish the

10   identification procedure, and they went back -- the deal was

11   done.  The identification procedure was complete.  They went

12   back to prepare their reports and to log in the drugs.

13   Officer Casallas looked at the drugs, and it's a small little

14   rock of crack cocaine, and you'll learn that it was basically

15   crushed in the testing process.  So, now it looks sort of like

16   sand.

17        He turned the drugs over to Keenan, who also

18   inspected them, identified them as crack cocaine.  They were

19   then given to Officer Sean Flaherty, another officer who

20   you'll hear from, who took the drugs and he put them in this

21   drug envelope with his handwriting on it and they ended up

22   getting stamped with the number from the case on it, did a

23   field test, put it in the drug locker at District B-2, and

24   from there it goes and gets sent to the BPD drug laboratory,

25   which, in turn, sends it out to the State Police Crime

1    Laboratory, which right now -- and let me make one thing

2    perfectly clear -- has nothing to do with the J.P. lab, has

3    nothing to do with a chemist named Annie Dookhan, completely

4    separate, has absolutely nothing to do and, in fact, these

5    drugs were analyzed by a woman named Claire Rimkus, who holds

6    a master's degree in forensic sciences from Boston University

7    School of Medicine.  She performed a whole battery of tests on

8    them, and she will tell you that the drugs are .15 grams of

9    cocaine base, also known as crack cocaine.

10           So, that's the evidence.  Aiding and abetting:  How

11   did the deal take place?  Barry Spencer set it up.

12   Conspiracy:  These fellows were not waiting for the bus stop.

13   They were waiting for a drug customer and that drug customer

14   just happened to be Richard Casallas.

15           I thank you for your attention.  I appreciate your

16   service and when we come back to speak again, I'll be asking

17   you to return guilty pleas on both counts of the indictment.

18   Thank you.

19           THE COURT:  Mr. Butters.

20           MR. BUTTERS:  Yes, your Honor.

21           DEFENDANT'S OPENING STATEMENT:

22           MR. BUTTERS:  Good morning, ladies and gentlemen.  My

23   name is Tom Butters.  I represent Barry Spencer, whose been

24   accused by the United States Government of participating, not

25   selling.  He didn't sell anything, but he's accused of

1   participating in a sale of a $20 bag of crack cocaine and when

2   you look inside the bag, when you take it back to the jury

3   room, it's almost infinitesimal, but the entire force of the

4   United States Government and the Boston Police Department has

5   been brought down upon Barry Spencer, and you're here because

6   of a -- because somebody named Morrison sold a $20 bag of

7   crack cocaine to an undercover officer.  Mr. Spencer did not

8   sell anything on that day.

9         And my brother in his opening said that there were

10  some complications with this case.  There are a lot of

11  complications with this case.  You would think that when you

12  have the United States Government and the entire Boston Police

13  Department at your service, that you would get an open-and-

14  shut case.  That's what you deserve.  That's what should have

15  been done that day, but despite all the technology that we

16  have in America and even in Boston, we have more technology

17  than almost anybody, no tape recording, no videotape of the

18  transaction.

19        Apparently we have a transmitter.  They call it a KEL

20  set, and the KEL set transmits what's said between people.

21  It's a microphone and it transmits what's said, but nobody

22  will tell you anything about what was said between Mr. Spencer

23  and the undercover officer because it was unintelligible.  So,

24  we don't know whether Mr. Spencer said, Hey, how are you? or

25  we don't know whether the police officer said, you know, Do

1    you have some crack cocaine you can sell me today? or we don't

2    know whether, for example, Mr. Spencer said, Oh, why don't

3    you -- you know, there's some other guys around here.  You

4    know, this is a street corner in Boston that's heavily

5    traveled, and why don't you go talk to him.  So, we have no

6    idea what was said except from the undercover officer, when it

7    would have been simple.

8         We have tape recordings.  We have transmitters that

9    work.  We have a stationary area.  They went to Egleston

10   Square because they wanted to target people who were selling

11   drugs in Egleston Square.  There are a lot of buildings in

12   Egleston Square.  You'll see from the photographs that they

13   could have set up a stationary videotape from anywhere in that

14   -- on that corner, because that's where they expected the drug

15   deal to go down and they had been out on the streets for

16   months doing the same thing, but there's no videotape of the

17   transaction.  The only videotape is that at some point when

18   Mr. Spencer -- who, by the way, lives in the neighborhood.

19   So, he's not, you know, going out and away from his home.

20   He's at his home, standing at a bus stop, and that's where

21   he's supposed to be, is around his home.

22        The other man, Mr. Morrison, I don't believe that he

23   was in his neighborhood, number one; and, number two, there

24   was another buy that happened a month and a half later where

25   the same undercover officer went out on the same street corner

1    and bought even less crack cocaine, but he got gypped because

2    there was only -- it was a $40 bag, but there was less weight.

3    And where was Mr. Spencer?  He wasn't there that day.  There's

4    no allegation that he was there that day.

5          And so, despite all the technology, what you have is

6    you have to rely on the word of one police officer, and nobody

7    else saw the transaction go down.  Every police officer that

8    will come in except for the undercover officer will say, Gee,

9    I didn't see it.  I didn't see.  I didn't hear anything.  I

10   mean, I saw them on the street corner.  Well, that's because

11   he lives near the street corner, Mr. Spencer.

12         So, at the end of the day, it's up to you to decide

13   whether you're convinced.  Are you convinced that Mr. Spencer

14   sold crack cocaine to an undercover Boston Police officer?

15         And when you go into the jury room, you have to say,

16   Wow.  Well, here's the evidence that I have.  Wouldn't it have

17   been nice if there was more evidence and we really knew what

18   happened.

19         And I would submit, ladies and gentlemen, when this

20   case is all over, which is going to be quickly, thankfully for

21   you, you are going to have doubts about what Mr. Spencer's

22   role was in this case, if any, and we will ask you to return a

23   verdict of not guilty.  Thank you.

24         THE COURT:  Members of the jury -- Mr. Wortmann, can

25   you call your witness, please.  In the meantime -- first of

1    all, we stretch.  So you can get up and stretch.

2            (Stretch break.)

3            THE COURT:  We will do this regularly.  Not just for

4    your benefit, but for mine, too.

5            MR. BUTTERS:  May we approach momentarily, your

6    Honor?  Mr. Wortmann and I, my client?

7            THE COURT:  Do we have to?

8            MR. BUTTERS:  Yes.

9      **SIDEBAR CONFERENCE:**

10           MR. BUTTERS:  I'm sorry.

11           THE COURT:  I want to have no sidebars.

12           MR. BUTTERS:  Okay.  Hopefully, this will be the last

13    one.

14           Mr. Wortmann is going to play or wants to play a

15    videotape.  There was a suppression motion related to the

16    videotape, but there's -- on the videotape there's -- the Gang

17    Unit are the guys who identified Mr. Spencer and Mr. Morrison

18    after the fact, and we would like an instruction -- well,

19    first of all, Mr. Spencer objects and --

20           THE COURT:  Is he on it?

21           MR. BUTTERS:  What?

22           THE COURT:  Is he shown on it?

23           MR. BUTTERS:  Yes.  And the Gang Unit members with

24    their jackets on are shown on it.

25           First of all, he wants to renew his objection to the

1  videotape being played at all; and, secondly, we would like

2  the Court to instruct the jury that the fact that these guys

3  had the "Gang Unit" insignia on is completely unrelated to

4  this case.  They simply needed some bodies out there.  I think

5  Mr. Wortmann --

6       MR. WORTMANN:  I have absolutely no trouble with you

7  giving that instruction.

8       THE COURT:  Okay.

9       MR. BUTTERS:  That they shouldn't make any adverse --

10      THE COURT:  Is it clear that what they were there on

11 is a Gang Unit --

12      MR. BUTTERS:  No, they aren't.

13      MR. WORTMANN:  You can instruct them those are just

14 the officers who got this investigation and had nothing to do

15 with gangs, period.  You can disregard that.

16      THE COURT:  Okay.

17      MR. BUTTERS:  And they should --

18      THE COURT:  These are the officers, not the --

19      MR. BUTTERS:  Right.  Right.

20      MR. WORTMANN:  Your Honor, were you going to give the

21 CSI instruction?

22      THE COURT:  I was about to do that.

23      (End of sidebar conference.)

24      DET. SRGT. DONALD KEENAN, SWORN.

25      COURTROOM DEPUTY CLERK URSO:  Sir, can I ask you to

1    please state your name, spelling your last name for the

2    record, please.

3                SRGT. DET. KEENAN:  Donald Keenan, K-e-e-n-a-n.

4                COURTROOM DEPUTY CLERK URSO:  Thank you.

5                THE COURT:  Hold it one second.

6                Mr. Ostrov, one of your jobs is to pour the water and

7    hand it down.  Or you can have that job if you would like.  So

8    you can keep it and hand out cups.

9                Let me explain a couple of things to you.

10               As you know from some of the questions I've asked

11   before, we care deeply about the way the evidence is presented

12   in a courtroom and we operate under a very complicated and

13   large set of rules.

14               I ask you, please, not to try to Google or get any

15   information about this case or any aspect of this case because

16   we would like you to decide it based entirely on the evidence

17   that is presented to you.  Anything you hear about the case

18   outside the courtroom is not being subjected to the same rules

19   and it can skew your perception of actually what happened or

20   what you think may have happened or could have happened.  So,

21   just please accept the evidence as it is presented by the

22   parties, the examination and cross-examination, and don't try

23   to get any information about the case from any other source or

24   even pieces of the case.  So, please don't Google.

25               Second, to the extent that some of you are addicted

1    to television mysteries and police stories, put those aside.

2    A lawsuit doesn't work the way television does.  We don't have

3    the kind of forensic ideas and evidence and machines that

4    suddenly give you the answer.  That is not the way it works.

5    So, put that aside as well.

6           And we don't have, for those of you old enough to

7    remember Perry Mason, the ability of having somebody step

8    forward, Now, you did it, didn't you, sir?  You know, that's

9    not the way it happened either.

10           Please listen carefully to the questions and listen

11    carefully to the answers and decide the case based on what you

12    hear in the courtroom, all of which is subject to the rules

13    that, if necessary, I will begin to explain to you in the

14    course of this short trial, okay?

15           So, you now may begin to question the witness.

16           MR. WORTMANN:  Thank you, your Honor.

17           And, your Honor, may I ask Ms. Urso to put the

18    document camera up.

19                         DIRECT EXAMINATION

20     BY MR. WORTMANN:

21     Q.   Mr. Keenan, what do you do for a living?

22     A.   I'm a sergeant detective in the Boston Police

23    Department.

24           THE COURT:  Now we're losing you.  Thank you.

25     A.   I'm a sergeant detective in the Boston Police

1    Department.

2      Q.   How long have you been with the Boston Police

3    Department, sir?

4      A.   Since 1997.

5      Q.   So, approximately 14, 15 years?

6      A.   Yes.

7      Q.   17 years?

8      A.   17 years.

9      Q.   Excuse my math.

10         And how long have you been a sergeant detective?

11     A.   Since 2007.

12     Q.   And could you tell the jury, please, where you are

13   currently assigned?

14     A.   Yes.   I'm assigned to the Drug Control Unit out of

15   District D-4 in the City of Boston.   D-4 covers the areas of

16   the South End, lower Roxbury, Back Bay and Fenway.

17     Q.   And as the sergeant detective assigned to the District 4

18   Drug Control Unit, what do you do?

19     A.   I supervise a squad of officers to investigate drug

20   activity in the city.

21     Q.   Now, are the seven years that you spent on the D-4 Drug

22   Control Unit your only experience in BPD's Drug Control Units?

23     A.   No.   In approximately 2010 -- approximately 2010 I was

24   assigned to the D-4 Drug Control Unit as a supervisor.   Prior

25   to that I was supervisor in the D-18, which covers Mattapan,

1  Hyde Park and Roslindale from 2007 to 2010.  Prior to that,

2  from 2005 to 2007 I was a patrol officer in the Drug Control

3  Unit in the downtown area.  From 1997 to 2005 I was a police

4  officer in District 1, which covers the downtown area.

5  Q.  So, you've been assigned to the Drug Control Unit since

6  2005?

7  A.  Correct.

8  Q.  Approximately nine years?

9  A.  Yes.

10  Q.  And during that time have you had the opportunity to

11  make seizures of drugs?

12  A.  Yes, I have.

13  Q.  In the hundreds?

14  A.  Yes.

15  Q.  Have you ever acted in an undercover capacity buying

16  drugs?

17  A.  I have.

18  Q.  Could you explain to the jury, Sergeant Detective

19  Keenan, what that involves?

20  A.  An undercover officer in the Drug Control Unit, his job

21  is to go out and purchase drugs in the city.  Specifically,

22  you're provided money, a KEL device.  A KEL device is just a

23  transmitter the undercover officer would carry with him.  He's

24  sent out into an area, whether it's a targeted person or area

25  in general or specific areas in the city where we just go out

1    and attempt to purchase drugs from people where we get

2    complaints of drug dealing.

3       Q.   Very often those people are total strangers?

4       A.   Yes.

5       Q.   And can you tell the jury approximately how many

6    undercover buys you've made over the course of your career?

7       A.   I've made hundreds of undercover drug buys.

8       Q.   And in the course of your work in the Drug Control

9    Units, have you become familiar with a substance known as

10   cocaine base?

11      A.   Yes.

12      Q.   What is cocaine base?

13      A.   Cocaine base is crack cocaine.  It's a smokable form of

14   cocaine.

15      Q.   Is that one of the drugs that you've had the opportunity

16   to seize and buy over the course of your career?

17      A.   Yes.

18      Q.   Now, have you ever been called to identify it in the

19   field?

20      A.   I have.

21      Q.   Can you describe for the jury how you do that?

22      A.   Crack cocaine is -- it's a hard white substance, rock-

23   like, and in the City of Boston it's sold usually on the

24   street in small plastic bags, probably the size of a pebble.

25   Usually you buy them for $20 a rock on the street.  The larger

1   the rock, obviously, the more money it cost.

2   Q.   Does it have a distinctive appearance?

3   A.   It does.  Like I said, it's an off-white, usually, you

4   know, a rock-like substance.

5   Q.   And how many times have you been called upon to identify

6   it in the field?

7   A.   Hundreds of times.

8   Q.   Now, earlier you said that the District 4 covers areas

9   in the downtown and areas of the South End.  Is the work of

10  the District 4 Drug Control Unit limited to D-4?

11  A.   No.

12  Q.   And where else do you work and why?

13  A.   We're Boston police officers.  That's our primary

14  assignment day to day, but we often get called to other parts

15  of the city by my commander or other supervisors in the city

16  to go make undercover drug purchases in the city.  My squad is

17  primarily made up of undercover officers.

18  Q.   And if I could focus you in on the late winter and

19  spring of 2013.  Were you involved in an operation outside of

20  District D-4?

21  A.   Yes.

22  Q.   What was the nature of that investigation?

23  A.   It was an operation to send undercover officers out to

24  purchase drugs in what we call a buy/walk operation.  We

25  attempt to buy drugs.  We buy drugs from people.  We'd

1    identify that person soon after and we let them walk or let

2    them go from there after they're identified.  At the end of

3    the operation, we would seek warrants for them and arrest the

4    people that we purchased drugs from.

5    Q.  And were there any particular areas in which this

6    operation focused on?

7    A.  Yeah, the B-2 area, Egleston Square area, H Block area,

8    which is Humboldt Ave, down to Washington Street.  Most of the

9    B-2 area on that side of Washington Street.

10   Q.  And this operation had a name?

11   A.  Operation H.

12   Q.  And --

13           MR. BUTTERS:  I'm sorry, I missed that.

14           THE WITNESS:  Operation H, as in the letter H.

15           MR. BUTTERS:  As in heroin?

16           THE WITNESS:  As in heroin.  H block.  A lot of the

17   streets are named -- start with the letter H in the area and

18   they call it H Block.

19   Q.  So, that's referred to as a geographic focus as opposed

20   to specific focus on a type of drug?

21   A.  Exactly.

22   Q.  Now, during this investigation, were there specific

23   investigative procedures that you employed in order to further

24   the investigation?

25   A.  Yes.

1    Q.   And can you describe those for us, please?

2    A.   Prior to going out, we have a briefing.  Most of the

3    time in this operation it would be Area B-2.  The undercover

4    officer would be decided on there, which undercover officer we

5    would be using that day.  The undercover officer is provided

6    with money which is previously recorded.  I photocopy the

7    money prior to giving it to the undercover officer.  He's also

8    provided with a KEL device, which I mentioned earlier.  A KEL

9    device is a transmitter which is hidden on the officer.  It's

10   a receiver that I -- there's a receiver that picks up that KEL

11   device.

12   Q.   Let me ask you -- let me stop you there, if I could,

13   sir, Sergeant Detective Keenan, and ask you about the KEL

14   device.  First, does the KEL device record?

15   A.   We don't record, no.

16   Q.   Can you explain to the jury why not?

17        MR. BUTTERS:  Objection, your Honor.

18        THE COURT:  Why do we need to know that?

19        MR. WORTMANN:  Well, I think there were issues raised

20   in the opening as to what investigative techniques that they

21   used and what investigative techniques they didn't use.

22        THE COURT:  Well, they didn't record for a reason.

23   The objection is sustained.

24        MR. BUTTERS:  Thank you, your Honor.

25   Q.   Who has the receiver?

1    A.   I have the receiver in my vehicle.

2    Q.   And what's the purpose of the KEL device?

3    A.   Merely -- the purpose is for officer safety.  Sending

4    the officers out there to purchase drugs, obviously, it's a

5    dangerous situation dealing with drug dealers.  And so, it's

6    for us to hear or attempt to hear what is going on and get

7    help to the officer if things start to get -- if the officer

8    is in a dangerous situation.

9    Q.   Now, do you also have access to video recording devices

10   that can be hidden on somebody's person?

11   A.   We do.

12   Q.   Did you use those in the Operation H?

13   A.   No.

14   Q.   Why not?

15   A.   Operation H, it was an operation where we were asked to

16   go into another part of the city that we're not familiar with,

17   which is good in a sense, where the people going to sell the

18   drugs to us didn't know us, but also puts us in a situation

19   where we're walking up to strangers, people we didn't know,

20   and ask them to purchase drugs.  This could lead to a lot of

21   the drug dealers actually searching the undercover officers to

22   find hidden equipment, you know, transmitters or camera

23   equipment that the undercover officer, perhaps, would have on

24   him.

25   Q.   Have you had it happen to you as an undercover officer?

1    A.   I have.

2    Q.   Have other undercover officers that you're supervising

3    had that happen to them?

4    A.   Yes.

5    Q.   So, those weren't used?

6    A.   The body camera was not used.

7    Q.   Now, in the course of this operation, did you have

8    specific targets when you went out on the street?

9    A.   Generally, no.

10   Q.   When you went into a particular location like Egleston

11   Square, did you have a particular house or storefront or

12   address where you believe that drug transactions were going to

13   occur?

14   A.   Not specifically.

15   Q.   So, what would the undercover then do?

16   A.   The undercover officer would be deployed in that area.

17   He would walk down and engage people in an attempt to purchase

18   drugs from people in that area.

19   Q.   Didn't know who was going to be selling?

20   A.   That's correct.

21   Q.   Didn't know where the selling was going to take place?

22   A.   Correct.

23   Q.   All right.   Now, earlier you mentioned -- you used the

24   term, "buy/walk"?

25   A.   Yes.

1    Q.   Can you just make clear for the jury what that term

2    means and could you contrast to something called "buy/bust"?

3    A.   Yes.  Like I said, a buy/walk is when an undercover

4    purchases drugs from somebody and that person is allowed to

5    leave the area without being arrested that day.  The reason we

6    do that is to keep an operation going.  In this operation we

7    were -- our task was to go there and throughout the

8    neighborhood attempt to purchase drugs from as many people who

9    were selling out there.

10        Another tactic we use is a buy/bust, which is -- again,

11   the officer is provided with money and the drug dealer -- once

12   the drugs are in hand, is separated from the drug dealer, the

13   drug dealer would be arrested soon after.

14   Q.   So --

15   A.   "Soon after," meaning like pretty much immediately.

16   Q.   What would have happened to your ongoing investigation

17   if you had started arresting people right after the drug deal

18   took place?

19   A.   Well, obviously, they would have known that there were

20   other Drug Unit -- other officers in this area conducting drug

21   investigations and the word around in the neighborhood would

22   have -- it would have been over fairly quickly if we arrested

23   the people immediately after we bought the drugs.

24   Q.   So, you didn't do that?

25   A.   We did not.

1    Q.   Does the buy/walk technique create issues regarding

2    identification?

3    A.   Yes.

4    Q.   Can you describe those for the jury, please?

5    A.   Well, obviously, during a buy/bust, you hand the guy the

6    money, he gives you the drugs, and he's arrested right after.

7    That's a great way to identify the person who you just gave

8    the money to because you're going to match that money up with

9    the serial numbers that you photocopied.

10        On a buy/walk they're going to be allowed to leave the

11    area.  So, you're going to have -- you need to stop them and

12    have any of the surveillance officers and the undercover

13    officer identify the person who they just purchased the drugs

14    from, and we do that a number of ways.

15    Q.   How did you do it in this investigation?

16    A.   Soon after drugs were purchased, the individuals that

17    sold the drugs were stopped by Boston police officers, where

18    they -- the officers conducted an FIO, field interrogation,

19    where they get the information, the identifying information

20    from the person that they stopped.

21    Q.   So, they actually give their names?

22    A.   Yes.

23    Q.   And was it your practice while this procedure was taking

24    place to do anything?

25    A.   Yes.  We would attempt in this operation to also -- or

1    in -- most of the time in a buy/walk to video record the stop

2    and we did in this instance.

3     Q.   Now, could you explain to the jury --

4          THE COURT:  Excuse me.  I think we need to stop until

5    tomorrow.

6          Members of the jury, you are now excused until

7    tomorrow morning at 9:00.  Please leave your notebooks on your

8    chairs, putting on the outside your name and the number.  It's

9    already done?

10         COURTROOM DEPUTY CLERK URSO:  No.  I just said to put

11   their number.

12         THE COURT:  So, Mr. Ostrov, you're No. 1.  Ms. Gath,

13   you're No. 4.  Ms. Libby, you're No. 8.  Ms. Bagley, you're

14   No. 12, and the rest of you can figure out who you are.

15         We are not going to read your notebooks, but we just

16   want to collect them overnight, keep them overnight for you

17   and you will get them back in the morning.

18         Please do not talk about the case while you're home

19   or wherever you are.  Just do your ordinary business, because

20   even talking about it also changes the evidence in your head

21   to some extent.  So, just please don't.

22         If you are all here promptly at 9:00, then we can

23   start promptly at 9:00 and if you're not, then we'll have to

24   wait for you.  So, it's important that you all be here.

25         MR. WORTMANN:  Your Honor, could we approach just for

1    one second before the jury goes out?

2         THE COURT:  Why do we have to have all these bench

3    conferences?

4         MR. WORTMANN:  Sorry.

5    **SIDEBAR CONFERENCE:**

6         MR. WORTMANN:  Forgive me, your Honor.  You may have

7    done this and if you did, I apologize, but I'm not sure the

8    jury has been told that they cannot talk about the case even

9    amongst themselves.

10        THE COURT:  I just did.  I told them not to talk

11   about it because it changes --

12        MR. WORTMANN:  Even amongst themselves?

13        THE COURT:  I did.

14        MR. WORTMANN:  Okay.  Sorry.

15        (End of sidebar conference.)

16        THE COURT:  All right.  You are excused until 9

17   o'clock tomorrow morning, and I thank you very much.

18        (Jury excused.)

19        THE COURT:  Court is in recess until 9:00 tomorrow

20   morning.

21        (Adjourned, 1:04 p.m.)

22

23

24

25

1      C E R T I F I C A T

2    I, Catherine A. Handel, Official Court Reporter of

3 the United States District Court, do hereby certify that the

4 foregoing transcript, from Page 1 to Page 102, constitutes to

5 the best of my skill and ability a true and accurate

6 transcription of my stenotype notes taken in the matter of

7 Criminal Action No. 13-10196-RWZ, United States of America versus

8 Barry Spencer.

9

10

 August 17, 2014  /s/Catherine A. Handel
11 Date      Catherine A. Handel, RPR-CM, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25