UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
       Plaintiff,         )
                        )
vs.                    )
                        ) Criminal Action
BARRY SPENCER,        ) No. 13-10196-RWZ
       Defendant.       )
                        )
                        )
                        )

**JURY TRIAL**
**DAY THREE**

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
Boston, Massachusetts 02210
June 18, 2014
9:00 a.m.

\*   \*   \*   \*

CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

APPEARANCES:

For the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE
(By: AUSA John A. Wortmann, Jr.)
     John J. Moakley Courthouse
     One Courthouse Way, Suite 9200
     Boston, MA 02210

For the Defendant:

BUTTERS BRAZILIAN, LLP
(By: Thomas J. Butters, Esq.)
     One Exeter Plaza
     12th Floor
     Boston, MA 02116

```
 1

 2                          I N D E X

 3
        WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS
 4

 5      CLAIRE RIMKUS

 6          By Mr. Wortmann:       5
            By Mr. Butters:              30
 7

 8

 9


10
        Government rests. . . . . . . . . . . . .  Page   36
11      Defendant rests. . . . . . . . . . . . .   Page   36
        Charge Conference. . . . . . . . . . . .   Page   38
12      Government's Closing Argument. . . . . . . Page   52
        Defendant's Closing Argument. . . . . . .  Page   71
13      Government's Rebuttal Argument. . . . . .  Page   80
        Jury question. . . . . . . . . . . . . .   Page  105
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (The following proceedings were held in open court
3   before the Honorable Rya W. Zobel, United States District Judge,
4   United States District Court, District of Massachusetts, at the
5   John J. Moakley United States Courthouse, 1 Courthouse Way,
6   Boston, Massachusetts, on June 18, 2014.
7              The defendant Barry Spencer is present with counsel.
8   Assistant United States Attorney John A. Wortmann, Jr., is
9   present.)
10             (Jury enters courtroom.)
11             THE COURT:  Good morning.  Please be seated.
12             Motion is denied.
13             MR. WORTMANN:  Motion, your Honor?  I'm sorry.
14             THE COURT:  Your request that I received yesterday is
15  denied.  We're going to the witness, Ms. Rimkus.
16             MR. WORTMANN:  Okay.
17             THE COURT:  Thank you.
18             Would you please come forward and step into the
19  witness box and remain standing until after you've been sworn.
20             COURTROOM DEPUTY CLERK URSO:  Can you please raise
21  your right hand, please.
22             CLAIRE RIMKUS, SWORN.
23             COURTROOM DEPUTY CLERK URSO:  Could you please state
24  your name, please, and spell your last name for the record,
25  please.
```

1           MS. RIMKUS:  My name is Claire Rimkus, last name is

2   spelled R-i-m-k-u-s.

3           COURTROOM DEPUTY CLERK URSO:  Thank you.

4           THE COURT:  Thank you.  You may proceed.

5           MR. WORTMANN:  Thank you, your Honor.

6                       DIRECT EXAMINATION

7   BY MR. WORTMANN:

8   Q.   Ms. Rimkus, what do you do for a living?

9   A.   I am a forensic scientist.

10  Q.   Where do you work?

11  A.   I work at the Massachusetts State Police Crime Lab.

12  Q.   Where is that?

13  A.   In Sudbury, Massachusetts.

14  Q.   Let me ask you, are you familiar with a facility that

15  operated at one time in Massachusetts known as the William

16  Hinton Lab?

17  A.   Yes, I am.

18  Q.   Is that a separate facility that is completely separate

19  and apart from the State Police Crime Lab?

20  A.   Correct.

21  Q.   And are you familiar with a chemist by the name of Annie

22  Dookhan?

23  A.   Yes.

24  Q.   Who is Ms. Dookhan?

25  A.   She's a former chemist from that Hinton Lab.

1    Q.   And was Ms. Dookhan ever employed by the State Police

2    Crime Lab?

3    A.   No.

4    Q.   As far as you know -- well, have you ever met her?

5    A.   No.

6    Q.   As far as you know, has she ever been to the State

7    Police Crime Lab?

8    A.   Not as far as I know.  I do not believe so.

9    Q.   Do you know when you started receiving drug samples,

10   approximately, from the City of Boston?

11   A.   In 2012.

12   Q.   And what was the reason for that?

13   A.   The closure of that Hinton Lab.

14   Q.   Now, what do you do at the State Police Crime Lab as a

15   forensic scientist?

16   A.   I analyze evidence submitted to determine the presence

17   or absence of controlled substances, I prepare reports based

18   on my findings and I testify to those findings as needed.

19   Q.   Do you have any academic training relative to your

20   responsibilities at the State Police Crime Lab?

21   A.   Yes, I do.

22   Q.   Could you describe that for the jury, please?

23   A.   I have a bachelor's degree in chemistry from Wellesley

24   College and I have a master's of biomedical forensic science

25   with a concentration in forensic chemistry from the Boston

1    University School of Medicine.

2    Q.   When did you receive your master's degree?

3    A.   In January of 2013.

4    Q.   And was there any course work in your graduate program

5    that's directly relevant to the work that you do at the State

6    Police Crime Lab?

7    A.   Yes.

8    Q.   Could you describe that for us, please?

9    A.   I had lecture-based courses in both forensic chemistry

10   and advanced forensic chemistry.  Lecture-based on analysis of

11   controlled substances and a laboratory-based course on

12   instrumental analysis.

13   Q.   And that course -- was that course dealing with how to

14   operate and interpret the very same instruments that you used

15   on a day-to-day level at the State Police Crime Lab?

16   A.   Yes, it was.

17   Q.   Now, after graduating from the Boston University School

18   of Medicine with your master's degree, when did you begin

19   working at the State Police Crime Lab?

20   A.   In January of 2013.

21   Q.   And when you joined the lab, did you receive any on-the-

22   job training?

23   A.   Yes.

24   Q.   Could you describe what it was like?

25   A.   I completed our in-house training program, which

1  consisted of completing work under -- pardon me -- casework

2  under the supervision of a senior chemist.  I also read

3  scientific articles on the analysis of drugs and I completed

4  several competency tests and oral examinations.

5  Q.  And those were tests -- do they include proficiency

6  testing on actually you analyzing a known substance and making

7  determinations?

8  A.  Correct.

9  Q.  Under the supervision of more senior chemists?

10  A.  Correct.

11  Q.  And --

12       THE COURT:  Excuse me.

13       Is there any objection to her qualifications?

14       MR. BUTTERS:  No, your Honor.

15       THE COURT:  Let me explain, members of the jury.

16       Ms. Rimkus is a different kind of witness from the

17  police officers you heard yesterday.  They testified about

18  what they observed and what they did in connection with

19  whatever they observed and as to them, as I told you, your

20  job -- one of your principal jobs is to determine whether you

21  believe what they say in whole or in part.

22       Ms. Rimkus, as I say, is different.  She is called as

23  an expert on the issue of identifying illegal drugs, and here

24  you have a two-part job.  First, you have to determine whether

25  you believe that her -- what her qualifications are to be an

1    expert witness.  As an expert witness, she's entitled to give

2    you opinions about things which a fact witness normally cannot

3    do.  She's not going to tell you what happened in the process

4    of getting these drugs.  She's going to look at the drugs and

5    tell you, based on my experience, it is my opinion that this

6    is some kind of a drug.

7            So, you need first to check on -- to consider her

8    qualifications to give these opinions.  If you find that she

9    is qualified, then you determine whether -- what it is that

10   she did and whether you believe what she did.

11           Like the other witnesses, there is this general

12   believability question that you come to, but in this case

13   there's the additional checking on the qualifications and

14   determining the qualifications.  Do you understand?

15           JURORS:  (Nodding).

16           MR. WORTMANN:  Thank you, your Honor.

17   Q.   Ms. Rimkus, just let me ask you whether -- since

18   beginning your day-to-day responsibilities at the State Police

19   Crime Lab, whether you have been qualified as an expert in

20   courts in the Commonwealth?

21   A.   Yes, I have.

22   Q.   And in what area?

23   A.   In the identification of controlled substances.

24   Q.   And you were permitted to so testify as an expert?

25   A.   Correct.

1    Q.   And to date how many courts?

2    A.   Two.

3    Q.   Okay.  Now, can you tell us since joining the lab in

4    January 2013, approximately how many samples of suspected

5    controlled substances you have in fact tested?

6    A.   Approximately a thousand.

7    Q.   And can you --

8         THE COURT:  From the time she started until she did

9    whatever was given to her from this case or until today?

10        MR. WORTMANN:  Until today.

11   A.   Until today, approximately a thousand.

12   Q.   And can you tell us what percentage of those,

13   approximately, involve cocaine base a/k/a crack cocaine?

14   A.   Approximately 15 percent.

15   Q.   Okay.  And during the time that you've been a forensic

16   scientist at the State Police Crime Lab, is there a procedure

17   that is used at the lab for testing samples or exhibits of

18   suspected cocaine base?

19   A.   Yes.

20   Q.   And, generally, could you describe what those tests,

21   procedures are?

22   A.   I initially will open evidence and make a general

23   observation as to what the contents are, any color.  Next I

24   take a weight of the sample.  I remove it from any packaging

25   and take a weight of just the suspected powder.

1    Q.   And how do you ensure the accuracy of the scales that

2    you use?

3    A.   We use analytical balances that we check daily for

4    accuracy and they are also externally calibrated yearly by an

5    external vendor.

6    Q.   Okay.  And once you've determined the net weight of the

7    contents of the exhibit, what do you then do?

8    A.   I then sample a portion of the exhibit for testing and

9    use analytical techniques.

10    Q.   Are there a specific number of tests that you ordinarily

11    use in sampling suspected cocaine base?

12    A.   Yes.

13    Q.   And what are those tests?

14    A.   We have one presumptive test, ultraviolet visual

15    spectroscopy or UV reviews, and then we use two confirmatory

16    tests.

17    Q.   Let me ask you to describe to the jury the difference

18    between a presumptive test and a confirmatory test.

19    A.   A presumptive test, also called a screening test, is not

20    entirely specific.  It's just an initial -- it gives an

21    indication of what the substance might be and it can help

22    direct my analysis further.  A confirmatory test is something

23    that identifies a molecule within a substance and confirms the

24    presence of that substance.

25    Q.   And that enables you to form an opinion to a reasonable

1    degree of scientific certainty as to what the contents of that

2    sample is?

3              MR. BUTTERS:  Objection, your Honor.  Leading.

4              THE COURT:  What's the objection?

5              MR. BUTTERS:  I'm sorry?

6              THE COURT:  What's the objection?

7              MR. BUTTERS:  Leading.

8              THE COURT:  I think you may answer.

9    A.   Yes, it does.

10   Q.   And what were the -- what are the two confirmatory tests

11   that you do with suspected cocaine base?

12   A.   There are FTIR, which is Fourier Transform Infrared

13   Spectroscopy.

14   Q.   What does that test for?

15   A.   That can differentiate between cocaine base and cocaine

16   powder, hydrochloride.

17   Q.   And the second test?

18   A.   Is GC/MS.  Gas chromatography/mass spectrometry.

19   Q.   What does that test do?

20   A.   That separates the components of a mixture and then

21   identifies each of those components.

22             MR. WORTMANN:  Your Honor, may I approach the

23   witness, please?

24             THE COURT:  Yes.

25             MR. WORTMANN:  Thank you.

Q.   Ms. Rimkus, I'm going to show you a plastic bag that has
been admitted into evidence as Exhibit No. 11 in this case.
And let me ask you first whether you recognize that?

A.   Yes, I do.

Q.   What do you recognize it to be?

A.   This is the evidence submitted with this case.

Q.   And is that a sample that you have tested using the
procedures that you just laid out?

A.   Yes, it is.

Q.   How do you recognize that that was, in fact, the sample
that was involved in this particular test that you sampled?

A.   I recognize the outer packaging, has a label with a
unique laboratory number assigned to this case.  It also has a
seal with my initials and the date of analysis.  In addition,
the inside packaging that has that unique laboratory number,
my initials and date.

Q.   Now, when you first got the sample, did it appear as it
appears today?

A.   No.

Q.   And how did it appear when you first got it?

A.   It was a small rock, like pebble, of a rock-like powder,
is what we call it, in a plastic bag.

Q.   And how did you change the appearance of the contents of
Exhibit 11 in the course of your presumptive and confirmatory
testing?

1    A.   So, I had to remove the item from its packaging and

2    after weighing it, I crushed it up to ensure that when I took

3    a sample, it was uniform.  And so, whatever sample I took was

4    representative of the entire powder.

5    Q.   And so, some of the sample was used up in your testing?

6    A.   Correct.

7    Q.   And can you tell us where the remaining crushed-up

8    powder is of what's left of the rock?  Where is that?

9    A.   That is folded up inside this bag.

10   Q.   And that bag is just marked --

11   A.   It's marked with the lab number and number one.

12   Q.   And we can both see some of the powder in there?

13   A.   Yes.

14   Q.   And it's also possible to feel the granules?

15   A.   Mm-hmm.

16        MR. WORTMANN:  If I can go back, your Honor.  Thank

17   you.

18   Q.   And putting Exhibit 11 back on the document camera, the

19   lab number that you indicated that was placed on the sample

20   was where?  And you can actually circle it on the screen.

21   A.   (Indicating).

22   Q.   Okay.  That's where the drugs are?

23   A.   Correct.

24   Q.   And why do you put them in a -- what appears to be a

25   paper envelope as opposed to something that's clear and you

1   can see through?

2   A.   The paper envelope simply has less static if we ever

3   would need to re-weigh or reopen the drugs.  It's for ease of

4   re-exampling.

5   Q.   And the initials here, whose are those?

6   A.   Those are my initials.

7   Q.   And the sample up here, what is that?  The number up

8   there.

9   A.   That is the lab number that our laboratory assigns.

10  Q.   And is there also a case number from the Boston Police

11  Department?

12  A.   Yes.

13  Q.   And that would be right there?

14  A.   Yes.

15  Q.   Now, could you tell us what was the first test you

16  performed on the contents of Exhibit 11 after you prepared it

17  for testing?

18  A.   UV reviews.

19  Q.   And what is that test?

20  A.   It essentially shines a light on the sample in solution

21  and the molecules will absorb that light at certain

22  wavelengths and it essentially produces a graph and by looking

23  at the pattern of the graph, we can have an idea what is in

24  that sample.

25  Q.   You testified earlier, that's merely a presumptive test?

1    A.   Correct.

2    Q.   And not one that you ultimately rely on in forming your

3    opinion as to what the contents are?

4    A.   Correct.

5    Q.   What's the first confirmatory test that you performed --

6    that you performed on Exhibit 11?

7    A.   The FTIR.

8    Q.   And can you tell the grand -- the members of the jury

9    what the FTIR is?

10   A.   That is -- like UV review, it's kind of spectroscopy,

11   meaning you submit the item to varying wavelengths of light.

12   Based on the structure of that molecule, it will react a

13   certain way and you get a graph and it's like a chemical

14   fingerprint.  It's a distinct pattern that only a molecule

15   with that structure will create.

16   Q.   So, different molecules will produce different graphs?

17   A.   Correct.

18   Q.   And then once you have the graph that's produced by the

19   FTIR, how do you interpret it as to what it shows?

20   A.   You compare it to a known reference spectrum of a

21   substance.

22   Q.   And let me put in front of you on the document camera

23   what has been marked as Exhibit 7A.  Do you recognize that,

24   ma'am?

25   A.   Yes.

1    Q.   And can you --

2         THE COURT:  Is this in evidence?  Excuse me.  Is

3    there an objection to its being in evidence?

4         MR. BUTTERS:  No, your Honor.

5         MR. WORTMANN:  Your Honor, I would offer Exhibit 7A

6    and 7B at the same time.

7    Q.   And can you tell us what that is?

8    A.   This is the FTIR data for the item in this case.

9    Q.   What's the significance of all these peaks and valleys

10   that are shown on Exhibit 7A?

11   A.   They each represent a certain bond within the molecule

12   and how it reacted to the test.

13   Q.   Now, once -- and how do you know that this piece of

14   paper reflects the FTIR test done on Exhibit No. 11?

15   A.   It has the unique laboratory identification number, 13-

16   20606, Item No. 1, and my initials at the top of the page.

17   Q.   And that would be right there?

18   A.   Yes, those are my initials.

19   Q.   Now, having gotten this, what do you then do in order to

20   make a determination as to the significance of the FTIR

21   results for the contents of Exhibit 11?

22   A.   I compare it to a known reference spectrum of cocaine

23   base.

24   Q.   So, explain what that means.

25   A.   We essentially have known samples of cocaine base that

1    have been also analyzed by this FTIR and I compare my sample

2    with the known.

3    Q.   And showing you what's been marked as Exhibit 7B.  Do

4    you recognize that?

5    A.   Yes.

6    Q.   And what is that?

7    A.   That is a library spectrum of cocaine base.

8    Q.   And have you had the opportunity to compare Exhibit 7B

9    and 7A?

10   A.   Yes.

11   Q.   Was it helpful to you in reaching a determination as to

12   what the contents of Exhibit 11 are?

13   A.   Yes.

14   Q.   And what was that result?

15   A.   I concluded that it was cocaine base.

16   Q.   Now, you indicated that you then performed two

17   additional -- or one additional test on two separate machines,

18   confirmatory test; is that right?

19   A.   Yes.  It's one instrument that serves two purposes.

20   Q.   And that machine is called?

21   A.   GC/MS.

22   Q.   And I'd like to -- first, let's talk about the GC, gas

23   chromatograph.  What does that do?

24   A.   The gas chromatograph separates components of a mixture.

25   So, I have a sample.  I dissolve it.  It runs through this

1    instrument and there's a long 15-meter column and different

2    parts of a mixture will come off of that column at different

3    times.

4    Q.   And, again, each molecule is unique?

5    A.   Correct.

6    Q.   So, it's another way of getting what you referred to

7    earlier as a chemical fingerprint?

8    A.   Yes.

9    Q.   And the gas chromatograph is a confirmatory test for

10   simply cocaine?

11   A.   When it is combined with the mass spectrometry portion.

12   Q.   It doesn't distinguish between cocaine base and cocaine?

13   A.   Correct, it does not.

14        MR. WORTMANN:  Your Honor, at this time I offer

15   Exhibits 8A and 8B into evidence.

16        THE COURT:  No objection?

17        MR. BUTTERS:  No objection, your Honor.

18        (Exhibit Nos. 8A and 8B received in Evidence.)

19   Q.   And putting before you what's been marked as Exhibit 8A,

20   can you tell us what this is?

21   A.   That is the GC data for this case.

22   Q.   And how do you know that it's this case?

23   A.   It has that laboratory number, item number and my

24   initials.

25   Q.   And that would be right here?

1    A.   Correct.

2    Q.   Now, once you obtain this from the gas chromatograph,

3  what do you do in order to determine what the significance of

4  this particular test result is?

5    A.   This needs to be compared with a known cocaine standard

6  that was run through this same instrument within 24 hours.

7    Q.   And showing you what's marked Exhibit 8B.  Do you

8  recognize that?

9    A.   Yes.

10    Q.   And what is it?

11    A.   That is our daily cocaine and heroin standard that we

12  run on each instrument.

13    Q.   And it also shows that the tests were run on the same

14  date, that is September 23rd, 2013?

15    A.   Correct.

16    Q.   And there are two lines here.  What do they show?

17    A.   One is the -- shows cocaine coming off of that column

18  and being detected by the instrument and the --

19    Q.   That would be the cocaine standard?

20    A.   Correct, cocaine standard.

21    Q.   Which line is that?

22    A.   The highlighted line.

23    Q.   And what's the number at the top of that column?

24    A.   5.956.

25    Q.   And the second line?

```
 1    A.   7.114.

 2    Q.   I'm sorry.  What does it -- what is that line?

 3    A.   That is the heroin standard.

 4    Q.   And that had no relevance to the testing you did here?

 5    A.   No.

 6    Q.   Now, once you have Exhibit 8A and 8B, did you compare

 7    them?

 8    A.   Yes.

 9    Q.   And was that helpful to you in reaching an opinion as to

10    what the contents of Exhibit 11 were?

11    A.   Yes.

12    Q.   And what was that?

13    A.   They had their retention times.  So, the same molecule

14    was going to come off of that column at the same time.  So, I

15    compared the retention time of the standard to the retention

16    time of the sample and they have to be within 0.1 minutes.

17    Q.   And were they?

18    A.   Yes.

19    Q.   And based on that, what conclusion did you reach?

20    A.   With the mass spec data, that it was consistent with

21    cocaine.

22    Q.   Okay.  And you mentioned the mass spec.  And that's the

23    second half of this second confirmatory test?

24    A.   Correct.

25         MR. WORTMANN:  And at this time, your Honor, I would
```

1    move into evidence Exhibits 9A and 9B.

2              THE COURT:  No objection?

3              MR. BUTTERS:  No objection, your Honor.

4              (Exhibit Nos. 9A and 9B received in Evidence.)

5    Q.   And, first, could you tell us what the mass spectrometer

6    is?

7    A.   So, as these samples are coming off the GC part of --

8    the first part of the instrument, they enter the mass spec and

9    they are bombarded with energy and the molecules are

10   fragmented and the fragments are then measured.  So, each

11   molecule will fragment the same way every time and produce

12   this unique spectrum or like a chemical fingerprint of that

13   substance.

14   Q.   And how are the results of the mass spectrometer

15   produced?  What do they look like?

16   A.   They look like a graph.

17   Q.   And showing you what's been marked as Exhibit A.  Can

18   you tell us what that is?

19   A.   That is the mass spec data for that cocaine peak.

20   Q.   And the sample number and your initials appear in the

21   middle of this page?

22   A.   Yes.

23   Q.   And what's the highlighted graph?

24   A.   That is the mass spec data.

25   Q.   For this particular sample?

1    A.   For that sample.

2    Q.   And the remaining samples -- the remaining graphs, what

3    do they reflect?

4    A.   Those are library spectra, reference spectrum of

5    cocaine.

6    Q.   And did you also compare them to some additional results

7    for Exhibit 11?  Did you compare them to some additional

8    cocaine standards as well?

9    A.   Yes.

10   Q.   And showing you what's marked as Exhibit 9B.  Can you

11   tell us what that is?

12   A.   That is the daily cocaine heroin standard that we run

13   every day.  That is the cocaine data from that.

14   Q.   So, 9A is library and 9B is the actual standard that was

15   run that same day?

16   A.   Yes.

17   Q.   And comparing the -- and the results for the sample are

18   at the top of the page?

19   A.   Correct.

20   Q.   Was the comparison between the mass spec results for the

21   contents of Exhibit 11 and the contents of the cocaine

22   standards, both from your library and the standards that were

23   actually run, was that helpful to you in forming your

24   conclusion as to what the contents of Exhibit 11 were?

25   A.   Yes.

1    Q.   And what was that opinion?

2    A.   That it was cocaine.

3         MR. WORTMANN:  Your Honor, could I ask the witness to

4    step down?  We have some blowups and I just want to go through

5    how the actual comparisons were made.

6         THE COURT:  Any objection?

7         MR. BUTTERS:  No objection.

8         MR. WORTMANN:  Your Honor, may I set up the easel

9    approximately right there?  I know it will block you and I

10   apologize, but I want to make sure Mr. Butters and the jury

11   can see.  Or where would you like me to do it?

12        THE COURT:  Go ahead.  Do it wherever it's

13   convenient.

14   Q.   Ms. Rimkus, if you could come down, please.

15        (Ms. Rimkus steps down and approaches easel.)

16        THE COURT:  I think you need to tilt it some more

17   because the jurors at this end can't really see it.

18        MR. WORTMANN:  I'd ask you, your Honor, to ask the

19   jurors if everybody can see this now.  Anybody can't, put up

20   your hand.

21        THE COURT:  This is the same that we've just seen on

22   the screen, right?

23        MR. WORTMANN:  It is.  It's just putting them

24   together.

25   Q.   Ms. Rimkus, this is Exhibit 7A and 7B.  And are these

1    the two documents that you used to make a comparison, namely

2    the actual results of the FTIR and a library sample?

3    A.   Yes.

4    Q.   How do you make a comparison with respect to the FTIR?

5    A.   So, this is the sample, the evidence inside, and then

6    this is a known library spectrum, and you're essentially

7    looking for what we call heat conformance.  So, where there's

8    a peak in the library, there should be a corresponding peak in

9    the sample.

10        So, what I do is I usually trace along with my hand and

11   make sure that for every corresponding peak and valley in this

12   library, there is one in my sample as well.

13   Q.   Now, it appears that these are not identical.

14   A.   They're not identical.

15   Q.   And is that unusual?

16   A.   No.

17   Q.   And did that in any way affect your opinion?

18   A.   No.

19   Q.   And based on the comparison that you did of these two

20   documents, the FTIR test, what did you conclude the contents

21   of Exhibit 11 to be?

22   A.   I concluded that it was cocaine base.

23        MR. WORTMANN:  Your Honor, if I can approach, please.

24        THE COURT:  Yes.

25        MR. WORTMANN:  I'm going to put up the comparison,

1  your Honor, of 8A and 8B.  Tom.

2          MR. BUTTERS:  No.  I saw it.

3          MR. WORTMANN:  Okay.  Thank you.

4          MR. BUTTERS:  I memorized it.

5    Q.   So, this is a blowup of what?

6    A.   This is the GC data, both the sample from this case and

7    the standard.

8    Q.   And when you obtain both the GC results of your drug

9    samples and the standard, how do you determine what the

10   implications are or results of that comparison are?

11   A.   I'm comparing this number right here (indicating),

12   that's the retention time.  So, this axis right here is time.

13   That's as things come off of that long column I talked about,

14   you'll see a spike for everything that comes off.  So, we see

15   a spike here in the sample at 5.961 minutes and in the

16   sample -- in the standard there's a corresponding peak at 5.956.

17   Q.   And what's the -- is there a standard that it has to

18   meet in order for there to be a positive for cocaine?

19   A.   Yes, it has to be within 0.1 minutes.

20   Q.   And this was within what?

21   A.   This is .005 minutes.

22   Q.   So, almost 100 times better than the minimum that you

23   would have to have?

24   A.   Correct.

25   Q.   Okay.

1          MR. WORTMANN:  And if I could approach one more time,

2     your Honor, please.

3      Q.   And, lastly, can you tell us what the third chalk that

4     I've put up on the board, what is that?

5      A.   This is the mass spec data for that item, for that peak

6     at 5.96, and then this is the mass spec data for the standard.

7      Q.   And in comparing the sample results on the mass spec to

8     the cocaine standard and the library standard, is there a

9     criteria that you have to have in order to make a

10    determination that it is, in fact, confirmatory for the

11    presence of cocaine?

12     A.   We have to look, again, at the general peak conformance.

13    We want to ensure that for major peaks, there are

14    corresponding major peaks in the library and standard.  In

15    addition, our laboratory mandates a 70 percent match, which is

16    basically a -- how much does this library match your sample.

17    And so, this right here (indicating) is one of the library

18    matches and it was a 99 percent match to my sample.

19     Q.   So, approximately 20 or 30 percent higher than that that

20    would be required for you to use this in forming an opinion

21    that the material contained cocaine?

22     A.   Yes.

23     Q.   And what about the comparison between Exhibit 11 and the

24    cocaine standards that were run that same day?

25          MR. BUTTERS:  Exhibit 11?

1          MR. WORTMANN:  It's Exhibit 9B.  I'm sorry.  Thank

2    you.

3    A.   For the standard I'm also looking to make sure that the

4    mass spectrum of my standard is within an acceptable range

5    with the library matches and you can see it was 99 percent

6    match to the library.

7    Q.   Again, well in excess of the 70 percent that's required?

8    A.   Yes.

9    Q.   I'd ask you to return to the witness stand, please.

10          MR. WORTMANN:  Mr. Butters, do you want me to leave

11    those up there?

12          MR. BUTTERS:  I wish you would.

13          MR. WORTMANN:  I will.  Thank you.

14          (Ms. Rimkus resumes the witness stand.)

15    Q.   Following the completion of all your testing, did you

16    reach a final opinion to a reasonable degree of scientific

17    certainty as to what the contents of Exhibit 11 were?

18    A.   Yes.

19    Q.   What were your conclusions?

20    A.   That it was cocaine base.

21    Q.   And once you had reached that conclusion, did you

22    document the results of your opinion?

23    A.   Yes, I wrote a report.

24    Q.   And that's known as a certificate of drug analysis?

25    A.   Correct.

1            MR. WORTMANN:  And, your Honor, I'd offer this as

2    Exhibit 10.

3            MR. BUTTERS:  No objection, your Honor.

4            THE COURT:  Okay.

5            (Exhibit No. 10 received in Evidence.)

6    Q.   And showing you what's been marked as Exhibit 10, can

7    you describe for the jury what this is, please?

8    A.   This is the certificate of drug analysis that I issue

9    after I have completed analyzing the items.

10   Q.   And we know it's of the same sample because?

11   A.   It has that unique laboratory identification number at

12   the top.

13   Q.   And your conclusions are written where?

14   A.   Under the phrase, "Has been examined with the following

15   results," that section right there.

16   Q.   And that's your signature?

17   A.   Correct.

18           MR. WORTMANN:  Thank you.  Your Honor, I have nothing

19   else.

20           THE COURT:  Let's stretch and then you can begin.

21           MR. BUTTERS:  Okay.

22           (Stretch break.)

23           THE COURT:  You may stretch, too.

24           THE WITNESS:  Thank you.

25           (Stretch break.)

1          THE COURT:  Okay.  You may proceed, Mr. Butters.

2          MR. BUTTERS:  Thank you, your Honor.

3                    CROSS-EXAMINATION

4     BY MR. BUTTERS:

5     Q.   First of all, Ms. Rimkus, you were -- this sample that

6     you got, you received -- or the lab received from the Boston

7     Police Department, correct?

8     A.   Yes.

9     Q.   And were you aware that this is the sample that Michael

10    Morrison sold to the undercover officer in March of 2012?

11    A.   I simply receive a case information listing names and

12    dates of incident.

13    Q.   So, you're not aware that this is the cocaine base that

14    Michael Morrison handed to the undercover officer or whether

15    -- who did it, right?

16    A.   I simply know the information I'm provided.

17    Q.   And you had been on the job -- were you still undergoing

18    your training when you completed these tests?

19    A.   Yes.

20    Q.   And did you have a supervisor who was helping you with

21    this particular test?

22    A.   No.  Our training has several modules and I had

23    completed the marijuana, cocaine and heroin modules at the

24    time of this analysis.  So, I could conduct the analysis

25    independently.

```
1    Q.   So, was this your first or second cocaine test, do you
2  think?
3    A.   No.
4    Q.   How many do you think you'd done before this one, do you
5  know?
6    A.   Independently?
7    Q.   Yes, independently.
8    A.   Cocaine or cocaine base?
9    Q.   Base.
10   A.   Several dozen.
11   Q.   And are there any -- in Exhibits 7 through 9, do any of
12 those documents reflect the fact that this substance was
13 cocaine base?
14   A.   Yes.
15   Q.   Which one?
16   A.   The FTIR data.
17   Q.   And which one is that?
18   A.   I'm not certain of the exhibit number.
19        MR. BUTTERS:  Well, may I approach the chalk?
20   Q.   Is it this one?
21   A.   No.
22   Q.   Is it this one?
23   A.   No.
24   Q.   It must be this one?
25   A.   Yes.
```

1    Q.   Okay.  And this is the one where you can see some

2    significant differences, can't you?

3             THE COURT:  I think you're blocking the jury's view.

4             MR. BUTTERS:  Oh, I'm sorry.  I'm going to have to

5    block you, then, your Honor.

6             THE COURT:  That's okay.

7             MR. BUTTERS:  Okay.

8             THE COURT:  You're not blocking me.  I can see the

9    back of you now.

10             MR. BUTTERS:  Okay.

11    Q.   Am I blocking you?

12    A.   Yes.

13    Q.   I'll tell you what.  Let me give you my little chalk

14    that I got from Mr. Wortmann that's in evidence, and this is

15    7A and 7B.  So that you can look at that, and I'll be over

16    here and the Judge will be blocked and --

17             THE COURT:  Well, I have my own 7A and B.

18             MR. BUTTERS:  Good.

19    Q.   So, there's some significant differences, would you

20    agree with me, between the actual sample that you got that Mr.

21    Morrison sold, which is 7A, correct?

22    A.   Are there significant differences, is the question?

23    Q.   Yes.

24    A.   No, not in my opinion.

25    Q.   Not in your opinion?  Well, doesn't this icicle -- isn't

1   the icicle on 7A significantly longer than 7B?

2   A.   That's correct.

3   Q.   And when you go to the right-hand side of Exhibits 7A

4   and 7B, the stalagmites -- impressive, though.

5           THE COURT:  The mites go up or the tites go up?  This

6   goes up --

7           MR. BUTTERS:  The mites go up and the tites come

8   down.

9           THE COURT:  Okay.

10          MR. BUTTERS:  Because I was a geology aficionado.

11  Q.   So, there's a significant difference there, too, isn't

12  there?  I mean, to the untrained eye.

13  A.   In terms of the height of the -- you're referring to?

14  Q.   Right.

15  A.   Correct.

16  Q.   But you still concluded that this was cocaine base?

17  A.   Yes.

18  Q.   And you say that when -- let me ask you something.

19       Are you familiar with the TRU Narc machine?

20  A.   I have heard of it.

21  Q.   Okay.  But you don't really know --

22  A.   I've never worked with one.

23  Q.   That's not something you use at the lab, though?

24  A.   It is not.

25  Q.   Because it's not -- well, you don't use it, right?

1    A.   Correct.

2    Q.   Okay.  We'll just leave it at that.

3         Now, on -- one thing I was confused about, among many

4    others, was that on 7B, on the document that you have in front

5    of you...

6              MR. BUTTERS:  May I approach, your Honor?

7    Q.   That 7A has a date -- oh, it's not 7A.  I'm sorry.

8         Okay.  Exhibits 8 and 9.  Here, I'll take this back so

9    we're not unduly confused.

10        If you would look at 8A and 8B -- well, let me do this

11   on the -- take advantage of this machine.  Can you read that

12   alright?

13   A.   Yes.

14   Q.   So, this indicates that the test was concluded -- or the

15   test was accomplished when?

16   A.   September 23rd.

17   Q.   And what's that -- what's the date at the bottom?

18   A.   That is the date that the document was printed.

19   Q.   Okay.  And so, let me show you Exhibit 8B, and this --

20   8B, as I understand it, is the test that you did on the

21   standard, you know, whatever the standard was?

22   A.   Correct.

23   Q.   And that says that you also did that on -- at the top it

24   says September 23rd, right?

25   A.   Yes.

1   Q.   And then at the bottom, though, it says it was printed

2   out on June 9th.  Do you know why that was?

3   A.   It was requested that I reprint it for simply the

4   quality of having a larger picture for court purposes.

5   Q.   So, in the beginning when you submitted something to Mr.

6   Wortmann, you didn't include this document, 8B, right?

7   A.   That data was included, but it was shrunken down on the

8   page and he requested a larger printout.

9   Q.   Do you know when you first received this sample, whether

10  you were asked even to test for cocaine base or whether the

11  lab was asked to test for cocaine base?

12  A.   I was not asked.  Our protocols determine that we do the

13  tests.  We always do FTIR and GC/MS on all suspected cocaine

14  samples.

15  Q.   Okay.

16          MR. BUTTERS:  I have no further questions, your Honor.

17          THE COURT:  No redirect?

18          MR. WORTMANN:  I have no redirect.

19          THE COURT:  Thank you, Ms. Rimkus.  You are excused.

20  Any other witnesses?

21          (Ms. Rimkus steps down.)

22          MR. WORTMANN:  Your Honor, would you hear me out at

23  sidebar on the other motion, on the person I talked to you

24  about?

25          THE COURT:  I don't think it's necessary .  We had an

1    agreement yesterday that this matter was not going to be

2    argued and I don't see any reason to have a witness on it.

3              MR. WORTMANN:  Okay.  Then the government rests.

4    And, your Honor, may I take these down?

5              THE COURT:  Yes.  And the defendant?

6              MR. BUTTERS:  We rest.

7              THE COURT:  Okay.  When counsel announce that they

8    rest on behalf of their respective clients -- and the

9    government is Mr. Wortmann's client -- that means that they

10   have finished representing all the evidence to you that they

11   anticipated presenting to you or that they wish to present to

12   you.

13             So, what we will do now is take a recess.  Your

14   goodies won't be there yet.  So, you'll have to wait until

15   they come, normally at around eleven, and what I will spend

16   the next 15 minutes or so talking with counsel about, as I

17   explained to you yesterday, what I will tell you the law is,

18   and then we will re-assemble and we will hear the arguments,

19   first of Mr. Wortmann on behalf of the government, then Mr.

20   Butters on behalf of the defendant.  Mr. Wortmann has an

21   opportunity for brief rebuttal.  He'll tell me ahead how long

22   it will be and we'll stop him at the end of it.  That is, when

23   the timing is up.  And then after that, depending on where we

24   are, we may take the recess with the goodies and then after

25   that I will charge you or if we do this all very quickly, we

may get it all done before the recess.  So, you're now excused

for about 15, 20 minutes.

          COURTROOM DEPUTY CLERK URSO:  All rise, please.

          (Jury excused.)

   THE FOLLOWING TAKES PLACE OUTSIDE THE PRESENCE OF THE JURY:

          THE COURT:  Let me just state for the record, explain

the absence of Juror No. 14.

          Yesterday after we closed, he apparently made some

comment to Lisa about having baseball tickets.  I happened to

walk -- to go down in the elevator with him and another juror

and he said something about baseball tickets.  And I said,

Hmm, but then I asked Ms. Urso -- I realized that he was the

alternate juror and he apparently had asked Ms. Urso about

whether the alternate jurors would participate or not, and she

declined to say anything, which was very wise of her.

          However, when I spoke with her, we thought that it

might be a kindness to him to excuse him earlier so that --

please be seated -- so that he would not give away the tickets

or think he was going to lose them all together because he was

going to have to be here at 1:30 because unless we excused him

yesterday, then that would happen.

          So, we asked counsel whether they had any objection

to our excusing him.  Counsel did not object.  And Ms. Urso

telephoned him and told him that he did not have to appear

today.  So, that's the story about Juror No. 14, who expressed

1    great happiness with that result.

2           Now, with respect to the charge, here is the verdict

3    as I propose to give it to the jury and there is one for each

4    of you.  Give one to Catherine.

5           COURTROOM DEPUTY CLERK URSO:  Yep.

6           CHARGE CONFERENCE:

7           THE COURT:  So, let me tell you what I expect to tell

8    the jury and then you can correct me at the end or augment

9    what I propose to say.

10          I will go through the usual role of the jury, find

11   the facts, to take the law as I give it to them, be fair and

12   not biased.  I will tell them that the evidence consists --

13   there are no stipulations in this case, are there?

14          MR. WORTMANN:  No.

15          THE COURT:  The evidence consists of the exhibits

16   that have been offered and introduced into evidence,

17   photographs, the various charts, and that's, in essence, it.

18   And that the jury should use all of these -- review all of the

19   exhibits and use them in the process of getting to a verdict.

20          Then I will tell them that the second component of

21   the evidence is the testimony of the witnesses and I will

22   explain to them about credibility and the tests that we

23   usually tell them about and that they should use all of them

24   and any others that they have found to be useful in their

25   everyday lives in making a judgment whether they believe

1    somebody or not.

2          I will explain to them about law enforcement, which

3    includes all the witnesses in this case, and that they are not

4    by virtue of their positions more or less credible than

5    anybody else.  I will explain to them about circumstantial and

6    direct evidence and how that works, and then I will tell them

7    what is not evidence, openings, closings.  I don't think any

8    testimony was stricken, but I may mention it just in case,

9    questions that were put to the jury in the form of a statement

10   that the witness doesn't adopt.  I don't think we had much of

11   that either.  Anything they may have heard outside the

12   courtroom, anything I say is not evidence, I will tell them.

13         I will tell them that you have not only a right, but

14   a duty to make objections and will then explain to them the

15   use of the notebooks, that they will not get a transcript.  We

16   do not have a transcript, despite Ms. Handel's hard work, and

17   that they may use the notebooks to help them remember the

18   evidence, but I will remind them that sometimes when we take

19   notes, we are not as accurate as maybe what somebody else may

20   remember who did not take notes, and I will urge them to use

21   their common sense and good judgment.

22         I will explain to them the presumption of innocence

23   in substantially the way in which I did in the voir dire.  I

24   will tell them that reasonable doubt does not mean proof

25   beyond all possible doubt, that it means proof to a degree of

certainty that satisfies the judgment of each juror and the
conscience of a reasonable person and leaves in that juror's
mind a clear and settled conviction of guilt.

I will tell them that a reasonable doubt exists when
after weighing and considering all the evidence using reason
and common sense, the jury cannot say that they have a settled
conviction of the truth of the charges.

I will tell them that a reasonable doubt may arise
from the evidence or from a lack of evidence and that the
burden always remains with the government and never shifts to
the defendant, and if they view the evidence as permitting
either of two conclusions, one that the defendant is guilty
and one that he is not guilty, they must find him not guilty.

I will tell them proof by a preponderance of the
evidence is not sufficient, nor is proof by clear and
convincing evidence.

I will tell them the indictment is not proof of
guilt.  It is simply the document that contains the
accusation, and that in doing their work they should not think
about or consider what the punishment might be.  That I will
have to deal with after they decide what they have to decide;
namely, whether the government has proven him guilty beyond a
reasonable doubt.

I will tell them about indictment conventions, that
"or" means "and" and "and" means "or" and "on or about" means

1  not necessarily on exactly that day.

2          I will give them the outline of the indictment as I

3  understand it, that the underlying allegation is that the

4  defendant and Mr. Robert Morrison distributed and sold the

5  crack cocaine.

6          The government has caused an indictment to be

7  returned with two criminal charges:  One, conspiracy to

8  distribute crack cocaine, and the other distribution of crack

9  cocaine on March 20th, 2013.

10          I will tell them that they are two different crimes

11  and they have different elements that the government has to

12  prove in order to prove the defendant guilty, and that he has

13  pled not guilty to each charge and, therefore, denies the

14  charge and each allegation made by the government.

15          Now, I prefer to start with the substantive offense

16  because it makes more sense to me to describe that and then

17  conspiracy to carry out that substantive offense.

18          So, I will tell them what the statute says.  It shall

19  be unlawful for any person knowingly and intentionally to

20  possess with intent to distribute a controlled substance, that

21  the indictment says that on March 20th, 2013, the defendant

22  did knowingly and intentionally, and so on, distribute.

23          The elements, I will tell them, are three:  One, that

24  the defendant distributed or possessed cocaine base with the

25  intention to distribute it, that he knew the cocaine -- that

the cocaine base was a controlled substance, and that he acted knowingly and intentionally.

I will explain to them possession, that it means to have direct physical control and custody of an object, which we call actual possession, or to have the power at any given time to exercise control over the object, and I will give them an example of taking a car to the repair shop. While I'm driving it there, I have actual possession of that car. I turn it over to the repair guy and at that point he has actual possession, but I continue to have constructive possession because I can tell him what to do with the car. So, that's the -- it can be one or the other, and I will explain to them that possession does not require ownership.

Intent to distribute, I will tell them, refers to a state of mind. It doesn't require that -- the government doesn't have to prove that the defendant actually distributed by sale or gift, or otherwise, only that he intended to do so and that he intended that a transfer of the drug take place.

Distribution means to deliver the substance and includes either the actual transfer or attempted transfer of the cocaine and, again, the government does not have to prove that the defendant benefited in any such transfer.

With respect to the second element, that the government has to prove that the substance involved was crack cocaine and the defendant knew it was a controlled substance,

1   I will tell them that knowledge, like intent, has to be

2   discerned from the defendant's conduct and the defendant's

3   statements in the context in which all of these things

4   occurred, and I will explain to them that we cannot know

5   intent or knowledge directly.  So, we have to discern it,

6   infer it indirectly by means of looking at what happened at

7   the time and what the defendant did and said in that context.

8        I will tell them with respect to the third element,

9   that he acted knowingly and intentionally, that knowingly

10  means to do something purposefully as opposed to doing

11  something by mistake or accident.  Intentionally means with

12  the intention to transfer the cocaine to another, and both

13  terms, again, derive from the defendant's state of mind and

14  have to be inferred from his words and his acts in the context

15  of the surrounding circumstances.

16       Now, I will tell them that in this case the

17  government has charged the defendant also with aiding and

18  abetting the commission of this offense, and I will tell them

19  what the statute says and that the idea is that a person

20  cannot avoid responsibility for getting somebody else to

21  commit the crime or by directing someone else to commit it or

22  by helping somebody else to do it.  It means that a person may

23  be found guilty of a crime without proof that he himself

24  committed it if the government proves beyond a reasonable

25  doubt that he willfully directed, aided, joined together with

another in the commission of that crime, and that willfully
means acting with knowledge that one's conduct is unlawful,
and the government has to prove that the defendant knowingly
and willfully associated himself in some way with the criminal
venture and willfully participated in it as he would in
something he wishes to bring about.

It is not enough to show that the defendant may have
had a suspicion of criminal activity.  It's not enough to show
that he was at the scene of the crime or even that he had
knowledge of a crime or that it was being or would be
committed.

The government has to prove that he was a knowing and
willful participant, not just a spectator, and this element is
proven if the government shows the defendant had actual or
constructive possession of the cocaine alone or with others or
that he in some way assisted the distribution of the drug on
March 20th, 2013.

So, in summary, if the government proves beyond a
reasonable doubt that the defendant with the intent to
distribute or did distribute or assisted the distribution of
crack cocaine on that day and that he knew it was a controlled
substance and that he knowingly and -- acted knowingly and
willfully, then the jury may find the defendant guilty, but if
the government did not prove each and every one of these
elements, then they must find him not guilty.

1          Now, conspiracy -- again, I will tell them what the

2    statute says, what the indictment says, and I will tell them

3    that the essence of conspiracy is an agreement, agreement by

4    two or more persons either to commit an unlawful act or to

5    carry out a lawful purpose by unlawful means, and the elements

6    with respect to conspiracy are only two:

7          One, that there was an agreement between two or more

8    persons at about the time alleged to either accomplish an

9    unlawful purpose or a lawful purpose by unlawful means.  In

10   this case the unlawful purpose to distribute crack cocaine.

11         And the second element is that the defendant

12   knowingly and willfully became a member of the conspiracy at

13   sometime during its existence.

14         With respect to the agreement -- I don't know if you

15   really need me to go through this.

16         MR. BUTTERS:  We don't, your Honor.

17         MR. WORTMANN:  Your Honor, I'd like -- as long as you

18   say it, but I sense that I'd like --

19         THE COURT:  I'm sorry?

20         MR. WORTMANN:  It requires the agreement to be gone

21   through with the jury in terms of it's an agreement, unspoken

22   or spoken.  It doesn't have to be a formal agreement --

23         THE COURT:  Yes, I say that.

24         MR. WORTMANN:  Okay.  That's fine.

25         THE COURT:  I describe what it means to have an

1    agreement and then what it means for the defendant to become a

2    member of it, which is element two, and I think it's

3    essentially boilerplate, both of these.

4            MR. WORTMANN:  Yes.

5            THE COURT:  Okay.  So, again, in summary, I will tell

6    them if the government proves that there was a conspiracy to

7    distribute crack cocaine and that the defendant knowing and

8    willfully joined it, then they may find him guilty on Count 1,

9    but if not both elements are proven, then they must find him

10   not guilty on Count 1.

11           I will tell them that when they are done, they should

12   consider separately each count because they are different

13   elements and they may consider different elements as to each

14   count.

15           Then once they have determined what their verdict is,

16   then they -- their foreperson should fill out the Verdict

17   Form, which I will explain to them.

18           I don't know whether it's necessary to tell them that

19   if for some reason they cannot come to agreement, they should

20   not fill out the form.

21           MR. WORTMANN:  I don't believe it is, your Honor.

22           THE COURT:  I mention it only because a jury

23   somewhere reported itself hung and then returned a verdict of

24   not guilty.  The unfortunate -- the other unfortunate part of

25   this was apparently the defendant, who was immediately

1    released, was murdered a week later.  So, I don't know.  You

2    tell me to what extent you want me to go into any of that.

3    So, in any event, I will explain to them the Verdict Form.

4          I will tell them that their first job should be to

5    elect a foreperson from among the twelve of them.  I will

6    excuse the remaining alternate, and tell them that if they

7    have any questions, they should -- the foreperson should write

8    out the question and I will answer either in writing or

9    reconvene us, if necessary, to explain whatever they may not

10   understand.

11         How long will your argument be, Mr. Wortmann?

12         MR. WORTMANN:  About 20 minutes, your Honor.

13   Probably about the same length as the opening.

14         THE COURT:  So, if we resume, let's say, by 10:15,

15   you should be done by about quarter of eleven.

16         MR. WORTMANN:  Yes.

17         THE COURT:  And, Mr. Butters, how long will you be?

18         MR. BUTTERS:  I would say 15 or 20 minutes.

19         THE COURT:  So, 11:30.  Charge by 12:00.  I guess we

20   should really order lunch for around noon, 12:15.  Agreed?

21         MR. BUTTERS:  Agreed.

22         MR. WORTMANN:  And then do the charge conference?

23         THE COURT:  No.

24         MR. WORTMANN:  You finish the charge before lunch?

25         THE COURT:  You will finish at about quarter of

1    eleven.

2         MR. WORTMANN:  Oh, you're right.  Absolutely right.

3         MR. BUTTERS:  Everything should be done by noon,

4    unless you --

5         THE COURT:  I think so.

6         MR. BUTTERS:  Unless you really take too much time.

7         THE COURT:  If I had used Mr. Wortmann's proposed

8    instructions, I think we would be here until 2:00.

9         MR. WORTMANN:  They're just there to help you, your

10   Honor.

11        THE COURT:  I know, and I did find them very helpful.

12   I cribbed one or two things.

13        So, I think we should get lunch up to the jury by

14   noon so that they can eat before they begin their

15   deliberations.

16        COURTROOM DEPUTY CLERK URSO:  Will the alternate be

17   eating, Judge, or are we going to dismiss him before --

18        THE COURT:  Will you allow the alternate to have

19   lunch with the others and then depart without talking about

20   the case in between or not?

21        MR. WORTMANN:  Your Honor, doesn't it make sense to

22   give the alternate something downstairs and let them start

23   deliberating while they eat lunch?

24        THE COURT:  No.  I usually tell them to eat lunch,

25   not to deliberate.

```
 1              COURTROOM DEPUTY CLERK URSO:  Just let him go and
 2     I'll do twelve?
 3              THE COURT:  So, is it agreeable to have him
 4     participate in the lunch?
 5              MR. WORTMANN:  Your Honor, as long as they get
 6     instructed that they shouldn't start deliberating, that's
 7     fine.
 8              THE COURT:  So, 13.
 9              COURTROOM DEPUTY CLERK URSO:  Okay.
10              MR. WORTMANN:  And, your Honor, five minutes for
11     rebuttal?
12              THE COURT:  Oh, I forgot to ask you that.
13              MR. WORTMANN:  Yes.
14              MR. BUTTERS:  I don't think it's fair to have
15     rebuttal.  I've suffered some serious consequences from good
16     rebuttals.
17              THE COURT:  Unfortunately, he's entitled to it.
18              All right.  So, why don't we take a recess.  Is 10,
19     15 time enough?
20              MR. BUTTERS:  I have one more thing that I would like
21     to say, your Honor.  That is that I intend to argue that they
22     should have had a microphone.  I don't think -- the case is
23     Commonwealth vs. Blood.  They call it a "Blood warrant," that
24     in the state system you have to get a blood warrant if you're
25     going to tape somebody without their knowledge in
```

1  circumstances where there's an expectation of privacy, and

2  *Blood* was a situation where all these conversations were taped

3  in people's private homes and certainly when you're on the

4  street corner, there is -- should be no expectation of

5  privacy.  And so -- and the government can argue whatever it

6  wants, but I want to be able to argue --

7       THE COURT:  I don't understand.  If I'm walking down

8  the street with a friend and talking to my friend about my

9  private things, why should you be entitled to tape that?

10       MR. BUTTERS:  Well --

11       THE COURT:  To listen to it?

12       MR. BUTTERS:  -- that's perhaps different, but when

13  you're standing in a bus stop on a busy street corner and

14  there's been, you know, a wealth of evidence about how busy it

15  was and how much traffic there was and how many people there

16  were --

17       THE COURT:  That doesn't mean you can't have a

18  private conversation.  I mean, isn't the state law that you

19  cannot tape somebody without a warrant?

20       MR. BUTTERS:  Yes, if there's a reasonable

21  expectation of privacy.

22       MR. WORTMANN:  Your Honor, the evidence was that they

23  were in this bus stop and there's no one else around.  It was

24  just the two of them.  There's absolutely no evidence that

25  anybody else could have overheard them.  Therefore, there's an

1    expectation of privacy.  Therefore, it would have been illegal

2    for them to do it.

3            THE COURT:  I think that's right.

4            MR. BUTTERS:  All right.  Well, that's why I wanted

5    to talk to you about it.  I'll have to think of another way to

6    say this.

7            MR. WORTMANN:  Yeah.

8            THE COURT:  We will start again at 10:15.  Is that

9    time enough?  Five minutes?

10           MR. BUTTERS:  Yes.

11           MR. WORTMANN:  Sure, your Honor.  Thank you.

12           THE COURT:  Do you wish the jury to have the jury

13   form while you're arguing?

14           MR. WORTMANN:  No.  It's so simple, your Honor, I

15   think it will just be a distraction.

16           THE COURT:  Okay.

17           (Recess taken.)

18           (Jury enters courtroom.)

19           THE COURT:  Please be seated.

20           Members of the jury, we're coming to the end of the

21   trial and, as I promised you, we will now hear from counsel,

22   and the convention in criminal cases, which is different from

23   what it is in civil cases, is that the prosecution goes first,

24   followed by the defense, and the prosecution then has an

25   opportunity for brief rebuttal.  Mr. Wortmann has asked for

1    five minutes and he will have five minutes to rebut.

2           So, as I told you in the beginning, when counsel

3    addressed you, that they were sort of telling you what was

4    going to happen, what the evidence was going to be.  You've

5    now heard it, and they're entitled to recall it for you, to

6    summarize it for you, which is why it's sometimes called

7    summation.  They're also entitled to try to persuade you based

8    on that evidence and that's why we also call it an argument,

9    closing argument.  So, don't be surprised if what they tell

10   you now will be very different from what they told you at the

11   beginning.

12          So, Mr. Wortmann, you may proceed.

13          MR. WORTMANN:  Thank you, your Honor.

14          GOVERNMENT'S CLOSING ARGUMENT:

15          MR. WORTMANN:  Ladies and gentlemen, at the outset,

16   we told you we would get the case to you on Wednesday.  I'm

17   glad we were able to get the case to you when we said we

18   would.  So, it's been a short trial, but even short trials

19   could be a major disruption in your lives, and both on my own

20   behalf and I know on Mr. Butters' behalf, on Mr. Spencer's

21   behalf, we appreciate that you got here on time, and we

22   apologize for the delays, and we appreciate the attention that

23   you've shown.  Without you guys, the system doesn't work.  So,

24   thank you on behalf of all of us.

25          I stood up before you a couple of days ago and I told

1   you that the government was going to prove to you that Barry

2   Spencer is a drug dealer, that he conspired with and aided and

3   abetted another man, Robert Morrison, Michael Morrison -- he

4   goes by two names -- to effect the hand-to-hand sale of crack

5   cocaine to Officer Richard Casallas.  Not that he handed the

6   drugs himself, not that he handled the drugs or the money, but

7   that he was a co-conspirator and aider and abetter.

8          Morrison, a man that even Mr. Butters went out of his

9   way to tell you was on other occasions walking around Egleston

10  Square selling drugs, crack cocaine, and Officer Casallas, an

11  experienced undercover officer, told you clearly, carefully

12  and unequivocally that Barry Spencer agreed to get him a rock

13  of crack cocaine after they had that initial conversation.

14  Brought Michael Morrison over in order to consummate the deal,

15  said, Here, he's going to take care of you, and then stood by

16  on the street.  Now, with these two guys right behind him,

17  looking up and down to make sure that the deal wasn't

18  interrupted, got the undercover's telephone.  And then what

19  happened?

20         Morrison and Spencer walked down the street together

21  until they were stopped by the Gang Unit officers and

22  videotaped so we would know who they are.  And meanwhile,

23  Officer Casallas walked the other way.

24         So, Barry Spencer was not a guy who was sitting

25  waiting for the bus.  He was not a guy just hanging out on a

1    cold and blustery day for his health.  He was a guy -- as you

2    heard, he was "on," and it was a slow day and he was waiting

3    to set up drug deals.

4            And I submit to you, ladies and gentlemen, that what

5    I told you we would prove is exactly the way the evidence has

6    come out.  A hand-to-hand drug sale made to an undercover

7    officer, not some informant, but an experienced undercover

8    officer, at the bus stop at 1990 Columbus Avenue, a deal that

9    Barry Spencer set up, that Barry Spencer helped to protect.

10           And here's the key.  That wouldn't have happened

11   unless Barry Spencer had done the legwork at the beginning.

12   He's the guy who put them together.  He's the guy who brought

13   them over.  And doesn't that suggest to you two things?  One,

14   that he substantially aided the transaction because that's

15   exactly how it went down.  It's Spencer who made it happen.

16   And the fact that he was able to get Morrison over there, and

17   then they walk off together, that they were working together.

18           And, you know, we talked at the opening about what a

19   conspiracy is, an agreement, implied or expressed.  It doesn't

20   have to be anything fancy.  Doesn't have to tell you that they

21   were working together.  That's what conspiracy and aiding and

22   abetting are all about.  That's what the evidence in this case

23   showed you happened and that's why Barry Spencer is guilty on

24   both counts is the right thing.

25           So, what's the evidence?  March 20, 2013, the B-2

Drug Control Unit goes out to buy crack cocaine in Egleston

Square.  And, you know, we showed you the aerial.  It's a

good-sized area.  Okay.  We know, and now you know, that they

didn't know where the deal was going to take place.  They

didn't know when the deal was going to take place.  They

didn't have anybody in mind.

       And think about those facts when you consider the

argument that you've heard about they should have done more,

that they should have had video cameras up, even though they

had no idea where they were going.

       There are three principle officers in this case.  I

mean, ask yourself whether that makes sense.  Ask yourself

whether that's what reasonable police officers should do,

given what they were out to do, which is quality of life,

street drug trafficking, you know, one of the major objectives

of this particular branch of the Boston Police Department.

       So, these three principle officers, Keenan, Walsh and

Casallas, you heard about their backgrounds.  Between them

they have more than 20 years of drug work.  They're

experienced, and I submit to you they know what they're doing

and they knew what not to do.

       What they were doing was, again, going after street

trafficking, the quality of life crimes, as Detective Keenan

told you, is what their unit does, and doing a buy/walk

investigation in which the undercover gets sent in to buy from

whoever is willing to sell them, and that's the problem with the quality of life, that these dealers are just out on the street.

And the undercover officer makes the buy, gets the drugs.  And what's the first thing that they have to do?  They got to get an identification, because if that guy gets away before they have a good identification on him, the investigation is over.

And so, what happened?  While the dealing was going on, the officers drove around and saw what they could.  And keep in mind, the key that you heard about is safety and the key that you heard about is secrecy.  And, sure, Detective Walsh stopped for ten seconds.  And wouldn't it have been nice, Mr. Butters will tell you, if he had taken a video of the defendant, but if he had done that, those cars honking behind him, they would have been honking away.  And what would he have done?  He would have blown the investigation if those people looked up and saw somebody with a video camera right on the other side of the street.  That's why this is a secretive business.  That's why these experienced officers do things the way they do.

And they were the only officers who really had the ability to go out there that day.  The Gang Unit guys couldn't because you saw what they look like.  They have, "Gang Unit" all over the back of their jackets.  They walk around and the

1   word would go out, the cops are on the block.  And what's

2   going to happen?  Nothing.

3          And if the B-2 guys -- Flaherty told you.  He said,

4   Look, we couldn't really go in there because they know my car,

5   they know my face.  And if we go in there, they're going to

6   know the area is heated up.  And what's going to happen?

7   Nothing.

8          So, should they have rented that apartment?  Ask

9   yourself whether that's reasonable.  And this is a theme I'm

10  going to come back to a bunch of times.  Use your common sense

11  and use your -- they conducted the investigation in a

12  reasonable way, in an aggressive way, in a way to get you good

13  solid testimony, testimony from an undercover officer who

14  looked Barry Spencer in the eye from two feet away and said,

15  "Hey, are you on?"  "Yeah, I'm always on.  It's a slow day.

16  What do you want?"  You heard Officer Casallas.

17         And focus on what the evidence is.  Focus on all the

18  evidence they brought you.  Focus on the quality of the

19  evidence, not what Mr. Butters thinks that they should have

20  done.

21         And, recall, at the opening Mr. Butters said that the

22  power and prestige of the Federal Government was behind this

23  investigation.  Well, you know now that's not true.  The

24  Federal Government, the DEA, the FBI had nothing to do with

25  this investigation.  It was the Drug Control Unit for District

1  D-4 and these three cops out on the street trying to make a

2  drug buy down in Egleston Square.

3         Now, you heard about the buy/walk investigation and

4  the critical importance of the identification as soon as

5  possible.  The undercover officer has to go out and had to put

6  his eyes on that guy.  Why?  Because they need to know if they

7  are -- if they're identifying the right guy, because if

8  it's -- you know, you heard questions about this.  What

9  happens if he gets up there and the Gang Unit has the wrong

10  guy?  Well, then you start looking real hard and it's -- and

11  you've got minutes to do it.  Do you know that show 48 Hours?

12  Well, this is one like 48 seconds, but as soon as people move

13  out in a busy square, the chances of finding them goes down

14  really quickly, but here they did it the right way.  They did

15  it the careful way and they gave you a good identification.

16  They drove by that stop.

17         Keenan saw Barry Spencer first.  Keenan then saw

18  Barry Spencer with Casallas.  Keenan then saw Barry Spencer

19  and Morrison, and you will see all of that stop.  Walsh sees

20  Barry Spencer, Morrison, and then Walsh sees them split up and

21  they go both different ways.  And, you know, like I said, they

22  weren't waiting for the bus stop.  They left the same way and

23  they went together.

24         And in this case they also got lucky because from the

25  moment that Sergeant Detective Keenan came in to -- and they

drove past that bus stop with Casallas and he said, That's

Barry Spence.  I know him from prior interactions on the

street.  He pointed him out.  He's the guy standing at the bus

stop.  And he said, You ought to take a run by him and see

what happens.  Why?  Because based on his prior dealings.

No one had to wonder who is that person standing at

the bus stop, because Keenan knew from the moment he saw him.

No one had to wonder because Richard Casallas walked up to him

and had, you know, an extended conversation, looking at him

eye to eye.

Remember what he told you when he was asked, Well,

were you looking on the street?  He said, No, I'm looking at

the people I'm dealing with.  I'm looking at their faces.  I'm

paying attention to the business in front of me, and the

people in front of him were Morrison and Spencer.

So, even then they do more to corroborate who the

seller is.  Walsh goes by.  Walsh sees him.  Walsh watches

them as the two of them go down Washington Street, take the

right on -- go down Columbus Ave, take the right on Washington

Street, and they get stopped by the Gang Unit up on Walnut

Park at a place where Mr. -- there was some suggestion he

lived, but where he wasn't when he got arrested a couple of

months later.  And they bring Casallas by.  And what did he

say?  Those are the guys.  And Walsh is there and he says,

Those are the guys.  And Keenan, who had seen him twice, says,

1    Those are the guys.

2            And just to make it clear, they bring you back the

3    video.  And would it have been nice if they could have gotten

4    the video of the deal?  Of course, it would.  Would they have

5    done it if they could?  But they couldn't do it and you heard

6    why.  So, what you have is the eyewitness testimony of an

7    experienced Boston police officer who made the conversations,

8    did the deal hand to hand.

9            Did Casallas have a body recorder?  No.  Why?  He

10   told you.  It's too dangerous.  He says, I get searched.  So,

11   are they taping the recordings?  No.  Why?  Because you heard

12   it would be illegal unless they had a judge issue a wiretap or

13   unless they had a court order.  How are they going to get a

14   court order when they don't know who they're going to be

15   buying from?  They did everything they could in the context of

16   the operation which they were trying to do.  And why?  Safety

17   of Officer Casallas is the first priority.  And ask yourselves

18   whether that's a decision you should second-guess.

19           But Casallas walks up to Spencer within minutes after

20   Keenan pointed him out and identified for him and told him who

21   he was.  And what is Spencer doing?  Well, as I've said, he

22   wasn't waiting on the bus stop.  Wasn't waiting for a bus

23   because if he had been waiting for the bus, after the deal was

24   done, he would have sat right there and waited for the bus.

25   No.  He left and he left with his pal, Morrison, and he's

1    sitting there on a blustery day.

2         And, again, think about what they did immediately

3    after the buy.  He leaves with Morrison.  If he was waiting

4    for that bus, he wouldn't have left.  He would have stayed

5    exactly where he was, but he left exactly when the deal was

6    done.  Why?  Because he wanted to get out of there because

7    that's where a drug deal had just been done.

8         He stays glued at the hip with Morrison so they can

9    go and finish whatever business they have until they get

10   stopped at Walnut Park and get videotaped on the

11   identification procedure.

12        Once again, common sense is critical, and I submit to

13   you that Barry Spencer stayed with Morrison because he wanted

14   to get his now that the deal was set up.  Maybe they were

15   doing other deals.  Maybe they were doing other things.

16        As you recall, you heard testimony from Keenan and

17   from maybe, I believe, Casallas as well, talking about, one,

18   that people work together, it happens all the time.  That just

19   makes sense out there.  They're out there to help each other.

20        Two, sometimes it's the dealers who pawn off the

21   drugs to somebody else so they're not carrying them.  On other

22   occasions the dealers will send out runners who are salesmen

23   to try to set up deals and then bring them to them.  And you

24   know what?  Do we know which one of those happened in this

25   case?  We don't, but it doesn't matter.  It doesn't matter

because either way, Barry Spencer was working with Morrison to sell drugs.  Barry Spencer aided and abetted that transaction. Barry Spencer knew what was going on because he said, What do you want?  And he said, He'll get the drugs for you.

It just -- by bringing Morrison to the deal -- you know, the evidence clearly shows that they were working together.  It shows that Spencer wanted that deal to happen, and he was the one who gave all the assistance to bring it about.  And can there be any question that he knew what was going on, given what he said, the words that came out of his mouth about crack cocaine, about what he did, which was standing there, as you heard from at least two different officers, looking back and forth.  Barry Spencer aided and abetted that deal.

So, why did he set up the deal?  And, once again, when you think about the evidence, use your common sense. First, was it to help a perfect stranger, Casallas?  Come on. Does that make any sense to you?  Ask yourself if it does.

Wouldn't Spencer have asked Casallas for something? Hey, I'll get you this, but, you know, I want something.  I want some money.  I want some drugs.  I want something.

Instead, what's the only thing he asked him for?  His telephone number, so they could call back.  It never happened because Spencer got taken off, you know, down the road.

So, let's go back for a minute and talk about what

happened when Spencer is approached by Casallas at the bus

stop.  Nobody else is there.  You heard it's blustery.

There's snow on the ground at 1990.  You remember some

small-talk, followed by the question, "Are you on?"  And

probably you guys never heard that before.  I never heard it

until I started doing this stuff.

And you recall Casallas telling you that that's code

word for saying, Are you selling drugs?  And he goes out on

the street looking for buyers, looking for sellers.  Sometimes

people look at him like he has two heads and he knows they're

not, and sometimes people say, Yeah, I'm on.  And what did

Spencer say?  "I'm always on," and, "It's been a slow day.

I'm glad you're here.  What do you want?"

And at first they take a few steps together down

towards Washington Street and then Spencer said, Wait a

minute.  He says, Stay here, because maybe he doesn't want to

see the drug dealer in case the dealer doesn't want to do the

deal.  Maybe he just doesn't want to be seen walking together,

but he says, Stay here.  And that's what Casallas does, and

waits five minutes.  Mr. Butters made a big deal about the

fact that he was prepared to wait for five minutes in order to

complete the deal.  Does that sound unreasonable to you?

He walks off to get Morrison.  Morrison comes back

and as he approaches, he says, Here, he's going to do the

deal.  He's going to sell you.  He's going to take care of

1   you.  And as Spencer takes that one step, looks, turns to the

2   side, also blocking vision and -- so that he's looking to see

3   if anybody is coming.  Quick exchange.  And he said -- he

4   pulled out a pile.  You know, Casallas said he thought there

5   were around ten, the same thing that he said on May 3rd.  And

6   Morrison gave him one.  He gave him 20 bucks.  There's some

7   small-talk and then they were done, but Barry Spencer wasn't

8   done yet because he wanted that telephone number.

9         And while this is happening, you know that Keenan

10  drives by.  You know that Walsh drives by.  And, look, they

11  weren't gilding the lily on you.  They told you they couldn't

12  see the hands.  They told you what they saw.  You know, they

13  didn't tell you, you know, that the KEL was great that day.

14  He was absolutely straight, told you what happened.  He said,

15  I could hear voices.  I couldn't make out any conversations,

16  and you heard that happens all the time.

17        So, here's where we talk about something that's, you

18  know, important but not critical, given all the corroboration

19  in this case, and that's the credibility of the undercover

20  officer, Richard Casallas.  You saw him on that witness stand.

21  You are the judges of credibility.  It's not me, not Mr.

22  Butters, you know.  It's not Judge Zobel.  You are the final

23  finders of the fact.

24        Did he get up there and did he tell you the truth or

25  did he make it all up, falsely accuse someone that he didn't

1    know?  And, once again, we get back to your common sense.

2         Look, you guys are all here because you have

3    different life experiences and, you know, you've been around,

4    you've done things.  You've interacted with people.  And all

5    the time in your lives you deal with people and you say, is

6    this guy being straight with me or is he not being straight

7    with me?  And you make those decisions.

8         You know, the second contractor comes up the roof and

9    you say, Get him out of here, and you work with people.  You

10   deal with people, and you make judgments about whether or not

11   you think they're honest and they're being straight with you

12   and you do that all the time.  It's no different here.  It's a

13   little artificial environment, but that's the decision that

14   you have to make.

15        And Judge Zobel is going to tell you about some of

16   the things that you should think about when you assess the

17   credibility of Richard Casallas and decide whether he lied to

18   you, because this isn't a case where something gets shady

19   where they, you know, maybe misunderstood something.  Maybe he

20   didn't quite -- you know, the concern whether he could see it.

21   Here, it's black and white.  Either these conversations took

22   place or he lied about them.  That's the decision you have to

23   make.  And how do you make it?

24        Did he have a good memory?  What was his manner while

25   he was on the stand?  Did he answer questions?  Was he -- you

1    know, did he handle himself the same way on direct and cross?

2    Did you get the sense he was trying to hide something?  You

3    know, was his testimony contradicted at any point?

4           And you recall -- and this is important.  You recall

5    that, obviously, Officer Casallas had testified at the grand

6    jury and he had -- Mr. Butters had the transcript, and he

7    said, Ah, when you testified, what did you say?  And it was

8    about the step, you know, and then he tried to suggest to you

9    that he changed his tune between the grand jury testimony and

10   what he said here.

11          And do you remember what happened?  Do you remember

12   when I got up and when I went a page or two ahead?  He said

13   exactly what happened, that he stood out and he was looking up

14   and down the street, exactly what he told you.  Exactly what

15   he told you.

16          If there's a difference between six or ten bags of

17   crack -- I don't know what it is.  So, apply that common

18   sense.  Was he telling you the truth or was he making it up to

19   get a conviction and violated the oath he gave?  And that is

20   your call.  I can't tell you what -- what I think doesn't

21   matter.  It's your decision, but ask yourself do you think he

22   got up there and told the truth or did you think he got up

23   there and lied?

24          Because his testimony is really straightforward and

25   gives you everything you need and then some to conclude that

1    Barry Spencer is guilty of both of the offenses.  The

2    conversations they had, what Spencer did, what Morrison came

3    and did and what Spencer did and what they did afterwards, but

4    keep in mind, ladies and gentlemen, that this case isn't just

5    Richard Casallas.  You had two officers in the same area

6    driving around.  And remember what they said and what they saw

7    on surveillance.  Remember what -- you know, Keenan drove by

8    the first time and there's Casallas talking to Mr. Spencer

9    and, again, he doesn't gild the lily.  He doesn't try to say,

10   Well, I saw them dealing.  He doesn't say that, Oh, yeah, I

11   could hear clear as the day on his KEL, which often you just

12   can't make out the words, which both Richard Casallas and

13   Keenan told you.  He told you the way it was.  He told you

14   what he saw and what he didn't see and he didn't try to gild

15   the lily at all.

16        Walsh tells you the same thing.  He comes around and

17   he says, Look, I tried to stop and I'm looking straight over

18   and I see Barry Spencer.  I identified him for you in the

19   court, but cars are honking at me.  I couldn't stay.  And they

20   did the best they could in a fluid, busy situation that street

21   dealing is all about.

22        Barry Spencer just wasn't some person waiting for a

23   bus.  He was a person waiting for a drug deal and he wanted to

24   set up that drug deal because he had a relationship with

25   Morrison, because he wanted to aid and abet and he wanted --

1    and, quite frankly, we don't know exactly why because they

2    don't go around talking about it.  He wanted something out of

3    the deal.

4           And after the deal, did he stay in the bus stop?  No.

5    He stayed with Morrison so they could deal whatever they got.

6           Ladies and gentlemen, all this evidence fits.  It

7    makes -- I submit to you it makes sense and it shows that, you

8    know, one thing and one thing only, that Barry Spencer is

9    guilty.

10          So, as I finish up, let me talk to you about some of

11   the things I submit should not be real -- real straight --

12   relatively straightforward things in your deliberations, such

13   as the fact that the contents of Exhibit 11 -- and, granted,

14   there's not a lot here.  You need to look and you can feel it.

15   You can see it.  It's right in that little package, because

16   this is street dealing.  This is not a major drug ring.

17          But guess what?  It's -- I submit to you, it's

18   cocaine base.  And how do we know that?  We know that because

19   three experienced drug officers identified it.  There's a

20   positive field drug test, and you heard about all the

21   analytical tests that Claire Rimkus, the person with a

22   forensic science degree, and what she did.  And, again, did

23   she seem to know what she's talking about?  Did she -- was

24   there any question about her?  Did she respond to both

25   questions the same way?  She's a scientist.  She did her tests

1    and she gave us the results.

2         But when you think about the drugs, ladies and

3    gentlemen -- and you already heard this a couple of times.

4    One thing that is not at issue is how much these drugs were.

5    All right.  Again, you heard street dealing.  You heard small

6    amounts.  You heard, you know, quality of life.  You heard

7    that's what the Drug Unit does.

8         And, you know, when Congress passed 21 U.S.C. 841 and

9    U.S.C. 846, they didn't say it's illegal to conspire to

10   distribute cocaine base or it's illegal to aid and abet

11   somebody else distributing cocaine base, that's unless it's

12   just a little bit of drugs and then it's okay.  It's not.

13        It's where the rubber hits the road.  That's why

14   they're out there doing it in those neighborhoods, and anyone

15   who suggests to you that the amount of drugs should be a

16   substantial factor in this case is basically saying ignore the

17   law, ignore the facts, and that's not consistent with your

18   oath.

19        The same thing with the identification.  It's a red

20   herring.  You had an I.D. made by a guy who knew Barry

21   Spencer, had familiarity with Barry Spencer, who knew him.

22   That's corroborated by two other witnesses.  It's corroborated

23   by the video.  There was no need, no reason to do anything --

24   they did four different things, and that video shows you that

25   that was Barry Wilson -- Barry Spencer, Barry Spencer and

1  Morrison standing on Walnut Park moments after the deal, and
2  Keenan went by and said, Those are the same two guys.
3  Casallas stood up and said, Those are the same two guys.  And
4  Walsh said, Those are the same two guys.
5          And, you know, what more do you want?  What more
6  should they reasonably do in these circumstances when you got
7  these fluid drug buys on the street and they have to move
8  quickly?  And what did they do afterwards?  They went back and
9  got more pictures.  They wrote up their reports.  So, you
10  know, the I.D. issue just goes no place.
11          Finally, ladies and gentlemen, I'm going to ask that
12  when you conduct your deliberations, when you retire and go
13  back to the jury room, following the Court's giving you the
14  law -- and if there's anything I said that's different on the
15  law, you know, go with the boss because that's what Judge
16  Zobel is.
17          Bring your common sense.  Bring your judgment.  It's
18  not -- when you become a juror, you're not anointed to become
19  something other than what you've been all your life.  You make
20  common sense judgments every day.  You know it when you see
21  it.  You know when you saw it.  And based on the evidence that
22  you saw here was one drug dealer helping another.  And I'm
23  going to ask when you return from the jury room, that you
24  return with a verdict that's true and just and based on all
25  the evidence and that verdict is that Barry Spencer is guilty

1    of Counts 1 and 2 of the indictment.  Thanks.

2              THE COURT:  Members of the jury, we will stretch

3    before we hear the defense.

4              (Stretch break.)

5              THE COURT:  You may proceed.

6              MR. BUTTERS:  Thank you, your Honor.

7              DEFENDANT'S CLOSING ARGUMENT:

8              MR. BUTTERS:  The Judge told you at the very

9    beginning of this trial that Barry Wilson (sic) is innocent

10   and the only thing that's going to change that is when you go

11   into the jury room and deliberate and ask yourselves whether

12   you have any doubt about the government's case.

13             So, the big question, really, is what did the United

14   States Government -- and that's where we are, here in the

15   United States District Court.  What did the United States

16   Government do in this trial to convince you, to convince you

17   that you have no doubt about what Barry Spencer did that day?

18   And, equally important, why did he do what he did?  What were

19   his -- what was his intention?

20             And Mr. Wortmann has already said in his closing a

21   couple of things.  One is, we don't know why Spencer did what

22   he did.  And he also said maybe he was trying to help

23   Casallas.  So, those are good points.  And if -- for example,

24   if what Mr. Spencer did -- if you're convinced that he did

25   anything and if he did it because he was in the neighborhood

and some guy came up to him and said, Hey, you know, I want to
buy some crack cocaine, and he said, you know, Talk to Bobby,
then I would submit to you that he's not guilty of aiding and
abetting or conspiring or distributing cocaine.  He has to be
a part of it.  He has to want it to happen.  He has to share
the intent to distribute cocaine and to do so unlawfully, and
that hasn't been established.

What's been established is that we have Operation H
where the government is out trying to locate street drug
dealers of cocaine and other drugs.  On this particular day
there are like at least ten police officers from the Boston
Police Department, at least.  We have supervisors.  We have
the Gang Unit.  We have all kinds of surveillance people.  We
have people from the local drug enforcement unit.  We got guys
that are from District 4, which is not the local Drug Unit,
and they say that they're out there doing their job, but they
don't have any targets, and they have marked money.  They have
a KEL set.  They have a video camera, and they're going out to
do their thing.

And, of course, they target -- what is targeted is an
area of Boston which is Egleston Square, and you've seen the
photos and you can take these into the jury room, but you can
see that in this area where the bus stop is there's a big
building right behind it.  There are buildings across the
street, and if we're going to make a buy in Egleston Square,

1    you know, it's pretty easy to set up the camera with the

2    tripod.  It would be equally easy if you're -- how many times

3    have you been going through traffic when some jerk is parked

4    with either a car or a construction vehicle and he's got the

5    flashers on and he's there taking his time getting coffee and

6    people go around him because that's what happens in the big

7    city here of Boston.

8            So, they could have set that van up and they had

9    tinted windows.  Nobody would have seen into the van.  They

10   could have had that van right across the street so there

11   wouldn't have been any problem here, and they could set that

12   van up -- as soon as Keenan saw his undercover guy, Officer

13   Casallas, engage Barry Spencer or talk to Barry Spencer, he

14   could have said, Hey, why don't you bring the van up here.

15   Let's get a video of this.

16           The other thing is when Mr. Wortmann says that

17   Officer -- or Detective Keenan -- Sergeant Detective Keenan

18   knew Spencer, you can't draw any inference about why.  There

19   is no evidence before you about why Officer -- Detective

20   Keenan knows Spencer.  There's no evidence.  You can't draw

21   any inference at all because of the fact that there were prior

22   encounters in the street.  For all you know, the -- Barry

23   Spencer was part of the baseball team that was sponsored by

24   Keenan or maybe he bought coffee for Keenan.  Who knows.

25   Maybe he was -- we don't know and you can't draw any inference

1  because of the fact that Keenan knew who Barry Spencer was.

2  There's no evidence before you.  So, you can't say, Oh, gee,

3  he must know Barry because Barry is a big dope dealer.  If

4  Barry is such a big dope dealer, the day when Casallas goes up

5  and asks him, Do you have any crack cocaine, or words to that

6  effect, Barry has nothing.  That is undisputed.  Barry Spencer

7  has no drugs.

8          And so, according to the testimony of the police, we

9  don't know why or what Barry Spencer did when he left the

10  vicinity of the bus stop.

11          And with respect to the time, the reason that I tried

12  to make a point about the five minutes was -- think back to

13  Detective Keenan's testimony that he's simply doing a circle.

14  He's going down Columbus, crossing Washington, making a

15  u-turn.  Then he comes up Columbus.  Then he makes a u-turn

16  and then he goes back down.

17          And the testimony of Casallas was five minutes

18  elapses.  Five minutes is a long time and it doesn't take

19  Keenan five minutes to go and turn around and come back where

20  he's going to go basically a full block, half a block down, a

21  half a block back.

22          And so, it's very convenient that Detective Keenan

23  sees not only the initial conversation between Casallas and

24  Spencer, but then he says -- well, you can infer from his

25  testimony that he makes a u-turn and then he sees,

1    miraculously, Spencer, Casallas and Morrison.  Morrison being

2    the drug dealer here.

3         It wasn't five minutes.  It didn't take him five

4    minutes to go make a u-turn.

5         So, now we have -- we have the KEL set.  You've heard

6    testimony that it's a transmitter.  You've heard testimony

7    that Detective Keenan is within, essentially, a half a block

8    of the bus stop the entire time that these conversations are

9    going on, and you would think that if somebody were going to

10   use a piece of equipment that is -- well, they're trying to

11   say that it's solely so that if there's a problem with the

12   officer's safety, that they'll be able to give a signal, but,

13   of course, the other reason that they have a transmitter and

14   that they have a receiver in the car that Detective Keenan is

15   in is so that he can overhear his conversation.  Just makes

16   sense.  You know, whether it's a tape recorder, whether it's a

17   transmitter, it just makes sense that that's why it's there.

18        But, again, they're just plagued by bad luck and they

19   can't hear anything.  So, nobody knows what was said at all

20   and they admit that they don't know that.

21        And so, the transmitter apparently doesn't work,

22   although you heard Officer Casallas say when I asked him,

23   Well, you use the KEL to tell Detective Keenan that you were

24   all set?  And he said yes.  So, it worked then.

25        So, the second -- and the other thing about the KEL

set, again, and/or any kind of thing that you would wear on
your body to transmit, we don't know -- Detective -- or
Officer Casallas didn't want us to know, you know, where it is
on his body.  I mean, how many places can you put a
transmitter?  Do you think you would put it in your shoe?

So, if you don't put it in your shoe -- and I don't
think anybody would put it in their shoe.  (A) It would be a
little uncomfortable and (B) it probably wouldn't work.  So,
we know it's somewhere from the ankle up to the top of his
head.

So, why wouldn't it transmit?  I mean, if it's
secreted and the police officers know from 20 or 30 years of
experience that transmitters will work -- I mean, did he
purposely wear a triple overcoat so that it wouldn't transmit?
I would submit to you that this evidence fails to help you.

The next thing that Detective Keenan said and
Detective Casallas may have said is -- in an effort to
persuade you that this was a joint venture, that Morrison and
Barry Spencer were working together, is that, you know, Well,
it's our experience, you know, that drug dealers work in
pairs, you know.  And so -- but, of course, that's what you
hear on direct examination, that, you know, they work in
pairs.  Somebody is down the street holding the drugs and then
somebody else goes to get them and then they bring them back,
and that's just the way it works on the streets of Boston.

1          Well, of course, on cross-examination, Detective

2     Keenan had to admit that that isn't the way it always works

3     and it just as frequently works that somebody is working

4     alone, and the evidence in this case supports that Morrison

5     was working alone, and the reason that I say that -- there are

6     several reasons:

7          One is, we don't know what Barry Spencer said to

8     Morrison.  We don't know why, if he did, that Morrison went to

9     get Spencer.  It could have been to help Casallas.  It could

10    have been because he's just trying to -- you know, it happens

11    all the time.  People buy crack cocaine on street corners in

12    Boston.  And he said, Yeah, Bobby can sell it to you.  And I

13    would submit to you, that's not a crime.  It's not a crime if

14    he's trying to help Casallas.

15         But what happens is Morrison comes back.  Morrison

16    hands the drugs to Casallas and Morrison gets the money, and

17    then six weeks later there's another buy.  Casallas goes up to

18    Morrison.  Barry Spencer, his alleged partner, if we believe

19    the prosecution, his alleged partner is nowhere to be found,

20    and Morrison is there giving the same crack cocaine that was

21    given six weeks earlier and there's no Morrison -- I mean,

22    there's no Spencer.  So, Morrison is clearly working alone,

23    just like he did on March 20th, 2012.

24         Now, concerning Casallas, his testimony was that --

25    and he said it in the grand jury -- there were only two people

1    at the bus stop when the deal went down, and here's the bus

2    stop.  Here's the bus stop.  Of course, you get to see this.

3    And the bus stop is a relatively small area.  So -- and he

4    said there's nobody at the bus stop, and then on redirect he

5    says, well, he wasn't really at the bus stop.  He was just,

6    you know, a foot away on the curb.

7         I don't know how to say this without swearing, but

8    that's -- I would submit to you, that's baloney.  He said he

9    wasn't at the bus stop.  And then he says, oh, he was right

10   here, you know, an arm's length away.

11        The other thing -- another example of Casallas

12   fudging, embellishing, whatever word you want to use, he says

13   that when he was approached by Morrison, that Morrison had ten

14   bags of crack in his hand and then, amazingly, six weeks later

15   he said, when he testified in the grand jury, he had ten bags

16   of cocaine in his hand.  Now, is that just a convenient number

17   that he uses or did he actually have the opportunity and take

18   the time to count them?  That's up to you to decide.

19        Then we have Officer Walsh, who is in the

20   construction van with the tinted windows and, again, he can't

21   park because of traffic.  I would submit to you that he could

22   have pulled over.  He could have videotaped this transaction,

23   but he didn't.

24        So, really, what you have after the trial is you have

25   a situation where only one person knows what was said, and I

1   would submit to you that that person wants to win this case.

2   He has an interest in the outcome of this case.  He -- they

3   arrested this guy, Barry, two months later and they want to

4   see him convicted because they arrested him.

5        And who is Barry?  I mean, what do you know about

6   Barry Spencer from the evidence in this case?  You know that

7   Detective Keenan and he know each other.  That's all you know

8   about them.  And you know that he lives in the neighborhood,

9   that Barry Spencer has every right to be on that street

10  corner, whether he's looking for a bus, whether he's waiting

11  to talk to friends.  He has a right to be there.

12       And we know that he lived on Walnut Street because

13  that's what the police report said.  He lived on Walnut Park,

14  which is where he was stopped by the Gang Unit.  He was

15  walking down Walnut Park, which is the home -- his home when

16  he was arrested.  That's the address that he told them that he

17  lived at.

18       And so, what do we -- what can you make of all this?

19  I mean, are you convinced that Barry Spencer wanted and

20  benefited from a drug deal that day?  For example, what about

21  the marked money?  I mean, whatever became of the marked

22  money?  Why would they even mark money if they were going to

23  do a buy/walk situation?  It just -- it doesn't make any

24  sense.

25       And, again, the question that you have to answer is,

1    the government -- have they convinced you about what Barry

2    Spencer had in his mind on that day?  Was he trying to help a

3    friend?  Was he trying to help some stranger in the

4    neighborhood?  They have to prove that to you.

5         Barry Spencer has every right to do what he did in

6    this trial.  It's his absolute right, which is to say, You've

7    accused me of a very serious crime and now you prove it,

8    because I didn't do it.  I did not do it.  Thank you.

9         THE COURT:  Mr. Wortmann.

10        GOVERNMENT'S REBUTTAL ARGUMENT:

11        MR. WORTMANN:  Let's remember what Officer Casallas

12   said because that's, obviously, of some importance.

13        "What happened when Mr. Spencer" -- this is the same

14   portion of the grand jury that I read to you from -- that

15   Officer Casallas read to you on Page 12:

16        "And what happened when Mr. Spencer came back with

17   Mr. Morrison?

18        "He came back to me.  He came back.  He told me

19   Morrison was going to take care of me and he was going to give

20   me the drugs.  At that point Spencer began to scan the area.

21   He was constantly looking up and down the street, looking at

22   cars in a counter-surveillance manner."

23        That's the stuff that you should make adverse

24   credibility finding against this guy who got up and told you

25   about?  Does that make any sense?

1          What also doesn't make any sense, ladies and

2    gentlemen, is Mr. Butters talking about that you must be

3    convinced beyond any doubt, no doubt.  Now, the Judge is the

4    boss.  She will tell you what reasonable doubt is and she will

5    tell you, I believe -- and if I'm wrong on this, you go with

6    her -- that doesn't mean beyond all possible doubt or any

7    conceivable doubt, you know.

8          Let's be clear.  Barry Spencer did a whole lot more

9    in this case than say, Go talk to Bobby, you know, and to

10   suggest that that's what happened here is just wrong.  He

11   said, I'm on.  I'll take care of you.  I'll go -- you know,

12   stay here a minute.  He gets the dealer.  He sets up the buy.

13   He watches the buy.

14         And you're going to hear about how you get someone's

15   intent.  All you need to do is this is something that he

16   wanted to bring about, either help himself, get something for

17   Morrison, help somebody else.  He wanted to bring about.  He

18   was a substantial factor in that deal taking place.  It

19   wouldn't have taken place without him.

20         And, again, use your common sense.  We can't get

21   inside people's heads.  We can only derive what they're

22   thinking based on what they did.  What did he do here?  He

23   went and arranged -- set up the deal with a perfect stranger,

24   who was somebody he obviously knew.  So, there's a whole lot

25   more than just go talk to Bobby.

And, again, we get back to this ten officers thing. You heard about how many officers were actually out on the street. Now, imagine, again, what Detective Walsh would have done if he's parked right on the street and took that video camera out while cars are honking at him. Don't you think it would have picked up Barry Spencer who is standing there looking for something out of the ordinary to happen, you know? And for them to do that would have been irresponsible, dangerous and could have damaged the entire investigation.

Mr. Butters talks about how long it took Keenan to go from one place to the other. Well, he forgets conveniently about two parts of the evidence. One, he talks about going a lot farther than just that same block. And all the officers told you what traffic was like. You see it from the pictures. You can see on the video that this is a really busy area. You get stuck at that traffic light and you're going to sit, and that's what happened, and that's what the timing was.

The KEL -- you heard Casallas say sometimes it's good. Sometimes it's bad. You heard Keenan say sometimes it's good. Sometimes it's bad. And, you know, they're out there. It's a windy day. It's blustery. There's street traffic. You know, when people are doing drug deals, they're not saying, Well, you know, let me go get somebody for you. That doesn't make sense that that's going to happen. They're going to be talking quiet because they don't want other people

1    to hear what's going on.  Does it show up on the KEL?  They

2    were honest with you and they told you that it didn't.

3           And there's no requirement that Mr. Spencer benefit

4    from this.  It's just something that he wanted to bring about,

5    something that he wanted to help Morrison.  He wanted to help

6    somebody else, and that's what he did.  This deal would not

7    have taken place, and you can infer the existence of the deal

8    based on what they did.  Look at the evidence.  Look at what

9    they did.  Look at what he said.  That's all you need.

10          Ladies and gentlemen, "verdict" means speak the

11   truth, and that's what I'm going to ask you to go back to the

12   jury room and do, speak the truth.  Tell Barry Spencer that

13   you know what he did, that he wasn't just hanging around.

14          And, sure, he's got a right to stand at a bus stop,

15   but he hasn't got a right to go set up drug deals and that's

16   what he did.  Tell him that you know what he did.  Tell him

17   you don't buy his story, and tell him the only way that counts

18   and that's guilty for Counts 1 and 2.  Thank you very much.

19          THE COURT:  Time to stretch.

20          (Stretch break.)

21          THE COURT:  Members of the jury, I'm handing you the

22   Verdict Forms, one of which your foreperson should fill out

23   when you're finished with your deliberations, but I give one

24   to each of you just for reference.

25          (Verdict Forms given to jurors.)

1          THE COURT:  It is a relatively simple form and I will

2     come back to it as we go along here.

3          Now, you've heard counsel in the opening statement,

4     you've heard counsel in their closing argument, and now it is

5     time for me to give you the law, and I ask you to accept the

6     law as I give it to you even if you think that the law is

7     unwise, even if you think that I am wrong.  We both have to

8     accept the law if it's unwise.  That is, you and all of us,

9     but if I am wrong, understand that there is a higher court

10    that can and will tell me so.

11         Understand also that you as jurors of the facts are

12    not subject to review by a higher court.  You are the only and

13    the final judges of the facts in this case.  So, accept the

14    law as I give it to you, apply it to the evidence as you have

15    heard it, and find the facts from the evidence in light of the

16    law as I shall outline it to you.

17         Trial by jury means a commitment by each of you to

18    seek the truth from the same evidence presented to all of you

19    and to arrive at a verdict by applying the same rules of law

20    that I shall give you.  You should perform this duty without

21    bias or prejudice, without sympathy or emotion for either

22    party.  All parties and the Court expect that you will

23    carefully and impartially consider all the evidence presented,

24    that you will follow the law as I shall outline it to you and

25    that you shall reach a just verdict.

1          Now, I have told you that you should determine the

2     facts from the evidence.  The evidence has two components.

3     First, there are all of the exhibits that have been offered

4     and accepted into evidence, including photographs.  I think

5     there was a video which we saw only briefly.

6          MR. WORTMANN:  Yes, your Honor.

7          THE COURT:  It was brief.  And the series of charts

8     that were prepared by the chemist.  That's, in essence, what

9     the evidence in this case consists of.  You should consider

10    all of it, review all of it, use all of it to assist you in

11    determining your verdict.

12         The second component of the evidence is the testimony

13    of all of the witnesses who have appeared before you.  Now,

14    here, as I have suggested to you earlier, one of your big jobs

15    is to determine whether you believe what any witness told you,

16    either in whole or in part.

17         There is nothing mysterious about that.  You do it

18    every day.  Somebody tells you a story and you probably almost

19    instinctively decide whether you believe what the person told

20    you or not.  Do the same thing here.

21         We have given some thought to how one makes this

22    judgment and sort of, as is our want, analyzed it and parsed

23    it.  So, I will give you some of the tests that we think are

24    useful in making this judgment, but any test that you have

25    found to be useful in your everyday lives in determining

whether you believe someone you may use in deciding whether

you believe any or all of the witnesses in this case.

So, you may consider the demeanor of the witness on

the stand, how the witness comported him or herself on the

stand, the ability that the witness demonstrated either to

observe the events and then to recall them to you, the

relationship of any witness to either the government or the

defendant and how that might impact, the interest any witness

may have in the outcome of this case, any bias that the

witness may have or exhibited either for or against the

government or for or against the defendant, and we talked

about this last one during the trial, consider whether the

witness' testimony was either supported or contradicted by

undisputed facts as you determine them, and that wasn't the

one I mentioned -- I meant, but consider whether the testimony

of the witness -- that the witness gave was inconsistent with

earlier testimony that the witness may have given, and

remember that I told you first you have to determine whether

there is an inconsistency and then whether in your judgment it

affects the believability of the witness.

So, these are some of the tests that you may consider

and, as I said, any test that you have determined to be a

useful indicator of whether the witness -- that a person is

telling the truth you may use in judging these witnesses.

I want to call particular attention to two types of

1    witnesses.  One is the fact that all of the witnesses are in

2    one way or another law enforcement personnel.  They work for

3    law enforcement agencies.  I simply remind you that makes them

4    neither more believable than anybody else or less believable

5    than anybody else.

6         And, second, I remind you about the chemist who

7    testified as an expert.  Now, in general, her believability

8    should be judged in the same way as that of every other

9    witness, but when you come to determine whether you will

10   accept or not her opinion, you should review her credentials,

11   her background, and determine whether, on the basis of her

12   experience and education, you will credit the opinions that

13   she has given you.

14        Now, there was -- I should also mention that we --

15   there was a lot of what we call direct evidence in this case

16   and there is also circumstantial evidence or sometimes we talk

17   about drawing inferences from the evidence.

18        So, for example, on Monday, when you came into this

19   very large room, you observed that there was this very large

20   desk and behind the desk sat or stood a person wearing a black

21   robe.  From those facts you reasonably inferred or deduced

22   that the person in the black robe was the judge who would

23   preside over this case.  That would have been a reasonable

24   deduction from the evidence, from the facts that were known to

25   you.  You could not, however, from those facts know for how

1    long this person had been a judge.

2              So, be careful that when you draw inferences from all

3    of the evidence, which you're entitled to do, that you not

4    engage in speculation or guesswork.  That you may not do.  You

5    may draw reasonable inferences.  Indeed, there are certain

6    parts of the evidence from which you must draw reasonable

7    inferences in order to get to the facts in the case, and I

8    will come to those in a moment, but you may not under any

9    circumstances guess about what happened or speculate about

10   that.

11             Now, there was also a lot of stuff that happened

12   during the trial that is not evidence and should not be

13   considered by you.  Counsel's opening statements were not

14   evidence.  They were simply their expectation of how the trial

15   would go.  The closing arguments or summations you just heard

16   are counsel's recollection of the evidence and counsel's

17   interpretation of it.  It has to be your recollection and your

18   interpretation that will have to carry the day.

19             Anything you may have heard about this case outside

20   the courtroom is not evidence and should not be considered by

21   you in reaching a verdict.  Nothing I have said in the course

22   of the trial is evidence.  I certainly want you to accept the

23   law as I give it to you, but I am in no way and did not during

24   the trial in any way try to tell you how you should decide

25   this case.  Just accept the law as I give it to you, but I'm

1    not directing you in any way how you need to decide this case

2    or should decide this case.

3           There were various times during the trial when

4    counsel rose to object.  Now, that is the way that we have

5    found to be a useful way of bringing to the judge's attention

6    when counsel thinks that the other side has done something

7    that is not in accordance with the rules under which we

8    operate.  You know by now that those are complicated rules.

9    So, counsel not only have a right to object, but they have a

10   duty to do this.  They have a duty to their client and in the

11   case of Mr. Wortmann, the government is the client.  They have

12   that duty to bring to the attention of the Court that they

13   think that a rule has been violated, and then the Court has to

14   make a ruling.  If the evidence came in, it is before you and

15   should be considered by you.  If I kept out anything, do not

16   try to figure out what it might be.  Ignore it.  Decide the

17   case on the basis of what is before you.

18          Now, when you next leave the courtroom, please take

19   your notebooks with you and use them to assist you in

20   recalling the evidence, with one caveat.  Sometimes when we

21   take notes, we paraphrase, and it may just be that one of you

22   who did not take notes has a clearer recollection of what

23   happened than what somebody else wrote down in the notes.  So,

24   do not automatically allow the notes to overrun the memory of

25   one of you.

1        Now, I told you at the time that we choose you as

2   jurors in this case that a defendant in a criminal trial is

3   presumed to be innocent.  It is really more than that.  It

4   means he is innocent until the government proves him guilty

5   beyond a reasonable doubt.  Necessarily, it means that a

6   defendant does not have to prove his innocence.  He doesn't

7   have to prove anything.  He doesn't have to testify.  He

8   doesn't have to offer witnesses.  He can say to the

9   government, as Mr. Butters so eloquently said, You,

10  government, have accused me.  Now you prove it.  And that is

11  the law of this country and written into the Constitution.

12       So you may not use the fact that this defendant did

13  not testify as any evidence of guilt.  You may not consider it

14  in reaching your verdict.  You must use only the evidence that

15  has, in fact, been presented to you in deciding whether he is

16  guilty or not or, really, more specifically, whether the

17  government has proven his guilt.

18       There are many reasons why a defendant might not want

19  to take the stand or might choose not to take the stand, not

20  the least of which is he doesn't have to.  So, you may not

21  consider that fact in determining the outcome of this case.

22       I have said that the government has to prove his

23  guilt beyond a reasonable doubt.  And so, this legal

24  presumption of innocence remains with the defendant throughout

25  the trial and during your deliberations and is not overcome

1   until, from all of the evidence, you are convinced beyond a

2   reasonable doubt that the defendant is guilty.

3          Now, proof beyond a reasonable doubt does not mean

4   proof beyond all possible doubt.  It does not mean proof to a

5   mathematical certainty.  It does mean proof to a degree of

6   certainty that satisfies your judgment and your conscience as

7   reasonable persons and leaves in your minds a clear and

8   settled conviction of guilt.

9          A reasonable doubt exists when, after weighing and

10  considering all the evidence, using reason and common sense,

11  you cannot say that you have a settled conviction of the

12  defendant's guilt and the truth of the charges.  A reasonable

13  doubt may arise either from the evidence that has been

14  presented to you or from a lack of evidence.

15         The burden of proof always remains with the

16  government.  It never shifts to the defendant and if you view

17  the evidence as reasonably permitting either of two

18  conclusions, one that the defendant is guilty and one that he

19  is not guilty, then you cannot find him guilty.  You must find

20  him not guilty.

21         You cannot find him guilty on the basis of a

22  preponderance of the evidence, which is the standard used in

23  civil cases, or even on the basis of clear and convincing

24  evidence, which is also used in some civil cases.  The

25  government has to prove him guilty beyond a reasonable doubt.

1   You certainly cannot find him guilty based on suspicion,

2   conjecture or surmise.

3          Now, note that the indictment in this case, which

4   will come to the jury room with you, is not evidence of guilt.

5   It is merely the document that contains the accusation.

6   That's all.  It is the accusation.

7          And as you go about deliberating on your verdict,

8   please do not consider what the punishment might be if you

9   were to determine that the defendant is guilty.  If you do

10   that -- that is if you find him guilty of one or both of these

11   counts, then I will need to deal with the issue of punishment

12   down the line, but it should not be part of your consideration

13   in determining his guilt or innocence.

14          Now, let us talk about this case specifically.  As I

15   said, a criminal case usually begins with an indictment, which

16   is the accusation, and indictments have certain peculiar

17   conventions.  In an indictment they always talk about "on or

18   about" dates.  You don't want to be tied down to any one of

19   them.  However, in this case it's on or about March 20th and

20   if it's on or about March 2013, that's good enough.  "Or"

21   means "and" in an indictment and "and" also means "or."  I

22   don't know whether this indictment is guilty of some of these

23   things, but it is a convention used in many and maybe in this

24   one.

25          Now, let me outline to you what the charges are in

this case.  The government's underlying allegation is that the defendant and Michael or Robert Morrison distributed or sold crack cocaine.  That's the underlying allegation.

And the government has caused an indictment to be returned with two criminal charges, one is conspiracy to distribute crack cocaine and distribution of the drug on March 20th, 2013.  So, one is a conspiracy.  The other is distribution.

And it is not uncommon for one act to give rise to several violations of law.  It happens all the time and the government has the choice of either choosing one or the other or charging him with both, but note that these are different crimes that have different elements, which I will explain to you.  So that each count requires you to consider it based on its set of elements and the evidence pertaining to that set of elements.

The defendant has pleaded not guilty as to both of these counts and thereby denies each charge and each allegation made by the government.

I want to start with Count 2, which is the distribution of crack cocaine, what we call a substantive offense, as opposed to conspiracy.  Conspiracy, in essence, means an agreement to commit a substantive offense.  So, that's why I want to start with the substantive offense, Count 2.

1          The statute as to this says that it shall be unlawful

2     for any person knowingly and intentionally to possess with

3     intent to distribute a controlled substance.

4          The indictment in this case says that, "On or about

5     March 20th, 2013, the defendant did knowingly and

6     intentionally distribute and possess with intent to distribute

7     a quantity of crack cocaine, a controlled substance."

8          Now, there are three -- I never get my fingers

9     right -- three elements:  One, that the defendant distributed

10    or possessed cocaine base, which is another name for crack

11    cocaine, with intent to distribute, first element.  Second,

12    that he knew that this crack cocaine was a controlled

13    substance; and, three, that he acted knowingly and

14    intentionally.

15         Now, let me go back over these.  First, that the

16    defendant distributed or possessed cocaine with the intent to

17    distribute it.  Possession means to have direct physical

18    control and custody of an object.  We call that actual

19    possession.  I possess this pencil (indicating) or to have the

20    power at any given time to exercise control over the object,

21    which we call constructive possession.  Let me give you an

22    example.

23         My car needs to be repaired.  I drive it to the

24    repair shop.  While I'm driving it to the repair shop, I have

25    actual possession of this car.  I'm running it.  I'm deciding

1    what to do with it.  I get to the repair shop and I turn it

2    over to the repair guy.  At that point he gets actual

3    possession.  I no longer control the car physically.  He has

4    that chance now.  However, I retain constructive possession

5    because I'm going to tell him what he's to do with the car.

6    Do you understand the difference?

7        JURORS:  (Nodding).

8        THE COURT:  Okay.  Now, possession may also be

9    exercised by just one person and we call that sole possession,

10   or it may be exercised by two people.

11       In my example I had actual possession for a time and

12   then constructive possession and the car repair guy had actual

13   possession while I had constructive possession.  So, we had

14   joint possession of this car, different kinds, but it can even

15   be the same kind.

16       Now, possession does not require ownership.  This

17   pencil belongs to the government, but I possess it at the

18   moment because I have the ability to decide what to do with it.

19       Now, when we talk about a defendant's intent, in this

20   case with respect to this offense the intent to distribute, we

21   refer to the defendant's state of mind.  It is the

22   quintessential thing that requires you to draw inferences.  We

23   cannot see what's in a person's mind.  We cannot smell it.  We

24   cannot hear it.  We have to look at what the defendant does,

25   what he says, and the circumstances surrounding his conduct

1    and his actions, and from those then infer what his state of

2    mind is.

3        With respect to this particular charge, at this part

4    of the instructions, in order to determine whether he had an

5    intent to distribute, you have to look at all the

6    circumstances, at his conduct and his words, to decide what

7    his intent was and whether he had this particular intent that

8    the statute requires and the government has to prove.

9        Distribution means to deliver the substance to

10   somebody and includes the actual constructive or attempted

11   transfer of the substance by sale or gift, or otherwise.  The

12   government does not have to prove that the defendant benefited

13   from the transfer, only that, in fact, there was an intent to

14   distribute or a distribution.

15       Now, the second element I told you is that the

16   government has to prove that he knew that cocaine was a

17   controlled substance.  Indeed, before that, it has to prove

18   that the substance was cocaine and then also that he knew that

19   it was a controlled substance, and on the issue of whether it

20   was cocaine, obviously, you need to consider the testimony of

21   the chemist.

22       And when you consider whether the defendant knew that

23   he was dealing with an unlawful substance, if you find that he

24   was dealing with anything, then you have to again look at his

25   mind and knowledge and intention, all of which, as I said, you

1    have to infer from his conduct and his words.

2         The last -- third element with respect to Count 2 is

3    that the government has to prove that he acted knowingly and

4    intentionally.  To do something knowingly means to do

5    something on purpose, with a purpose and not by mistake or

6    accident.  To do something intentionally means in this context

7    that he acted with the intention to transfer the cocaine to

8    another or the substance if it hasn't been proven yet.

9         Now, both terms, again, concern the defendant's state

10   of mind and, again, you need to infer that from his words, his

11   conduct and the circumstances.

12        Now, in this indictment the defendant has been

13   charged not only with possessing with intent to distribute and

14   distributing, but there is also a charge that includes the

15   allegation that he -- or the aiding and abetting statute, and

16   that statute is Section 2 of the Criminal Code, and it says,

17   "Whoever commits an offense against the United States or aids,

18   abets, counsels, commands, induces or procures its commission,

19   shall be punishable as a principal.  Whoever willfully causes

20   an act to be done which if directly performed by him or

21   another would be an offense against the United States shall be

22   punishable as a principal."

23        The idea is that a person cannot avoid responsibility

24   for a criminal act by getting somebody else to commit it or by

25   directing somebody else to do it or by helping somebody else

1    to do it.

2            So, the indictment in this case accuses the defendant

3    not only of distributing crack cocaine, but of aiding and

4    abetting the distribution of crack cocaine, and it means that

5    a person may be found guilty of a crime without proof that he

6    himself committed it if the government proves beyond a

7    reasonable doubt that he willfully directed, aided, joined

8    together with another in the commission of a crime.

9            Now, willfully means acting with knowledge that one's

10   conduct is unlawful.  I have already explained to you

11   knowingly.  And the government has to prove that the defendant

12   knowingly and willfully associated himself in some way with

13   this criminal venture and willfully participated in it as he

14   would in something he wishes to bring about.

15           It is not enough to show that the defendant had a

16   suspicion that criminal activity was taking place.  It is not

17   enough to show that he was at the scene of the crime or even

18   that he had knowledge of a crime or that a crime would be

19   committed in the future.

20           The government has to prove that the defendant was a

21   knowing and willful participant, not just a spectator, and

22   this element is proven if the government shows that the

23   defendant had actual or constructive possession of the cocaine

24   alone or with others or that he in some way assisted in the

25   distribution of the drug on March 20th, 2013.

1          If you find that the government has proven that the

2     defendant possessed with intent to distribute or distributed

3     or assisted the distribution of crack cocaine on that day and

4     that he knew it was a controlled substance and that he did so

5     knowingly and willfully, then you may find the defendant

6     guilty on Count 2, but if you determine that the government

7     has not proven every single one of these elements, then you

8     must find the defendant not guilty on Count 2.

9          Now, depending on what your determination is, you

10    should check either the line that says "guilty" or the line

11    that says "not guilty," okay?

12         Conspiracy to distribute crack cocaine is Count 1,

13    and the statute says, "Any person who conspires to commit a

14    drug offense shall be guilty."

15         Now, the drug offense is what I just explained to you

16    under Count 2.

17         And the indictment says, "From a time unknown, but at

18    least until March 20th, 2013, in Boston, the defendant did

19    knowingly and intentionally combine, conspire, confederate and

20    agree with Michael or Robert Michael Morrison to distribute

21    crack cocaine, a controlled substance."

22         The essence of conspiracy is the agreement, an

23    agreement by two or more persons to accomplish an unlawful act

24    or to use unlawful means to accomplish a lawful purpose.

25         And here there are only two elements:  One, that

1    there was an agreement about the time alleged by two or more

2    persons to accomplish an unlawful purpose.  Here, to

3    distribute crack cocaine.  And, two, that the defendant

4    knowingly and willfully -- you know, we come back to the same

5    defining words -- became a member of the conspiracy at

6    sometime during its existence.

7              Let me go back to the first element, that there was

8    an agreement.  The government does not have to prove that the

9    parties had a formal written agreement.  Conspiracy is

10   established if the evidence and the reasonable inferences you

11   draw from the evidence show beyond a reasonable doubt that the

12   conspirator in some way, either explicitly or tacitly, came to

13   an understanding to accomplish an unlawful act.

14             A conspiracy is usually by its nature secret.  It may

15   be shown by the conduct of the alleged conspirators, conduct

16   that evidences a shared purpose to violate the law.

17             It may be inferred from the movement of its

18   participants, what they did, how they acted, how they

19   interacted.  It may be inferred by their statements, what they

20   said to each other, what they said to others, all in the

21   context of the circumstances surrounding these acts and

22   circumstances.

23             The government does not have to prove that all

24   conspirators played an equal role or that all participated for

25   the same period of time or that they explicitly agreed on the

1    purpose of the conspiracy or how they would succeed.  It does

2    not have to prove that all conspirators knew all the details

3    of the plan or that they would -- or that they succeeded in

4    carrying out their plan.  The government does have to show

5    that the conspiracy charged existed, that there was an

6    agreement to violate the law in some particular.

7         The second element is that the government has to

8    prove that this defendant was a member of the conspiracy at

9    sometime.  So, if you find the agreement, the government still

10   has to show that the defendant knowingly and willfully joined

11   in the unlawful plan with an understanding of the unlawful

12   character.

13        It doesn't have to show he knew all the details of

14   the scheme, nor that he participated from the beginning, nor

15   that he knew all the conspirators, nor that all the

16   conspirators played equal roles, but a person cannot become a

17   member of the conspiracy merely by associating with other

18   members, merely by knowing about the conspiracy or merely by

19   being present at the scene of the alleged offense, nor can a

20   person be deemed to be a conspirator merely by happening to do

21   something that advances the conspiracy or assists the

22   conspirators.

23        The government must prove beyond a reasonable doubt

24   that the defendant, knowing of the existence of the conspiracy

25   and general outline of the unlawful plan, intentionally joined

1   in by participating in some way with other conspirators,

2   directly or indirectly.

3           Now, note that in deciding whether the defendant

4   became a member of the conspiracy, you have to consider only

5   the evidence of his conduct and his statements and the

6   circumstances surrounding what he did.

7           Finally, a conspiracy is often described similar to a

8   partnership and has consequences similar to a partnership.  If

9   one partner makes an agreement on behalf of the partnership,

10  then the other partners are bound by that agreement.  So with

11  a conspiracy.  If one conspirator does an act or makes a

12  statement in furtherance of the conspiracy, other

13  conspirators, that is persons who are conspirators, are bound

14  by the actor's statement and may be responsible for the

15  conduct of that conspirator.

16          Here, again, you should review all of the evidence

17  and determine whether there was an agreement to distribute

18  crack cocaine as charged and then whether the government has

19  proven that this defendant, Mr. Spencer, did knowingly and

20  willfully join that conspiracy or if not, whether he conspired

21  to possess the drug, knowing it to be an illegal drug and with

22  the intention to distribute it.

23          And if the government has proven that there was a

24  conspiracy to distribute crack cocaine and that the defendant

25  knowingly and willfully joined in it, then you may find the

1    defendant guilty on Count 1, but if the government does not

2    prove both elements beyond a reasonable doubt, then you must

3    find the defendant not guilty on Count 1.

4            Now, the first order of business when you get into

5    the jury room should be to elect a foreperson from among the

6    twelve of you who will be deliberating on this verdict.

7            I've already explained to you that you must review

8    the evidence as to each count separately because there are

9    separate elements and different elements, and then if you

10   determine that the government has proven him guilty beyond a

11   reasonable doubt on that count, then as to that count check

12   the "guilty" line.  If the government has not so proven, check

13   the "not guilty" line, and do that for each of the two counts

14   that are before you.

15           If you have any questions about anything that I have

16   told you, please ask your foreperson to write out the question

17   and give it to the marshal who will be sitting outside the

18   jury room and not listening in, and I will attempt to answer

19   the question either in writing, if I can, or we will

20   re-assemble to explain whatever it is that needs explanation.

21           I have asked the cafeteria to provide lunch by noon.

22           COURTROOM DEPUTY CLERK URSO:  Yes, they did.

23           THE COURT:  Your lunch is waiting for you.

24           COURTROOM DEPUTY CLERK URSO:  No.  At noon.

25           THE COURT:  Well, it will be there.

```
 1            And I would suggest that you not discuss the case

 2    until you have finished lunch and then really go to work, and

 3    if you do that, then, Mr. Oliveira, you are the alternate

 4    juror in this case and will not be able to participate, can

 5    join you for lunch, but he is not permitted to be there once

 6    you start the deliberations.  So, I would ask you, please, to

 7    have lunch without deliberating and then Mr. Oliveira will be

 8    able to join you and go home on a full stomach, and you should

 9    begin your deliberations after that.

10            Also, please let the marshal know when you have a

11    verdict and we will re-assemble to take your verdict in open

12    court.

13            Relax for a moment while I talk to counsel where they

14    can point out wherein I was in error.

15     SIDEBAR CONFERENCE:

16            MR. WORTMANN:  Your Honor --

17            MR. BUTTERS:  The only thing, a few times you

18    mentioned that if you find that there was cocaine.  They had

19    to find it was cocaine base.  You should remind them it's

20    cocaine base that they have to find.

21            MR. WORTMANN:  That makes sense.

22            THE COURT:  Okay.  They have everything.  So, I now

23    charge them -- and the exhibits have been assembled?

24            MR. WORTMANN:  We'll put them together with Ms. Urso.

25            COURTROOM DEPUTY CLERK URSO:  Yes, I'll do it.
```

1          (End of sidebar conference.)

2          THE COURT:  Counsel reminded me that I referred to

3     both cocaine and crack cocaine.  The charge here is cocaine

4     base, which is the same thing as crack cocaine.  It is not

5     just plain cocaine, but it is crack cocaine, cocaine base that

6     is at issue in the case.  Are you with me?

7          JUROR:  Yes, we're with you.

8          THE COURT:  I now charge you to commence your

9     deliberations after you have lunch.  We will send the exhibits

10    up to you as soon as we have assembled them, and you are then

11    -- you should then commence your deliberations after you have

12    finished lunch.  Thank you very much.

13          COURTROOM DEPUTY CLERK URSO:  All rise, please.

14          (Jury excused.)

15          THE COURT:  And Court is in recess until 2:00 or

16    until we hear from the jury.

17          (Jury excused at 11:49 a.m.)

18          (Recess taken.)

19          (Jury question at 2:19 p.m.)

20          (Attorneys examine jury's written question.)

21          THE COURT:  The jury wanted to know as follows:  "Can

22    we see grand jury testimony of the Detective Casallas,"

23    misspelled, "regarding Morrison's case, at least what was

24    discussed in this trial?"

25          The answer is:  "Members of the jury, I regret that I

1   cannot send you any portion of the grand jury transcript

2   because it is not in evidence.  Please use your collective

3   memory."

4           MR. WORTMANN:  Your Honor, could I ask that the

5   question be marked as an exhibit?

6           THE COURT:  It's part of the record.  It will remain

7   being part of the record.

8           MR. WORTMANN:  Okay.  Thank you.

9           (Adjourned, 2:21 p.m.)

10

11

12

13

14                   C E R T I F I C A T E

15           I, Catherine A. Handel, Official Court Reporter of the

16   United States District Court, do hereby certify that the

17   foregoing transcript, from Page 1 to Page 106, constitutes to the

18   best of my skill and ability a true and accurate transcription of

19   my stenotype notes taken in the matter of Criminal Action No.

20   13-10196-RWZ, United States of America versus Barry Spencer.

21

22

23   August 17, 2014     /s/Catherine A. Handel
     Date                Catherine A. Handel, RPR-CM, CRR

24

25