UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL NO. 13-10196-RWZ


UNITED STATES OF AMERICA

v.

BARRY SPENCER


MEMORANDUM OF DECISION

October 8, 2015


ZOBEL, D.J.

 Over two years ago, Boston Police officers arrested Barry Spencer.  The charge: two months before his arrest, he was allegedly the lookout for a $20 sale of 0.15 grams of cocaine.  Somehow, this case, which arose from a city-level investigation, found its way to federal court.  The government ultimately indicted Mr. Spencer for distributing and conspiring to distribute cocaine base, and he was tried to a jury in June 2014.  After deliberating for two days, the jury declared itself to be deadlocked.  I declared a mistrial.  In an unsolicited letter to the court the next week, one of the jurors explained that "the total case . . . seemed unfair.  Unjust.  Wrong."  Docket # 161.  But the government persisted.  The second trial, in April 2015, resulted in a guilty verdict on both counts after the jury deliberated for five and a half hours.

Defendant, then representing himself,[1] moved for a new trial on several grounds, including what seemed to be speculative allegations of a <u>Brady</u> violation.  At the trial, a state drug laboratory chemist, Claire Rimkus, testified that she corrected a "clerical" error in her analysis report by changing a date.  She hinted that she did this in response to a phone call, and defendant invoked his right under <u>Brady</u> to know who made that phone call and why.  The court held a hearing where defendant passionately argued his case.  But, aside from vividly conjuring up the ghost of Annie Dookhan,[2] he presented no evidence that the government engaged in any questionable conduct.  Had that been the end of it, the court would have had no choice but to summarily deny his motion for a new trial.

The government, however, proceeded to vigorously dispute defendant's allegations of a <u>Brady</u> violation.  In the course of doing so, the Assistant United States Attorney ("AUSA") who tried the case told the court that he personally called the chemist and asked her to revise her report.  This involvement by the government, which was clearly news to defendant and his standby counsel, lent credence to defendant's <u>Brady</u> argument.  The court held an evidentiary hearing and, in response to leads uncovered in that proceeding, ordered the government to produce all communications related to the error.

The court is now satisfied that all relevant information has been unearthed.  As

---

[1] Defendant has, at various points in this case, elected to represent himself.  He is an able advocate for his cause.  Nonetheless, the court appointed standby counsel, Mr. Thomas Butters, who tried the case to the jury and has taken the lead on the post-verdict matters, aside from this motion for a new trial.  Mr. Butters has performed admirably, protecting defendant's interests at every turn and ensuring that the mistakes described in this opinion found the light of day.  The court thanks Mr. Butters for his exceptional service.

[2] For that story, see <u>Commonwealth v. Scott</u>, 5 N.E.3d 530, 535-38 (Mass. 2014).

explained below, the motion for a new trial is denied because defendant has not shown

a reasonable probability that the result of the trial would have been different had the

government disclosed the information about the correction prior thereto.  This order,

however, does not imply approval of the government's conduct in this case.

## I.    Background

This prosecution began over two years ago with a criminal complaint filed on

May 17, 2013.  It alleged that defendant, along with Michael Morrison, violated 21

U.S.C. § 841 on March 20, 2013 by knowingly and intentionally distributing cocaine and

aiding and abetting its distribution in violation of 18 U.S.C. § 2.  In an affidavit

accompanying the complaint, Sgt. Det. Donald Keenan of the Boston Police

Department ("BPD") summarized the facts giving rise to the charges:

> For some time, members of the [BPD District D-4[3] Drug Control Unit
> ("DCU")] have been attacking street-level trafficking in and around various
> areas of Boston (some of which are outside District D-4) where drug
> trafficking and the violence it sometimes breeds is of concern.  In these
> operations, BPD undercover officers are often used to purchase street
> level amounts of drugs, (usually that form of cocaine known as cocaine
> base or "crack cocaine"), from individuals who come to these areas to sell
> drugs.
>
> Activity took place in these ongoing operations on March 20, 2013, when
> members of my unit was assigned to assist the District B-2 Drug Control
> Unit in drug operations being conducted in the area around Egleston
> Square in Roxbury.  At approximately 2:25 p.m. on March 20, 2013, a
> member of my unit was deployed in the area of Egleston Square in an
> undercover capacity ("the UC") to attempt to buy drugs from area dealers.
> The UC (who has identified crack cocaine on many occasions of times
> based on its appearance and texture) was sent out only after I provided
> him/her with $40 of prerecorded BPD buy money and myself and other
> officers from the B-2 and D-4 DCUs went out on surveillance.
>
> After the UC was released, he/she made his way to the bus stop in front

---

[3] District D-4 covers neighborhoods in the Back Bay, South End, Lower Roxbury, and Fenway
areas of Boston.  Keenan Aff. (Docket # 1-2) ¶ 1.

of 1990 Columbus Avenue where I had seen an individual named Barry Spencer who I knew from prior drug arrests and who had sued me in connection with an earlier case in which I bought drugs from him in an undercover capacity.  The UC approached Spencer and asked him if he was "ON" (which, based on my training and experience, I know is street term for someone actively selling drugs), and told Spencer that he/she wanted $20 of crack cocaine.  Spencer told the UC that business had been slow and was glad he/she came up.  Spencer then asked the UC to follow him.

The UC followed Spencer for several steps towards Washington Street before Spencer told the UC to return to the bus stop and wait. After approximately five minutes, Spencer returned to the bus stop with a second male later identified as Michael Morrison.  As Spencer and Morrison approached the UC, Spencer told the UC that Morrison was going to "give it to him/her" and then began to look around the area in a manner which the UC concluded was counter surveillance (i.e, checking to see if there was any law enforcement in the area).

Morrison then reached into his right pants pocket and pulled out a plastic bag that the UC identified as containing approximately 10 wrapped pieces of crack cocaine.  The UC and Morrison then exchanged one of those pieces for $20 of the recorded BPD buy money I had previously given him/her.

Once the buy was complete, Spencer asked the UC for his/her telephone number which the UC provided.  The UC then thanked Spencer and Morrison, left the area, and alerted me that the deal was complete.

I and other members of my unit were able to surveil the deal as it took place.  After it was complete, officers maintained surveillance on Spencer and Morrison so that they could be approached near the intersection of Walnut Park and Washington Street and be identified by officers from the Youth Violence Strike Force who were in the area to assist us.  As this procedure was taking place, I drove the UC past in an unmarked car and the UC identified Spencer and Morrison as the two men who had just sold him/her the drugs.  Detective Greg Walsh (who was in the area in another undercover vehicle) videotaped the identification procedure.

When the UC returned to District D-4, he/she was shown pictures of Spencer and Morrison and confirmed that they were the persons who had sold him/her the drugs.  The drugs (which had been identified by the UC as crack cocaine) were turned over to Officer Sean Flaherty who field tested them (positive for cocaine) and logged them into evidence so that they could be sent to the Massachusetts State Police Crime Lab [the "State Drug Lab"] for further testing.

Keenan Aff. (Docket # 1-2) ¶¶ 6-13 (paragraph numbers omitted and names converted to sentence case).  The Boston Police arrested defendant about two months later on May 26, 2013.[4]  The delay between the incident and defendant's arrest was apparently to avoid tipping anyone off about the ongoing sting operation.

Shortly after the sale, this case came to the attention of federal authorities. According to the sworn statement of the AUSA who tried this case, he "agreed," on behalf of the United States Attorney's Office, "to prosecuted [sic] Barry Spencer and Robert Morrison in the Spring of 2013 in a meeting with the Suffolk County District Attorney's Office."  AUSA Aff. (Docket # 96) ¶ 2.[5]  The government then filed sealed complaints against Messrs. Spencer and Morrison on May 17, 2013, and a grand jury returned an indictment on June 26, 2013, charging only Mr. Spencer with violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, distribution of cocaine, and aiding and abetting.  Docket # 21.  The First Superseding Indictment followed on August 28, 2013, against both Messrs. Morrison and Spencer.  It added a count for conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 and a second distribution charge against Mr. Morrison.  Docket # 39.  On February 11, 2014, Mr. Morrison pled to all charges, and on March 26, 2014 the government filed a Second Superseding Indictment that changed the drug in these charges from cocaine to cocaine base and charged only Mr. Spencer.  Docket # 119.

On September 17, 2013, after the First but before the Second Superseding Indictment, the Boston Police submitted the substance that Mr. Morrison had sold to the

---

[4] Defendant was arrested on outstanding state warrants.

[5] The AUSA's affidavit appears to have been inadvertently sealed in response to a motion seeking to seal only its accompanying exhibit.  The affidavit, Docket # 96, shall be unsealed, but the exhibit, Docket # 97, shall remain sealed.

undercover officer to the State Drug Lab for identification.  The sample was delivered

by an unidentified officer along with a tracking form, called an SP295.  The SP295

indicates that the sample was the result of a "Seizure" that occurred on "5/26/13" at

4:17 AM.  Docket # 258-1 at 6.  This raised two problems: first, the sample was not

obtained by a seizure, but rather a "purchase," which was another option on the form;

and second, it was obtained on March 20, 2013, not May 26, which was the date of Mr.

Spencer's arrest.

Ms. Claire Rimkus, a chemist in the Massachusetts State Police Forensic

Services Group, received the sample and did tests to determine whether it was a

controlled substance.  On September 26, 2013, she issued a Certificate of Drug

Analysis concluding that the sample "was found to contain Cocaine, a derivative of

coca leaves, and a Class B Controlled Substance as defined under Chapter 94C,

Section 31 of the [Massachusetts] General Laws"; that "[t]he Cocaine was present in

the base form"; and that its weight "was 0.15 grams."  Docket # 258-1 at 5.  The

Certificate, like the SP295, stated that the "date of incident" for the substance that had

been analyzed was May 26, 2013—the date of Mr. Spencer's arrest, and, again, not the

date of sale.  The government appears to have produced both the Certificate and the

SP295 to defendant's counsel on December 3, 2013.  Id. at 1.

Several months later, in the course of preparing for trial, the government

apparently suspected that the incident date on the Certificate was an error.  Shortly

before 9:15 A.M. on April 3, 2014, the AUSA who prosecuted the case called Ms.

Rimkus "to inform her of his belief that the date of incident on the Certificate of Drug

Analysis was wrong."  Docket # 271-1 ¶ 7; see also Docket # 271-3 (state police drug

lab call log recording that "[c]onversation with AUSA . . . indicated that 'Incident Date'

6

provided on the SP-295 was incorrect").  According to Ms. Rimkus's testimony, she then called the Boston Police Department's evidence unit to confirm the incident date. See also Docket # 271-3.  The person who picked up her call told her that the correct date was March 20, 2013.[6]  This unnamed source did not tell her where the new, purportedly "correct" information came from and did not send her any documentary evidence to support the correction.

Around 8:00 A.M. the next day, Ms. Rimkus sent the AUSA an email reporting, among other things, that the State Drug Lab was "working on writing a corrected report re: the incident date on the Certificate of Drug Analysis."  Docket # 271-2.  That afternoon, she mailed to the AUSA a revised Certificate of Drug Analysis showing a March 20, 2013 incident date.  See Docket # 271-3.  The AUSA forwarded the corrected Certificate to defendant and his counsel on April 9, 2014, describing it as "an update[d] certification from the State Police Lab that corrected a clerical error regarding the date of the underlying purchase."  Docket # 271-4.

At this point, defendant and his counsel had both the original and corrected versions of the Certificate of Drug Analysis, along with the SP295.[7]  They did not know about the call from the AUSA to Ms. Rimkus, nor did they know about her call to the BPD.  They did not have her official call log reflecting these conversations, and they did not have copies of her emails with the AUSA.  The only explanation they had for the two Certificates was the AUSA's statement that there was a "clerical error" in the report.

The first jury trial began on June 16, 2014, and concluded two days later.  The

---

[6] That is, according to Ms. Rimkus's testimony during the court's Brady investigation.  Her contemporaneous notes of the call with the BPD indicate that the correct incident date was March 20, 2014.  See Docket # 271-3.

[7] As best the court can tell, only one version of the SP295 exists.

jurors deliberated on June 18 and 19, but then indicated that they were deadlocked. Even after an <u>Allen</u> charge, <u>see</u> <u>Allen v. United States</u>, 164 U.S. 492 (1896), they failed to reach a unanimous verdict, and I declared a mistrial.

The government moved for a pretrial conference about three weeks later, thus expressing its intent to retry Mr. Spencer. The second trial commenced on April 21, 2015. No further discovery took place, and no further productions were made to defendant or his counsel during the interim. On the second day of the trial, Ms. Rimkus took the stand. The government introduced the corrected Certificate of Drug Analysis, and she offered testimony about it. On cross-examination, defense counsel engaged in the following exchange with Ms. Rimkus:

> Q. I'd like to show you Exhibit 10, which that's the analysis that was given to the jury, right? [i.e., the corrected Drug Analysis Report]
>
> A. Yes.
>
> Q. And then you did another certificate of analysis, correct?
>
> A. Yes.
>
> Q. And what's the date of that one?
>
> A. The date which it was issued or...
>
> Q. Well, first, let me ask you this. When did you do the test?
>
> A. In September of 2013.
>
> Q. And the document that was not introduced to the jury, what's the date of that?
>
> A. That document is dated September 26th, 2013.
>
> Q. And this is something that was prepared by you?
>
> A. Yes, it was.
>
> Q. Okay.
>
> MR. BUTTERS: Your Honor, may I have this marked?
>
> THE COURT: Are you objecting?
>
> [AUSA]: No. . . .
>
> (Defendant's Exhibit No. 2 received in Evidence.)

Q. So, can you tell me why you didn't submit Exhibit 2 in this case?

A. This Exhibit 2 is the report I initially prepared after the testing and then it was discovered that Boston Police had essentially given me the wrong date of incident when they submitted the evidence. I then prepared a corrected report. The only difference on that report being a different date of incident.

Q. So, what's the date of incident on Defendant's Exhibit 2?

A. May 26th, 2013.

Q. So, do you know how the Boston Police Department came up with May 26, 2013 as the date of the incident?

A. I don't know. I simply receive a drug evidence submission form with suspect name, incident date, incident number, and that is the information that I put on my report.

Q. So, when did you actually perform the tests that you have explained to the jury today?

A. That was September 23rd, 2013.

Q. So, Exhibit 10 says -- is dated April 4, 2014, right?

A. Correct.

Q. And the reason for that was the mistake of the BPD?

A. Yes.

Q. Do you know if they gave you the right sample at all? Do you have any way of knowing?

A. I only know the information that they supply me when they submit the evidence.

Docket # 249 at 30:5-32:6. No further questions were asked about the error in the

report.

The case went to the jury at 10:35 A.M. on the third day of the trial. About three

hours later, the jury sent out a question, asking "[w]ith respect to the certificate of drug

analysis, we possess a copy of the, 'corrected' certificate. Is there a signed/notarized

copy of the original?"[8]  Docket # 259 at 3:14-18.  Counsel agreed that no such copy

---

[8] After the trial but before a transcript was prepared, the court was under the impression that the jury requested the uncorrected version of the report. Docket # 242 at 2. The transcript has corrected this misapprehension. The jury had both versions of the report: the corrected version, Gov't Ex. 10, and the

was admitted into evidence, and I responded accordingly.  After one more unrelated question, the jury returned a unanimous verdict of guilty on both counts around 4:00 P.M.

Following the guilty verdict, defendant filed his motion for a new trial.  He raised a number of grounds, but focused on the government's failure to disclose the events leading up to the chemist's revised report.  However, he lacked evidence—nothing indicated any wrongdoing on the part of the government or anyone else.  He alleged that someone called Ms. Rimkus and told her to alter her Certificate of Drug Analysis, but he did not know where the call came from or who placed it.  That is, until the AUSA responded to defendant at the hearing:

> [AUSA:] And you want to know where the telephone came from?  It came from me because there was a typographical error in it.  And the people at the lab, they rely on the information they're provided by --
>
> THE COURT: Wait a minute.
>
> You called them to tell them to change the date?
>
> [AUSA:] I told them there was a clerical error in the drug certificate.
>
> THE COURT: How did you know that?
>
> [AUSA:] Because we had the drugs. Because the drugs were authenticated by Officer Flaherty, Officer Casallas and Officer Keenan. The lab doesn't know where the drugs – what date the drugs purchased. They can't possibly know that.  And the clerical error was committed when the drugs were submitted to the lab, but the point is, your Honor, all the evidence that came in from those drugs were dated March 20th and the jury heard that and they heard about the fact that the drug certification originally came.
>
> Those drugs weren't purchased on May 26th.  Nothing happened on that date.  What happened was, you know, Casallas handed the drugs to Keenan.  Keenan handed the drugs to Flaherty.  Flaherty put them into evidence with all the paperwork you saw with his initials on the bag and that is how it was done, and somebody gave the chemist, who has no idea where these things -- what dates these drugs -- the wrong date.

uncorrected version, Def. Ex. 2.  It did not have a notarized copy of the corrected version.

So, the date of the drugs was based on the date of the drugs and all of the documentation that was generated the drugs -- at the time that the drugs were entered into evidence in the Boston evidence management system, and that's why as soon as I made that phone call, I sent an email to them telling them about the fact that there was a clerical error on the drugs, because the drug lab would have no basis for knowing one way or the other. They're just relying on what other people said, and the evidence at the Boston Police Department, as the jury heard all that stuff, was that these drugs were dated March 20th, and the idea that there was anything wrong with that, your Honor -- you know, I won't even -- you know, Mr. Spencer has called me a liar, a cheat, unethical, you know, a perjurer, and everything else, and he just -- he's just wrong.

And there's – it's just -- you know, I can't even respond to some of the things that he said and, you know – and, quite frankly, I've had it with the allegations of misconduct up to here (indicating) because none of it is based on anything. Everything he complains of was disclosed and – you know, the fact of the matter is that every argument he makes is completely without merit, and I don't know what else to say, Judge, other than, you know, I disclosed exactly what I should have disclosed. I disclosed it a year before the trial. You gave the jury a very careful instruction on chain of custody and there was -- you know, there was absolutely nothing untoward about asking them -- the lab -- if I called the Boston Police Department and told them to change the date, that would -- God knows, that would be wrong and I would never do it, but the evidence as to where those drugs came from, came from the Boston Police Department, not from the State Police Crime Lab, which all they do is take the drugs in and test them, and all she was saying was these are the drugs that I got in this case. These are the drugs that I tested, and this is ["X"] amount of crack cocaine and cocaine base, and the authenticity of that exhibit came exclusively from the officers who were involved and put it into the system. And that's what happened. That's why I did what I did and, quite frankly, if I had it to do over again, I would do exactly the same thing, which is ask them to correct it and disclose to the defense that I did it and that it was corrected and that's exactly what I did in this case.

Docket # 261 at 29:22-32:14.

The revelations in the AUSA's narrative were troubling. First, it was troubling that the AUSA might have directed the alteration of a Certificate of Drug Analysis based only on his views about the integrity of the chain of custody. Second, even if the AUSA merely instructed Ms. Rimkus to look into the suspected error, his indication that he also emailed the Boston Police Department suggested impropriety in the handling of

the evidence.  And finally, after a cursory review of the relevant documents, it became

clear that the AUSA's characterization of the error as "typographical" or "clerical" was

not entirely accurate.  "Typographical" and "clerical" errors are generally understood to

be obvious mistakes for which the correction is immediately apparent from the

document itself, but a viewer of the uncorrected Certificate would have no way of

knowing that an error existed, let alone how to correct it.  Cf. Superior Fireplace Co. v.

Majestic Prods. Co., 270 F.3d 1358, 1369-70 (Fed. Cir. 2001).  Taken with the AUSA's

indignant assurances that he "would do exactly the same thing" again, I deemed it

appropriate to hold a thorough evidentiary hearing to decide whether any Brady

violations had occurred.  See Docket # 242.

    That hearing happened on July 2, 2015.  But, in the lead-up to it, the

government filed an unsolicited "Response to Court Order" detailing its position.  See

Docket # 254.  Attached to that filing was a "Case Conversation Log Report," in which

the State Drug Lab employees, including Ms. Rimkus, recorded many (although, as the

court later learned, not all[9]) of their conversations with the police and prosecutors.

Although this log was prepared in the ordinary course of the drug lab's business,

Docket # 254 at 15, the government did not produce it to Mr. Spencer until June 16,

2015—two months after his second trial ended.  Id. at 4 n.2.  The government excuses

this error by asserting that it "was not aware that Rimkus had notes reflecting all

contacts about this case until it spoke with her in anticipation of the July 2, 2015

hearing."  Id.  And, in any event, the government offers a no-harm, no-foul rationale: it

contends that, even if it had known about the log, it would not "have been required to

---

[9] For example, Ms. Rimkus's April 4, 2014 emails with the AUSA were not logged.  Compare
Docket # 254 at 16, with Docket # 271-2 at 3.

produce [the log] under Local Rule 116.9."[10]

Ms. Rimkus testified at the Brady hearing, corroborating the account in the government's filings.  She told the court that she received the sample along with the SP295, which bore the incorrect incident date.  She then did her tests, copied the date from the SP295 onto her report, and sent the drugs back to the state police.  As the AUSA told the court earlier, Ms. Rimkus testified that the AUSA called her in April 2014 and suggested that the Certificate of Drug Analysis contained a "clerical" error in the incident date.  She then called the Boston Police Department's evidence unit and spoke to an unidentified individual who confirmed the error and gave her the correct March date.  Ms. Rimkus then prepared the corrected Certificate of Drug Analysis and sent it to the AUSA.  Again, it is troubling that the drug lab apparently did not require documentation before changing a sworn report.  But more troubling was the absence of any testimony about the AUSA's communications with the Boston Police Department after his call to Ms. Rimkus (i.e., the email that he referenced at the May 19 hearing).  To get to the bottom of that, I ordered the government to produce the email and any

---

[10] This argument also falls flat.  Local Rule 116.9 provides that "[a]ll contemporaneous notes, memoranda, statements, reports, . . . , and other documents (regardless of the medium in which they are stored) memorializing matters relevant to the charges contained in the indictment made by or in the custody of any law enforcement officer whose agency at the time was formally participating in an investigation intended, in whole or in part, to result in a federal indictment shall be preserved until the entry of judgment unless otherwise ordered by the Court."  Local Rule 116.9 is about preservation of notes, not production.  It—along with Local Rule 116.8, which requires the government attorney prosecuting the case to inform law enforcement agencies (like the State Police Drug Lab and Ms. Rimkus) of Local Rule 116.9 and collect all information subject to Local Rule 116.9—is designed to ensure that no information is lost or destroyed before the government considers whether the information must be disclosed.  Put simply, Local Rules 116.8 and 116.9 are about preserving the full universe of potentially relevant information and evidence.  Local Rule 116.2 (along with the Brady/Giglio case law, of course) deals with what information from that universe must be produced to the defense.  It requires the government to produce any information that "tends to . . . cast doubt on defendant's guilt as to any essential element in any count in the indictment" or "on the credibility or accuracy of any evidence that the government anticipates using in its case-in-chief."  D. Mass. L.R. 116.2(a)(1), (3).  So while the government is technically right that Local Rule 116.9 did not require production of Ms. Rimkus's notes, Local Rule 116.2 might have.  I do not address the government's compliance with Local Rule 116.2 further here, except to note that it may have been disregarded.

other related communications for the court's inspection.  <u>See</u> Docket 263.

The government did that on July 30, 2015.  After a thorough search of the AUSA's emails, the government concluded that he misspoke and no such email exchange occurred.  With that sworn assurance, the court is now satisfied that it has all relevant information to decide whether a <u>Brady</u> violation occurred.  The <u>Brady</u> issue boils down to two questions: was the government's failure to disclose the state police lab call log about the drug sample a <u>Brady</u> violation, and, if not, was its failure to disclose the AUSA's communications with Ms. Rimkus more generally a <u>Brady</u> violation?  After setting out the governing legal standard, I will consider these questions in turn.

## II.    Legal Standard

Mr. Spencer moves for a new trial under Federal Rule of Criminal Procedure 33. That rule allows the court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Because he filed his motion for a new trial <u>pro se</u>, the court construes it liberally.  <u>Cf.</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972).  His only remaining ground for relief is based upon newly discovered evidence—primarily, evidence relating to the chain of custody of the drug evidence that formed the basis for Ms. Rimkus's testimony.  According to defendant, the government improperly withheld this information during pretrial discovery in contravention of his Fifth Amendment rights as explained in <u>Brady v. Maryland</u>, 373 U.S. 83, 86 (1963), <u>Giglio v. United States</u>, 405 U.S. 150, 153-54 (1972), and their progeny.

In the normal course, a defendant who seeks a new trial on the basis of newly discovered evidence must establish that: (1) the evidence was unknown or unavailable to the defendant at the time of the trial; (2) failure to learn of the evidence was not due

to lack of diligence by the defendant; (3) the evidence is material and not merely

cumulative or impeaching; and (4) the emergence of the evidence will probably result in

an acquittal upon retrial of the defendant.  United States v. Del-Valle, 566 F.3d 31, 38

(1st Cir. 2009).  This is a particularly "weighty burden" because "[a] showing of

prejudice under the fourth prong of the test requires an 'actual probability that an

acquittal would have resulted if the evidence had been available.'"  Id. (quoting United

States v. Gonzalez-Gonzalez, 258 F.3d 16, 20 (1st Cir. 2001)).

    But, when the basis for the motion is that the government failed to disclose

evidence required to be disclosed under Brady/Giglio," a "more defendant-friendly . . .

standard applies."  United States v. Gonzalez-Gonzalez, 258 F.3d 16, 20 (1st Cir.

2001).  "Instead of requiring that the defendant show that an acquittal would have

'probably' resulted had the material been produced, we require only that the defendant

show a 'reasonable probability' that had the government disclosed the evidence prior to

trial, the result of the proceeding would have been different."  United States v. Flores-

Rivera, 787 F.3d 1, 15-16 (1st Cir. 2015).  This boils down to asking "whether a trial

held in the absence of such evidence can be described as a trial that can produce 'a

verdict worthy of confidence.'"  Id. at 16 (quoting Kyles v. Whitley, 514 U.S. 419, 434

(1995)).  Although "somewhat Delphic," this "'undermine confidence' formula suggests

that reversal might be warranted in some cases even if there is less than an even

chance that the evidence would produce an acquittal."  Conley v. United States, 415

F.3d 183, 188 (1st Cir. 2005).

    Because the legal standard for defendant's motion turns on whether a

Brady/Giglio violation occurred, a threshold question defendant must answer is

whether, in fact, one did.  "There are three components of a true Brady violation: [1]

The evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; [2] that evidence must have been suppressed

by the State, either willfully or inadvertently; and [3] prejudice must have ensued."

Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Del-Valle, 566 F.3d at 40.  Implicit

within these components is a materiality requirement, and the "touchstone of materiality

is a 'reasonable probability' of a different result."  Kyles, 514 U.S. at 434 (1995).

## III.   Analysis

### A.   The State Drug Lab Call Log

Brady violations typically occur when documentary evidence is improperly

withheld, so the obvious starting point for the Brady inquiry here is the late-produced

state drug lab call log.  There can be little doubt that the call log is favorable to

defendant.  It describes a series of communications between Ms. Rimkus and the

AUSA, including a description of the error in the original Certificate of Drug Analysis.

Ms. Rimkus's entry for April 3, 2014 indicates that the AUSA told her about a mistake

on the Certificate and where it came from (i.e., the SP295), and that she merely called

an unidentified person at the BPD before sending the AUSA a report with a new date

(which differs from the 2014 date that she recorded on the call log).  This evidence of

both the AUSA's close involvement in the Certificate's preparation and the questionable

recordkeeping within the State Drug Lab and the BPD may well have called Ms.

Rimkus's conclusions into doubt.  It has particular relevance given the jury's question

about chain of custody, the proof of which depended largely on the documentation

implicated in the instant motion.

As to suppression, the government's submissions make clear that the United States Attorney's Office did not know of the call log's existence until after this court began its investigation of possible <u>Brady</u> issues.  Docket # 254 at 4 n.2.  In the government's view, this absolves its representative of any pre-trial obligation to disclose it to the defense.  That might be true in some circumstances, but the law does not countenance willful blindness when favorable evidence rests with key investigators. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf," <u>Kyles</u>, 514 U.S. at 437, including all information "possessed by the prosecution team or its agents." <u>Lopez v. Massachusetts</u>, 480 F.3d 591, 594 (1st Cir. 2007).

The First Circuit has not had occasion to fully define who is and is not a member or agent of the prosecution team.  <u>See, e.g.</u>, <u>United States v. Josleyn</u>, 206 F.3d 144, 154 (1st Cir. 2000) (concluding that "prosecutors may be held accountable for information known to police investigators" but may not be for information known to "private parties"); <u>see also</u> <u>Wilkins v. United States</u>, 754 F.3d 24, 28 (1st Cir. 2014) (declining to "resolve th[e] contretemps" of whether a state drug lab chemist was a member of a federal prosecution team).  Most other circuits, however, have developed a set of questions to guide the cross-jurisdiction constructive knowledge inquiry. "Those questions include: (1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." <u>United States v. Risha</u>, 445 F.3d 298, 304 (3d Cir. 2006).  Looking at these and related factors, courts in this jurisdiction at

both the federal and state level have concluded that Massachusetts State Drug Lab chemists are members of a prosecution team for <u>Brady</u> purposes.  <u>See, e.g.</u>, <u>United States v. Hampton</u>, No.09-cr-10281-WGY, 2015 WL 3794750, at *8 (D. Mass. June 18, 2015) (state drug lab chemist, Annie Dookhan, was member of federal prosecution team for drug crimes); <u>cf.</u> <u>Commonwealth v. Scott</u>, 5 N.E.3d 530, 543 (Mass. 2014) (counting Dookhan as a member of the Commonwealth prosecution team for purposes of deciding whether to vacate guilty pleas).

The evidence in this case suggests that Ms. Rimkus was acting as a member or agent of the prosecution team.  Although she and the United States Attorney's Office work for different sovereigns, they were undoubtedly working as a single unit here.  The call log itself shows that the AUSA was directing her activities.  The log, which the government suggests "reflect[s] all [of her] contacts about this case," Docket # 254 at 4 n.2, lists only one conversation to which the AUSA was <u>not</u> a party.  That lone conversation—Ms. Rimkus's April 3, 2014 call to the BPD evidence unit—was a direct response to a phone call from the AUSA to Ms. Rimkus earlier that day.  The log shows that when the AUSA called the State Drug Lab, it listened.  The Lab sent the AUSA the original Certificate and the corrected report; Ms. Rimkus followed up with the BPD as soon as the AUSA noted the error in the incident date; and she even sent him high-resolution scans of her test results so he could make trial demonstratives.  This level of responsiveness leaves no doubt that if the AUSA had asked for the call log, he would have received it.  Ms. Rimkus was therefore part of the prosecution team, and, because she knew about the call log well in advance of Mr. Spencer's first trial, the government's "we didn't know" excuse for failing to produce it to the defense fails.

The court is, of course, mindful that the United States Attorney's Office does not work with the State Drug Lab as frequently as it works with federal drug agencies.  That alone makes the government's contention that it did not know about the call log plausible.  But the government's apparent lack of familiarity with state procedures does not diminish its <u>Brady</u> obligations.  Once the government decides to try a state case, it must get up to speed on the state's investigatory practices and procedures.

This, at last, brings us to prejudice.  It is here that defendant's argument fails, but only by the narrowest of margins.  At trial, the government presented evidence that the alleged drugs purchased from Mr. Morrison, in the transaction where Mr. Spencer stood watch, were assigned a control (or "CHATEAU CORP.") number by the BPD.  The evidence showed that the sample bearing that control number was sent to Ms. Rimkus at the State Drug Lab, and that she analyzed the sample bearing that control number in preparing her original Drug Analysis Report.  Regardless of the date on the SP295, that control number associates the sample purchased from Mr. Morrison on March 20, 2013 with the sample that tested positive for crack cocaine at the lab.  Even if defendant had been able to cast doubt on the SP295 and incident date on the corrected Certificate of Drug Analysis, no reasonable jury could have concluded, in light of the control number records, that the chain of custody was broken.  The government's failure to produce the call log to defendant before his trial, while questionable, was not an actionable <u>Brady</u> violation.

### B.   The AUSA's Communications with Ms. Rimkus

<u>Brady</u> violations are not limited to the government's failure to disclose documentary evidence—they may include the government's failure to disclose other types of favorable information as well.  <u>See, e.g.</u>, <u>Kyles</u>, 514 U.S. at 436-37.  As with

the call log, there is little doubt that evidence regarding the AUSA's involvement in the preparation of the corrected Certificate of Drug Analysis would have been favorable to defendant.  For example, it might have been used to paint Ms. Rimkus as sloppy, at best, or a pawn of the prosecution, at worst.  And, because the AUSA himself was involved in these communications and necessarily knew they happened, there is no question that the government suppressed them by failing to tell the defense the full story about why the Certificate was corrected.

This series of events, however, cannot support a mistrial.  Like the call log, the suppression of this information was not prejudicial to defendant.  Even if the information had been available to him at trial, government counsel could have relied only upon the control number to show the chain of custody and integrity of Ms. Rimkus's test results. No reasonable jury could have doubted that the sample delivered to Ms. Rimkus was the same one purchased from Mr. Morrison on March 20, 2013.  No Brady violation occurred.

## IV.    Conclusion

Brady and its progeny are procedural rules that seek to produce "verdict[s] worthy of confidence."  Kyles, 514 U.S. at 434.  It is part of the larger framework of rules governing prosecutors' conduct, all of which aim to ensure the "fairness, integrity [and] public reputation of judicial proceedings."  United States v. Young, 470 U.S. 1, 15 (1985) (quoting United States v. Atkinson, 297 U.S. 157, 159 (1936)).  Even though the government's missteps here did not rise to the level of a Brady violation, its judgment in prosecuting this case is hardly a boon to the justice system's public image.

Yet, now that a jury has spoken, the court's role is merely to decide whether the government's procedural missteps prejudiced the defendant.  Viewing the record as a

whole, I cannot find that they did.  Defendant received a fair trial, despite the court's concerns about how this case came about and how its prosecution proceeded.

Defendant's motion for a new trial (Docket # 227) is DENIED.  Having found no remediable <u>Brady</u> violation, the court also DENIES defendant's motion to dismiss the indictment (Docket # 247).  In light of this order, the government's motion for leave to file another memorandum in support of its position (Docket # 258) is DENIED, as is defendant's motion to strike the government's response to the court's July 10, 2015 order (Docket # 272).

Relatedly, Mr. Spencer's motion to appear pro se (Docket # 226) and his motion to appoint counsel for sentencing (Docket # 239) are DENIED AS MOOT because both of these motions predate the May 19, 2015 hearing where Mr. Spencer agreed to proceed with his current stand-by counsel.


_____October 8, 2015_____          _____/s/Rya W. Zobel_____
            DATE                                      RYA W. ZOBEL
                                        UNITED STATES DISTRICT JUDGE