UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
        Plaintiff,            )
                              )
vs.                           )
                              ) Criminal Action
BARRY SPENCER,                ) No. 13-10196-RWZ
        Defendant.            )
                              )
                              )
                              )
```

**EVIDENTIARY HEARING**

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
Boston, Massachusetts 02210
July 2, 2015
2:00 p.m.

\* \* \* \*

CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

    APPEARANCES:

2

3   For the Plaintiff:

4    UNITED STATES ATTORNEY'S OFFICE
     (By: AUSA John A. Wortmann, Jr., and
5         AUSA Cynthia Young
          John J. Moakley Courthouse
6         One Courthouse Way, Suite 9200
          Boston, MA 02210
7


8

9   For the Defendant:

10   BUTTERS BRAZILLAN, LLP
     (By: Thomas Butters, Esq.)
11        699 Boylston Street
          12th Floor
12        Boston, MA 02116

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2
                        I N D E X
3

4    WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

5    CLAIRE RIMKUS

6        By Ms. Young:          5                26
         By Mr. Butters:               22
7

8

9


10
     EXHIBIT                            FOR I.D.   IN EVID.
11

12   No. 1   Drug analysis report                    8
     No. 2   Case Conversation Log                   15
13   No. 4   Submittal form                          28

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (The following proceedings were held in open court
3    before the Honorable Rya W. Zobel, United States District Judge,
4    United States District Court, District of Massachusetts, at the
5    John J. Moakley United States Courthouse, 1 Courthouse Way,
6    Boston, Massachusetts, on July 2, 2015.
7              The defendant, Barry Spencer, is present with counsel.
8    Assistant United States Attorneys John A. Wortmann, Jr., and
9    Cynthia Young are present.)
10             COURTROOM DEPUTY CLERK URSO:  This is the United
11   States versus Barry Spencer.  It's Criminal 13-10196.  If
12   counsel could please identify themselves.
13             MR. WORTMANN:  Your Honor, good afternoon.  John
14   Wortmann for the United States.
15             Your Honor, in view of your order, Cynthia Young here
16   is now co-counsel and she'll be handling the hearing today.
17             MS. YOUNG:  Good afternoon, your Honor.  Whatever
18   time of the day it is.
19             THE COURT:  It is afternoon.
20             MS. YOUNG:  I know.  I'm a little mixed up.
21             THE COURT:  I hope.
22             MR. BUTTERS:  Your Honor, Thomas Butters here in my
23   capacity as standby counsel.
24             THE DEFENDANT:  Barry Spencer.  How you doing?
25             THE COURT:  How do you do?
```

| | |
|---|---|
| 1 | THE DEFENDANT:  All right. |
| 2 | THE COURT:  Now, I think that the issue that has been |
| 3 | raised by Mr. Spencer in his motion is essentially a *Grady* |
| 4 | issue, and I think the purpose of this hearing today is |
| 5 | primarily to determine what happened, and I think the |
| 6 | government should take the lead in laying out the facts. |
| 7 | MS. YOUNG:  All right, your Honor.  I will call |
| 8 | Claire Rimkus to the stand. |
| 9 | COURTROOM DEPUTY CLERK URSO:  Can you please raise |
| 10 | your right hand, please. |
| 11 | CLAIRE RIMKUS, SWORN. |
| 12 | COURTROOM DEPUTY CLERK URSO:  Can you please state |
| 13 | your name, spelling your last for the record, please. |
| 14 | MS. RIMKUS:  My name is Claire Rimkus.  My last name |
| 15 | is R-i-m-k-u-s. |
| 16 | COURTROOM DEPUTY CLERK URSO:  Thank you. |
| 17 | THE COURT:  You may proceed. |
| 18 | DIRECT EXAMINATION |
| 19 | BY MS. YOUNG: |
| 20 | Q.   Good afternoon, Ms. Rimkus. |
| 21 | A.   Good afternoon. |
| 22 | Q.   Did you testify previously in the case of United States |
| 23 | versus Barry Spencer? |
| 24 | A.   Yes, I did. |
| 25 | Q.   Did you receive a subpoena to come today? |

1    A.   Yes, I did.

2    Q.   Did you bring anything with you in response to that

3  subpoena?

4    A.   Yes, I did.

5    Q.   What did you bring?

6    A.   I brought our -- the case file, which includes any

7  documentation, lab data, notes, et cetera, of my analysis, and

8  I also brought a record of the case communication that we

9  keep.

10   Q.   And do you have that with you now?

11   A.   Yes, I do.

12        MS. YOUNG:  Your Honor, may I approach?

13        (Discussion off the record.)

14        MS. YOUNG:  May I approach again, your Honor?

15        THE COURT:  Yes.

16        MR. BUTTERS:  Is this a copy?

17   Q.   Ms. Rimkus, is this a copy of --

18        THE COURT:  Could you keep your voice up, please.

19        MR. BUTTERS:  Oh, I'm sorry.

20        THE COURT:  As you speak to her, your voice goes over

21  there and not over here.

22        MS. YOUNG:  Apologize, your Honor.

23   Q.   Is this a copy -- are these documents a copy of what's

24  in the blue file?

25   A.   No, they're not.

1   Q.   They're totally separate.   One is the case -- whoops.

2   The blue file is what?

3   A.   The blue file contains my certificate, my notes, and all

4   the data related to the analysis.

5   Q.   And the stapled group of documents?

6   A.   That's the whole packet, is our -- are printed out from

7   our online system.   They're a record of case communications.

8   Q.   And this is in response to the subpoena that was issued

9   by the defendant; is that correct?

10  A.   That's correct.

11         MS. YOUNG:   May I approach again, your Honor?

12         THE COURT:   Yes.

13  Q.   I'm showing you what's been marked as Exhibit 1 for

14  today's hearing.   Do you recognize that document?

15  A.   Yes, I do.

16  Q.   How do you recognize it?

17  A.   I recognize it by the unique laboratory number at the

18  top of the document and by my name and signature at the

19  bottom.

20  Q.   And can you tell us what it is?

21  A.   This is a report of drug analysis that I issued after

22  analyzing this case.

23         MS. YOUNG:   Your Honor, I would like to move the drug

24  certificate into -- it's the original drug certificate.   I've

25  shown it to Mr. Butters -- into evidence.

```
 1              THE COURT:  No objection, right?

 2              MR. BUTTERS:  No objection, your Honor -- well, are

 3   you doing this or am I doing this?

 4              THE DEFENDANT:  You're doing this.

 5              MR. BUTTERS:  I'm doing this.

 6    Q.   Ms. Rimkus, would you please --

 7              THE COURT:  So, it's Exhibit 1 in evidence.

 8              MS. YOUNG:  Exhibit 1.  Thank you, your Honor.

 9              (Exhibit No. 1 received in Evidence.)

10    Q.   Would you please look at the information at the top of

11   that report.

12    A.   Okay.

13    Q.   And what does it show at the top of the drug analysis

14   report?

15    A.   There is a defendant name and agency, case officer,

16   agency case number, date of incident, date submitted.

17    Q.   Where did you obtain the information that's at the top

18   of that report?

19    A.   That information is filled out by the submitting agency,

20   in this case the Boston Police Department.  When they submit

21   their evidence to our laboratory, they fill out a form, the

22   SP-295 Form, that contains the information of incident, date,

23   agency, case officer, case number.

24    Q.   So, what is your understanding of the -- it says on the

25   top of this -- you just said, "date of incident."  What is
```

1   your understanding of what the date of incident is?

2   A.   That is the date that the police took ownership of the

3   evidence.  So, the date on which it was seized or purchased.

4   Q.   Were you present at the time of that incident?

5   A.   No, I was not.

6   Q.   So, all of your information is obtained from this -- the

7   information that comes to you from the submitting agency,

8   which in this case was the Boston Police Department?

9   A.   That's correct.

10  Q.   When did you complete this report, Exhibit 1?

11  A.   September 26th, 2013.

12  Q.   And at sometime after you completed the report, did you

13  receive a phone call about the information on the report?

14  A.   Yes, I did.

15  Q.   From whom did you get that phone call?

16  A.   From John Wortmann.

17  Q.   And what did he call you about?

18  A.   He called to inform me that he thought the incident date

19  on the certificate was incorrect.

20  Q.   And is that the only thing he said?

21  A.   As far as I can recall, yes.

22  Q.   Did he ask you to do anything?

23  A.   Well, I explained to him --

24         THE COURT:  I'm sorry.  What did he tell you was

25  incorrect?

1          THE WITNESS:  The date of incident.

2     Q.   Did he ask you to do anything?

3     A.   No, he did not.

4     Q.   Was this the first time that -- excuse me.  Let me start

5     again.

6          How long have you worked at the State Police Lab?

7     A.   Two and a half years.

8     Q.   And was this the first time that you ever received a

9     call about a drug analysis that you had completed?

10    A.   No, it was not the first.

11    Q.   And how many times previously had you received such

12    calls?

13    A.   Several.  Several times.  At least four or five.

14    Q.   And in general --

15         THE COURT:  These were calls pertaining to what kind

16    of error?

17         THE WITNESS:  Pertaining to an administrative error

18    on the certificate.

19         THE COURT:  The certificate is your document, which

20    is now Exhibit 1?

21         THE WITNESS:  That is correct.

22    Q.   By "certificate" you're referring to the analysis of

23    drug report?

24    A.   That's correct.

25    Q.   And the previous calls that you've received about that

1    kind of information on the drug analysis report, who did you

2    get those calls from, in general?

3      A.   From assistant district attorneys.

4      Q.   Now, when you got the call from Mr. Wortmann, what did

5    you do in response to that call?

6      A.   I telephoned the Boston Police Department's drug

7    depository to confirm the date of incident.

8      Q.   And when you received prior calls from other prosecutors

9    in other cases, what did you do in response to those calls?

10     A.   I also telephoned the submitting agency to confirm the

11   correct information.

12     Q.   And when you say "submitting agency," you're referring

13   to the police department that has the drugs, that sent them

14   over to the State Police Lab?

15     A.   That's correct.

16     Q.   All right.  So, you called them, the Boston Police

17   Department.  And do you recall who you spoke to?

18     A.   No, I do not.

19     Q.   Do you recall what the person said to you?

20     A.   Yes.

21     Q.   And what did the person tell you?

22     A.   I gave them the cc number, the Boston Police incident

23   number, and inquired as to what the date of incident in their

24   record was, and they told me that the date of incident was

25   March 20th.

1    Q.   Now, when you refer to the "cc" number, is that on the

2    report that you have in front of you, Exhibit 1?

3    A.   Yes, it is.

4    Q.   And what's the number?

5    A.   The number is 130164540.

6    Q.   Now, in response to that -- after that phone call, did

7    you do anything?

8    A.   Yes, I did.

9    Q.   What did you do?

10   A.   I issued a corrected report.

11   Q.   And on that report, did you indicate that it was a

12   corrected report?

13   A.   Yes, I did.

14   Q.   All right.  Now, did you memorialize either --

15        THE COURT:  I'm sorry.  How did you indicate that?

16        THE WITNESS:  The report had a header.  For instance,

17   the original one just says, "Drug analysis report."  The

18   corrected report says, I believe, "Drug analysis report

19   (corrected)."

20        THE COURT:  Do we have --

21        MS. YOUNG:  I will -- if you would like, I can do

22   that next, if you would like, your Honor.

23   Q.   All I wanted to ask you is did you memorialize those

24   conversations with Mr. Wortmann and with the Boston Police

25   Department about the report?

A.   Yes, I did.

Q.   Let me just show you what's been marked -- premarked as Exhibit 2 for today's hearing.  Do you recognize that?

A.   Yes, I do.

Q.   And what is that?

A.   This is a log report of any case communications associated with this case.

Q.   And when you say, "case communications associated with this case," communications between who -- which two people are you talking about, any communications?

A.   Any communications that we have about a case we log in our online system.  So, it can be between the police department, between the attorneys.  They're all logged.

Q.   But it's between someone in the lab and someone outside the lab; is that correct?

A.   That's correct.

Q.   So, it's not internal communications.  It's just to third parties?

A.   That's correct.

Q.   And do you know who wrote the notes that are on that log?

A.   Yes, I do.

Q.   Who did?

A.   There are several notes that have been entered by several people.

Q.   And any of those notes by you?

1    A.   Yes, they are.

2    Q.   Let me just ask, how do you know that those are the

3    notes that relate to this case?

4    A.   The unique laboratory number 13-20606 associated with

5    this case is on this document.

6    Q.   Let me just ask you, is that a number that is the State

7    Police Lab number?

8    A.   Yes, it is.

9    Q.   And is that also on Exhibit 1, the analysis of drug

10   report?

11   A.   Yes, it is.

12   Q.   Now, looking at those notes, when you -- those notes

13   came from some sort of computer printout; is that correct?

14   A.   That's correct.

15   Q.   And are those notes entered by you into a computer?

16   A.   Yes, they are.

17   Q.   And are they -- do you enter the notes contemporaneously

18   with whatever it is that you're doing?

19   A.   Yes.

20   Q.   So, if I could have you look...

21        MS. YOUNG:  Actually, your Honor, may I move that

22   into evidence, the case conversation log?

23        THE COURT:  I assume there's no objection.

24        MR. BUTTERS:  No objection, your Honor.

25        (Exhibit No. 2 received in Evidence.)

1    Q.   If I can direct your attention to the entry for the log

2    on April 3rd of 2014.

3    A.   Yes.

4    Q.   Do you see a note there?

5    A.   Yes, I do.

6    Q.   Is that your note?

7    A.   Yes.

8    Q.   You wrote that note?

9    A.   Yes.

10   Q.   Can you just read the note to us, please.

11   A.   "Conversation with AUSA John Wortmann indicated that

12   incident date provided on the SP-295 was incorrect.  Called

13   BPD evidence unit, who confirmed that the incident date for cc

14   number 130164540 is 3/20/2014.  Changed incident date in LIMS

15   and issued corrected report."

16   Q.   So, let me ask you first, what is the SP-295?

17   A.   That is the drug submission form that the police

18   department fills out when they are submitting evidence to the

19   lab.

20   Q.   And does that form come from the Boston Police

21   Department to the lab?

22   A.   They generally fill it out at the lab as they are

23   submitting the evidence.

24   Q.   And what is LIMS?

25   A.   LIMS is our Laboratory Information Management System.

```
1    That's our online system that we use to track our cases.
2      Q.   And do you recognize the cc number that's on there that
3    you just read?
4      A.   Yes, I do.
5      Q.   Is that the same number that's also on Exhibit 1, the
6    drug analysis report?
7      A.   Yes, it is.
8      Q.   Now, is there other information --
9           THE COURT:  Ms. Rimkus, do you have the SP-295?  Did
10   that come to you, the form itself?
11          THE WITNESS:  Yes, it was.
12          THE COURT:  Do you have one or two of those?
13          THE WITNESS:  One.
14          THE COURT:  Okay.
15     Q.   Now, if you look at that, your case conversation notes,
16   it has some other information on it; is that correct?
17     A.   Yes.
18     Q.   For that same date, April 3rd, 2014?
19     A.   Yes.
20     Q.   And it has a contact number?
21     A.   Yes.
22     Q.   And whose contact number is that?
23     A.   That's the Boston Police drug depository.
24     Q.   So, that indicates -- you put that number in because
25   that's the contact person you reached with respect to the drug
```

certificate?

A.   Yes.

Q.   Okay.  So, your notes now -- those notes you just read to us indicate that the date of incident was actually what date?

A.   The notes indicate the date of the incident was March 20th, 2014.

Q.   And is that correct?

A.   That is a typo, typographical area.

Q.   Which part is the typographical error?

        MR. BUTTERS:  Excuse me.  Which exhibit are we talking about?

        MS. YOUNG:  Excuse me.  We're still on this Exhibit 2, and she's still referring to this, the note.

Q.   The April 3rd note, correct?

A.   Correct.

Q.   And so, what you just read to us, your case conversation notes, you're saying there's a typo in the date of incident that you have in those notes?

A.   Yes.

Q.   And what is the typo?

A.   The year of the incident.

Q.   What -- your notes say what?

A.   My notes indicate it's 2014.

Q.   And how do you know that that's a typographical error?

1    A.   The drugs were analyzed by me in 2013.  So, my analysis

2    could not precede the incident date.

3    Q.   And, in fact, when you completed the analysis of the --

4    the drug certificate, what date did you put on it, 2013 or

5    2014?

6    A.   2013.

7    Q.   Let me...

8         MS. YOUNG:  If I may approach, your Honor.

9    Q.   If I could also, just to confirm that, direct your

10   attention to the note on November 19th, 2013.  That's also one

11   of your notes that you wrote in the case conversation log?

12   A.   Yes.

13   Q.   And can you tell us what that says?

14   A.   "Faxed copy of cert to CP.  Transmission okay."

15   Q.   When you say "CP," what does that refer to?

16   A.   That refers to the contact person.

17   Q.   And the contact person in this case was who on that

18   note?

19   A.   John Wortmann.

20   Q.   So, it says you faxed a copy of the certificate to John

21   Wortmann on November 19th of 2013?

22   A.   Yes.

23        THE COURT:  Let me go back.  Now I'm really very much

24   confused.

25        THE DEFENDANT:  I know.

```
1              THE COURT:  The incident that accompanied the first

2    document that you got asking you to do the analysis, what was

3    the date of that, the very first time you were introduced to

4    this case?

5              THE WITNESS:  The date of incident?

6              THE COURT:  Yes.

7              THE WITNESS:  Was May 26th, 2013.

8              THE COURT:  And that was a correct date or an

9    incorrect date?

10             THE WITNESS:  That was an incorrect date.

11             THE COURT:  And what was the correct date that I

12   gather you got as a result of the call from Mr. Wortmann?

13             THE WITNESS:  That was March 20th, 2013.

14             THE COURT:  That was the date that Mr. Wortmann told

15   you was the correct date?

16             THE WITNESS:  No.

17             THE COURT:  He just said that the first one was

18   incorrect?

19             THE WITNESS:  That's correct.

20             THE COURT:  And then you got the correct date by

21   calling the police department?

22             THE WITNESS:  Yes.

23             THE COURT:  And then the entry of 2014, is that

24   something that appeared only in this note or did it appear

25   anywhere else?
```

1          THE WITNESS:  That appeared only in this note.

2          THE COURT:  Okay.

3          MS. YOUNG:  Your Honor, if I may approach, this may

4     help.

5     Q.   I want to show you what's been marked as Exhibit 3 for

6     today's hearing.  It has an Exhibit 10 from the trial still on

7     it.  Do you recognize that?

8     A.   Yes, I do.

9     Q.   And what is that?

10    A.   This is the corrected drug analysis report that I

11    issued.

12    Q.   And what date did you issue that report?

13    A.   On April 4th, 2014.

14    Q.   So, that's the day after the phone call from Mr.

15    Wortmann and after you made the phone call to Boston Police

16    Department; is that correct?

17    A.   That's correct.

18    Q.   And are there any changes on that report from the

19    original report that's Exhibit 1?

20    A.   Yes.

21    Q.   What are the changes?

22    A.   The two differences are the date that the report was

23    prepared and the date of incident.

24    Q.   And what does this corrected version -- does this, in

25    fact, say that it's a corrected version?

1    A.   Yes, it does.

2    Q.   And does it say anything else about the correction?

3    A.   Yes, it does.

4    Q.   What does it say?

5    A.   It says, "Certificate of drug analysis (corrected).

6  This report supersedes the one issued on September 26th,

7  2013."

8    Q.   And what is changed in that report as compared to the

9  original report?

10   A.   The date of incident.

11   Q.   That's the only thing you changed?

12   A.   Yes.

13   Q.   Other than, obviously, a new signature and a new report.

14        And did you note that in some way on the report, that

15  that's the change?

16   A.   Yes.

17   Q.   How did you note that?

18   A.   The date of incident is italicized.

19   Q.   Now, Ms. Rimkus, when you prepared the final report,

20  this corrected version, what were you relying on for the date

21  of incident?

22   A.   I was relying on my conversation with the Boston Police

23  Department.

24   Q.   So, you were not relying on Mr. Wortmann's call?

25   A.   No.

1    Q.   But Mr. Wortmann's call alerted you to the fact that

2    there was a problem?

3    A.   That is correct.

4    Q.   And that it was incorrect?

5    A.   Yes.

6         MR. BUTTERS:  A little leading there.

7         MS. YOUNG:  I have no further questions, your Honor.

8         THE COURT:  Any questions?

9         MR. BUTTERS:  I just have a couple, your Honor.

10                       CROSS-EXAMINATION

11   BY MR. BUTTERS:

12   Q.   Do you see this blue folder that you have?

13   A.   Yes.

14   Q.   This is your original report, correct?

15   A.   That's correct.

16   Q.   Is this submission report, SP-295, is this an original

17   carbon copy?

18        MR. BUTTERS:  May I approach, your Honor?

19        THE COURT:  Yes.  Both of you can approach whenever

20   you want.

21        MR. BUTTERS:  Thank you.

22   A.   Yes.

23   Q.   So, where is the original of that document?

24   A.   That is -- I believe it's returned to the submitting

25   agency.

1    Q.   To the Boston Police Department?

2    A.   Yes.

3    Q.   And so, when you called to -- about this error, did you

4    say, Look, we'll send the drugs back to you because we have a

5    mix-up here?

6    A.   No, I did not.

7    Q.   So, are you telling me there's no second submission

8    sheet, this SP-295?  Is this the only one that exists?

9    A.   Yes.

10   Q.   In other words, you didn't -- you were supposed to send

11   the drugs back to the Boston Police Department so that they

12   could submit them in the proper way, correct, with the proper

13   information?  Isn't that the protocol?

14   A.   That is not our protocol.

15   Q.   How do you know?

16   A.   Because our protocol is that when there is a discrepancy

17   in case information, we simply contact the submitting agency

18   and ask them what the date of incident is.

19   Q.   Well, did you talk to Officer Flaherty, Sean Flaherty?

20   He was the officer that submitted the original drug -- the

21   drugs for analysis, correct?

22   A.   That's correct.  I don't believe I did.

23   Q.   So, you just talked to somebody that you don't remember

24   who it was?

25   A.   Correct.

1    Q.   And was that -- where was that person located that you

2  talked to?

3    A.   In the Boston Police drug depository.

4    Q.   But you didn't talk to Officer Flaherty?

5    A.   No.

6    Q.   And you didn't resubmit -- or no one resubmitted these

7  drugs from the Boston Police Department?

8    A.   No.

9    Q.   And so, you called somebody that you don't know who it

10  was and they told you change the date and so you did it?

11    A.   Yes.  They informed me of what the correct date in their

12  records was, and then I issued a corrected report.

13    Q.   But, of course, you don't know what the correct --

14         THE COURT:  Excuse me one minute, Mr. Butters.

15         What records did this person say he or she was

16  referring to?

17         THE WITNESS:  They did not refer to records.

18         THE COURT:  Okay.  I'm sorry to interrupt.

19         MR. BUTTERS:  May I have a moment, your Honor, to

20  talk to my brother?

21         THE COURT:  Yes.

22         (Discussion off the record.)

23    Q.   Is there a written protocol at the State Police Lab for

24  situations like this that you're aware of?

25    A.   Yes.

1   Q.   Do you have that with you?

2   A.   No, I do not.

3   Q.   Well, I have the policy from the Commonwealth of

4   Massachusetts, Department of Public Health, and that's a

5   different laboratory, correct?

6   A.   That's correct.

7   Q.   That's the one in Jamaica Plain that had all the

8   problems, right?

9   A.   That's correct.

10         THE DEFENDANT:  Amherst.  Amherst also.

11   Q.   And Amherst also.  And this...

12         MR. BUTTERS:  May I -- yes, I may.

13   Q.   And it says under their procedure --

14         MS. YOUNG:  Objection, your Honor.  This is not

15   relevant to this State Police Lab.

16         MR. BUTTERS:  This will just be a question or two, if

17   I may.

18         THE COURT:  I know, but the question is whether it's

19   relevant, but I'll let him do it.  I may not pay any attention

20   to it.  I do not believe it is relevant.  It's a different

21   laboratory, which is --

22         MR. BUTTERS:  Well, let me just ask the question,

23   though.

24   Q.   I mean, how can you rely on calling the Boston Police

25   Department rather than going through the regular protocol?

1    Meaning, the regular protocol is that you get something from

2    the Boston Police Department, somebody delivers it to the lab,

3    right?

4    A.   That's correct.

5    Q.   And they have -- and they use the form SP-295?

6    A.   Yes.

7    Q.   And it's submitted, and then you know that that's the

8    right sample, you know that's the right date or wrong date in

9    some instances, correct?

10   A.   Correct.

11   Q.   But then in this instance, instead of returning the

12   drugs to the lab and having them resubmit them with the

13   appropriate form, you simply make a phone call and talk to

14   somebody that you don't know?

15   A.   That's our protocol.

16        MR. BUTTERS:   I don't have any other questions, your

17   Honor.

18        THE COURT:   Any redirect?

19                    REDIRECT EXAMINATION

20   BY MS. YOUNG:

21   Q.   Ms. Rimkus, can I just ask you, you said before that was

22   not the only time a mistake like this has happened?

23   A.   That's correct.

24   Q.   And in your standard operating procedure, when such a

25   mistake happens, is to call whatever the submitting agency is

1    to ask them what the date is?

2    A.   That's correct.

3    Q.   And let me just ask you one more thing.  Mr. Butters was

4    asking you about the drugs being resubmitted.  Were you

5    retesting the drugs when you made -- wrote the corrected

6    report?

7    A.   No, I was not.

8    Q.   You were just correcting what you thought was an error

9    in the report?

10   A.   Yes, it was purely an administrative correction.

11   Q.   And you also testified that you were not present for the

12   date of incident, correct?

13   A.   No, I was not.

14   Q.   So that that information is not of your own personal

15   knowledge?

16   A.   Correct.

17   Q.   But the information that you rely on is the cc number

18   and the State Police Drug Lab number?

19   A.   Yes.

20           MS. YOUNG:  Thank you.

21           THE DEFENDANT:  Your Honor --

22           MR. BUTTERS:  Let me.

23           Your Honor, first of all, may I offer this submittal

24   form from Officer Flaherty?  We have a copy of it.

25           (Discussion off the record.)

1          MR. BUTTERS:  As Mr. --

2          THE COURT:  I assume there's no objection?

3          MS. YOUNG:  No objection, your Honor.

4          COURTROOM DEPUTY CLERK URSO:  We're going to go as

5    four for you?

6          MR. BUTTERS:  Sure.  Sure.

7          (Exhibit No. 4 received in Evidence.)

8          THE COURT:  What are you calling it?

9          COURTROOM DEPUTY CLERK URSO:  Four.  Exhibit 4.

10         THE COURT:  Exhibit 4?

11         COURTROOM DEPUTY CLERK URSO:  Yes.

12         (Discussion off the record.)

13         MR. BUTTERS:  The Judge knows that now.

14         THE DEFENDANT:  Your Honor, can I for a minute?

15         Ms. Rimkus, are you a chemist or an evidence officer?

16         THE WITNESS:  I am a forensic scientist.  I'm a

17    chemist.

18         THE DEFENDANT:  So, actually, you're not actually an

19    evidence officer; is that correct?

20         THE WITNESS:  No, I am not.

21         THE DEFENDANT:  Who fills out this form?

22         THE WITNESS:  A member of the submitting agency.

23         THE DEFENDANT:  Okay.  And this goes to an evidence

24    officer, doesn't it?

25         THE WITNESS:  It goes to an evidence unit technician

1    at our lab.

2          THE DEFENDANT:  Okay.  When you go to get samples out

3    of the lab, the protocol is that you would go inside of the

4    evidence safe or off to the officer and technician and ask

5    them and they assign samples to you; is that correct?

6          THE WITNESS:  Generally, yes.  We go to the vault.

7    We don't have to necessarily interact with the evidence

8    technicians.

9          THE DEFENDANT:  You go into the vault by yourself?

10         THE WITNESS:  No.  We always go with another person.

11         THE DEFENDANT:  So, actually -- so, it has to be an

12   evidence technician that goes into the vault with you; isn't

13   that correct?  Because that's their area, right?

14         THE WITNESS:  No.  Two chemists can enter our vault.

15         THE DEFENDANT:  Two chemists can enter?

16         THE WITNESS:  Yes, they can.

17         THE DEFENDANT:  Well, that's how come they locked

18   down the Hinton lab, isn't it?  Because chemists were going in

19   there with --

20         MS. YOUNG:  Objection.

21         THE COURT:  The Hinton lab has nothing to do with

22   this case.

23         THE DEFENDANT:  Okay.  But I'm just saying -- I mean,

24   I'm trying to get this protocol right.

25         So, the evidence officer is the one who did this

1  submission paper with receiving, the one who you brought the

2  evidence, right?

3          THE WITNESS:  I'm sorry?

4          THE DEFENDANT:  The person who brought this from the

5  Boston Police, they came and they brought this here and one of

6  your technicians filled this out?

7          THE WITNESS:  No, that is not correct.

8          THE DEFENDANT:  It's not.  Who filled this out?

9          THE COURT:  What is "this" that you're referring to?

10          THE DEFENDANT:  What we just marked as evidence, your

11  Honor.

12          THE COURT:  Okay.

13          MR. BUTTERS:  Exhibit 4.

14          THE DEFENDANT:  Exhibit 4.  So, who filled this paper

15  out?  Did you fill it out or a chemist?

16          THE WITNESS:  No.  It's a member of the Boston Police

17  Department, either the case officer or the submitting evidence

18  officer.

19          THE DEFENDANT:  So, what does the evidence

20  technicians do?  Would they just watch the chemists go in and

21  out of the safe or do they watch the evidence in the safe?

22  What do they do?

23          THE WITNESS:  They perform the intake.

24          THE DEFENDANT:  Okay.  So, at the Boston -- so, at

25  your -- at your lab, the prosecutors can call you directly at

```
1    your table and ask you to check on things and change things

2    around, you're saying?

3            THE WITNESS:  They can ask us to confirm dates,

4    correct.

5            THE DEFENDANT:  If they had a priority order, would

6    that go through evidence technicians or supervisor or do they

7    call you and say, Hey, Claire, can you pull out a few samples

8    that I'm waiting on or did you go and do it or does it go

9    through a supervisor?

10           THE WITNESS:  You're referring to placing a

11   priority --

12           THE DEFENDANT:  Say they have --

13           THE COURT:  Hold it, Mr. Spencer.  If you ask a

14   question, you need to allow her to answer.

15           THE DEFENDANT:  Okay.  I'm trying to.  I'm pulling

16   back.

17           THE COURT:  Please.  And please ask simple questions,

18   not those --

19           THE DEFENDANT:  Not the complex ones, okay.

20           THE COURT:  -- because I can't follow them.

21           THE DEFENDANT:  Okay.  If you get a priority order,

22   who fills that order?  Would they call you directly --

23           THE COURT:  Who fills it out, that was the question.

24           THE DEFENDANT:  Okay.  Who fills the order for a

25   priority order?
```

1            THE WITNESS:  Generally one of our temporary

2   administrative employees.

3            THE DEFENDANT:  So, it would come in -- to which

4   office would it come into?  Would it come into the evidence

5   technician's office or the chemist's office?

6            THE WITNESS:  To clarify, you're referring to a

7   request to analyze evidence?

8            THE DEFENDANT:  Yes, out of the correct number that

9   it is.  Say if the trial is coming and they need it done,

10  would that go to the evidence tech's office or would it go to

11  the chemist's supervisor's office?

12           THE WITNESS:  That goes to the Drug Unit.  So, it's

13  either answered by a Drug Unit chemist or by an administrative

14  employee.

15           THE DEFENDANT:  Okay.  At the time you only did like

16  200 to 300 samples; is that correct, when you did this sample?

17           THE WITNESS:  That's correct.

18           THE DEFENDANT:  So, during that time, how many times

19  did you actually have a phone call that you had to check on

20  dates or other administrative problems that you had inside of

21  a certificate or a submittal paper that was incorrect at that

22  time?

23           THE WITNESS:  I cannot recall exactly.

24           THE DEFENDANT:  You cannot recall.

25           Oh, who was actually your supervisor at that time?

1   Since that it needed to be done, who did you go to to ask for

2   the policy to do that?

3          THE WITNESS:  I'm sorry.  To ask for the policy?

4          THE DEFENDANT:  Who trained you to take the call and

5   go and call the police and do it that way?  Who trained you to

6   do that policy?

7          THE WITNESS:  My supervisor, Timothy Woods.

8          THE DEFENDANT:  Timothy Woods.  And did Timothy Woods

9   tell you to call the Boston Police and verify the date?

10         THE WITNESS:  I don't believe he told me that

11  directly.  I think I knew that from knowing our protocols at

12  the lab.

13         THE DEFENDANT:  At the time you only did 200 to 300

14  samples.  So, how many, again, did you do by yourself of

15  calling to correct administrative problems?

16         THE WITNESS:  I can't recall, but I had read our --

17  all of our protocols prior to beginning any casework at the

18  lab.

19         THE DEFENDANT:  But you don't have the protocols here

20  today?

21         THE WITNESS:  No, I do not.

22         THE DEFENDANT:  So, you're saying that any chemist

23  can receive phone calls from prosecutors at any time to change

24  or to redirect or rearrange anything on --

25         THE COURT:  Can we just have a question, please, a

```
 1    simple question.

 2               THE DEFENDANT:  So, you're saying that the

 3    prosecutor's office can call you at any time on any whim and

 4    ask you to change something; is that correct?

 5               THE WITNESS:  That is not correct.

 6               THE DEFENDANT:  Okay.  So, by him doing that -- I'm

 7    trying to get -- you said you don't know how many actual

 8    changes you've done at that time; that's correct?

 9               THE WITNESS:  Correct.

10               THE DEFENDANT:  Now, with the evidence technicians --

11    isn't it that submittals come through the evidence

12    technicians, anything that has to do with anything of a change

13    in the samples?  Meaning, when this was submitted, if anything

14    was wrong on here, isn't it policy that it has to go through

15    the evidence tech's office because it deals with the evidence?

16               THE WITNESS:  No, that's not correct.

17               THE DEFENDANT:  So, your job is to investigate and do

18    samples, you're telling me?

19               THE WITNESS:  Yes, it's our responsibility -- if a

20    discrepancy is brought to our attention, it's our

21    responsibility to contact the police department and confirm

22    the correct information.

23               THE DEFENDANT:  Did you -- so, you went to your

24    supervisor and explained this to him and he told you what to

25    do?
```

1          THE WITNESS:  I don't recall.  Not necessarily.

2          THE DEFENDANT:  Not necessarily.

3          Now, the only question I have is what do evidence

4    techs do when they find out that something on here is wrong?

5    Aren't they supposed to correct it or --

6          THE COURT:  I'm sorry.  What is the question?

7          THE DEFENDANT:  The evidence techs.  So, their job --

8    they have no other function but to just receive the samples

9    and watch them in the safe, you're saying?

10         THE WITNESS:  Sometimes they can call to confirm

11   information.

12         THE DEFENDANT:  When you called the Boston Police,

13   who did you talk to that day?

14         THE WITNESS:  I do not remember.

15         THE DEFENDANT:  You do not remember.  It's not in

16   your notes, is it?

17         THE WITNESS:  No, it's not.

18         THE DEFENDANT:  So, you don't know who you talked to

19   on that day.  Do you know why they had a May 26th date?

20         THE WITNESS:  No, I don't.

21         THE DEFENDANT:  Do you know that Mr. Morrison was

22   arrested in May of that same month with another example?

23         THE WITNESS:  I did not know that.

24         THE DEFENDANT:  Do you know if that sample was --

25   ended up as this example?

1          THE WITNESS:  I do not know.

2          THE DEFENDANT:  Do you know if any other samples was

3  mixed up out of that whole operation that were grabbed in May,

4  if that was switched with this sample right here?

5          THE WITNESS:  I do not know.

6          THE DEFENDANT:  You do not know.

7          So, when you called to check this date -- I mean, the

8  number -- I understand the numbers should correspond with the

9  date, but, however, someone changed this date and there was a

10  reason it was changed, and Mr. Wortmann called.  Do you know

11  if Mr. Wortmann had any animosity against me to try

12  and conceal that?

13          THE COURT:  No.  No.  No.  No.  Mr. Spencer, you're

14  going far afield.  You may have questions that are within the

15  scope of the direct, more or less.

16          THE DEFENDANT:  They are within, I think, because if

17  Mr. Wortmann is calling --

18          THE COURT:  I'm telling you, you're going far afield.

19  So, please stick to the evidence that is necessary to decide

20  this matter.

21          THE DEFENDANT:  All right.  I just want to make sure,

22  your Honor, that she...

23          So, you don't know if this sample was any other

24  sample but that sample, you're saying?

25          THE WITNESS:  Correct.  I only know the information,

1    the numbers that are given to me.

2            THE DEFENDANT:  What was told you.  Okay.

3            And you don't remember who you talked to that day?

4            THE WITNESS:  Correct.

5            THE DEFENDANT:  And you don't remember if you spoke

6    to your supervisor?

7            THE COURT:  I think we have covered that.

8            THE DEFENDANT:  Thank you, your Honor.  I just wanted

9    to make sure.

10           THE COURT:  I know, but please don't.

11           THE DEFENDANT:  I'm sorry.

12           THE COURT:  Any -- this was recross or was it

13   redirect?

14           MS. YOUNG:  It was re-redirect, your Honor.

15           THE COURT:  Re-redirect?

16           MS. YOUNG:  Yes.

17           THE DEFENDANT:  Yes, it's re --

18           THE COURT:  No, we do not have re-redirect.  We have

19   two rounds, and that's it.  So, we're done.

20           Thank you, Ms. Rimkus.  You are excused.

21           (Ms. Rimkus steps down.)

22           THE COURT:  Who is next?

23           MS. YOUNG:  I call Donald Keenan...

24           Your Honor, may I just have a moment?

25           (Pause.)

1          MS. YOUNG:  Your Honor, may I show you the exhibits

2      that have been introduced, just so you're sure about what

3      we're talking about?

4              (AUSA Young hands documents to the Court.)

5          MS. YOUNG:  The government rests at this time.

6          THE COURT:  Mr. Butters.

7          THE DEFENDANT:  Question.  Is Mr. -- is the actual

8      lady, Diana Lopez, here?

9          THE COURT:  Wait a minute.  Who is --

10         MR. BUTTERS:  Your Honor --

11         THE COURT:  Does the defendant have any evidence?

12         MR. BUTTERS:  No.

13         THE DEFENDANT:  No, other than -- your Honor, there's

14     a question I wanted to ask.  Is the drug control log submitted

15     with this --

16         THE COURT:  I don't know the answer to any such

17     evidentiary questions.  If you want to ask, you may ask the

18     government or you may ask Mr. Butters or you may call a

19     witness to explain it, but I don't know the answer to any of

20     these things.

21             (Discussion off the record.)

22         MR. BUTTERS:  We have no questions, your Honor.

23         THE DEFENDANT:  Is Flaherty here?

24         MR. BUTTERS:  No.

25         THE COURT:  Okay.

1          THE DEFENDANT:  Can we call Mr. Wortmann to the

2     stand?  I would like to talk to Mr. Wortmann for a minute, if

3     we can.

4          THE COURT:  I think you should heed your counsel's

5     advice.

6          THE DEFENDANT:  Well, your Honor, it's -- the problem

7     is --

8          THE COURT:  I'm telling you, once you ask questions

9     and you get evidence, you cannot take it back, and you may not

10    like what you get.  So, I think that if Mr. Butters is

11    advising you, that there is no further evidence, for you to

12    call Mr. Wortmann, it very well may be the death knell to your

13    motion.

14         THE DEFENDANT:  Well, if you put it like that, your

15    Honor.

16         MR. BUTTERS:  Thank you, your Honor.  We rest.

17         THE COURT:  Okay.  I'll hear argument.  I guess by

18    the defense first.

19         MR. BUTTERS:  Yes, your Honor.

20         Well, your Honor, I would just say this.  That,

21    clearly, there's a question here about the -- about this drug

22    test, and the reason I say that is because we have the form

23    that's submitted by Officer Flaherty that has the wrong date

24    on it, and to me that creates a doubt about when this

25    particular cocaine was seized.

1          If you look at Exhibit 4, it has Michael Morrison at

2     the top and Barry Spencer at the top, and it has the date of

3     incident as May 26th, and what should have happened is this

4     should have been sent back -- if there was a question about

5     whether this was the right sample from the March 20 incident,

6     the drugs should have been sent back to the Boston drug log

7     lab, if that's the right way to say it, and they should have

8     resubmitted it.

9          THE COURT:  But the issue that I have to decide is

10    whether there was some defect in the trial, and it seems to me

11    from the papers that I have seen and from the evidence I heard

12    today and from the fact that the jury asked about the earlier

13    document -- I think it was the SP-295 or -- but they asked for

14    a different document from that which they had, and we told

15    them they couldn't have it because it wasn't in evidence.

16         I think that the issue for the jury was -- I don't

17    know this, but they were a conscientious jury -- was a chain

18    of custody issue.

19         MR. BUTTERS:  Right.

20         THE COURT:  And it is the chain of custody issue that

21    comes to the fore when you look at the wrong date and the

22    corrected date, was this really the drug that was taken from

23    Mr. Spencer or Mr. -- his co-defendant on that date.  That's

24    the question.

25         MR. BUTTERS:  Right.

1          THE COURT:  And whether the trial in some way was

2     tainted by the error in the date, and if that's the case, then

3     the question is whether the government had an obligation to

4     let the defendant know before the trial that there was such a

5     problem, because it did cause, maybe, a chain of custody

6     question, at least to the point where the defendant could more

7     effectively argue it than the defendant did, in fact, argue it

8     based on what he learned at the trial.  That, I think, is the

9     issue in the case in this motion, but I may be wrong about it.

10          MR. BUTTERS:  No.  I agree.

11          THE DEFENDANT:  I agree.

12          THE COURT:  So, if you want to address that, I'm

13     happy to hear you.

14          MR. BUTTERS:  Well, I would just somewhat reiterate

15     what I already said, which is that there was an issue in front

16     of the jury that the jury had a question about, about whether

17     these were the correct drugs that were submitted and because

18     of what happened during the trial, they were unable to really

19     get a clear answer to that.  And so -- and that's not my fault

20     and that's not Mr. Spencer's fault, and we don't have that

21     burden.

22          THE COURT:  Ms. Young.

23          MS. YOUNG:  Yes, your Honor, a couple of things.

24          First of all, all of this evidence, except for the

25     case conversation log -- so, the original certificate and the

1    corrected certificate had both been turned over to the defense

2    long before the trial.  So, they had this and, in fact, Mr.

3    Butters questioned Claire Rimkus about the corrected drug

4    certificate at the trial.  When we submitted our pleading on

5    Sunday -- or Monday, attached to that were several pages of

6    the cross-examination by Mr. Butters of Ms. Rimkus about that

7    document.  And, in fact, your Honor, at that time --

8            THE COURT:  But that document was her report.

9            MS. YOUNG:  Yes, that was -- well, what Mr.

10   Butters --

11           THE COURT:  What was not available to the defendant

12   was -- I don't know that they had the SP-295.

13           MS. YOUNG:  But those things were all turned over in

14   discovery.  So, they did have that document as well.

15           THE COURT:  Was there ever a second SP-295?

16           MS. YOUNG:  No, your Honor, because the drugs were

17   not resubmitted.  The SP-295 -- and if you look at the bottom

18   of that Exhibit 4 that Mr. Butters introduced --

19           THE DEFENDANT:  We didn't have this file.  The

20   exhibits are right here.

21           MS. YOUNG:  The SP -- if you look at the bottom of

22   that document -- okay.  The defense did have it.  In fact, it

23   is Bates stamped Page 179.  It was turned over by the

24   government to the defendant on December 3rd, 2013, and if you

25   look at the bottom of that, your Honor, if you look on the

1    left --

2              THE COURT:  This is Exhibit 4?

3              MS. YOUNG:  This is Exhibit 4.

4              If you look on the left-hand side, it says submitted

5    by whom.  You can't read it, but that name is Diana Lopez.

6    She's Boston Police Department.  That is 9/17/2013.  And then

7    the name on the other side, delivered to whom.  Cante is the

8    name of a person at the State Police Drug Lab.

9              The next numbers, which are very difficult to read,

10   sometime in November of 2013 someone from the drug lab

11   submitted by whom, and on the other side is the -- Keith

12   Butler, I believe, that was who it was delivered to.

13             This SP-295 goes with the drugs.  So, the drugs were

14   -- they were taken from the Boston Police Department drug

15   depository in the evidence unit by Diana Lopez, taken to the

16   State Police Drug Lab, and then after they were tested in

17   September 2013, they were bought back to the Boston Police

18   Department drug evidence unit -- the depository.

19             So, that's what -- at the bottom of this SP-295 --

20   this is the form that goes with the drugs and you can see that

21   -- two things that actually make it clear that these were the

22   same drugs.  One is if you look at the agency case number,

23   which is on the right-hand side and the form filled out by

24   hand, second line down from the -- on the right, it says

25   1310164540.  That is the cc number that everyone keeps

```
1    referring to.  It's on all of the documents.  It was actually
2    on the evidence.  It's -- in fact, it's reflected on the bag
3    of drugs themselves, and if you look above that, there's
4    something stamped on there, 13-20606-1.  That's the number
5    that the State Police Lab gives it.
6         So, you have two checks that these are the same
7    drugs.  The first is the cc number that Boston Police issues
8    as soon as this drug transaction took place on March 20th of
9    2013.  The original arrest report shows that.  That number was
10   issued the moment that drug -- right after that drug
11   transaction took place.  When this form SP-295 goes to the
12   State Police Lab, the state police has its own numbering
13   system.  That's when they put the number at the top.  So,
14   that's what the SP-295 is --
15        THE COURT:  Who originates this document?
16        MS. YOUNG:  It's a state police form, but it's --
17   it's written by someone at the drug depository.
18        THE COURT:  But if it is filled out the moment they
19   get the drug, how do they get a date that is two months later?
20        MS. YOUNG:  No.  I misstated -- well, perhaps, I'm
21   not making this clear.  The cc number is given to the drugs
22   right as soon as the drug transaction takes place.
23        THE COURT:  Which number is that, the 13- --
24        MS. YOUNG:  Yes, that's what's known as the agency
25   case number, the complaint number, the cc number from the
```

1   Boston Police Department.  That number is reflected on all of

2   the incident reports that Boston Police fills out of what just

3   happened, the drug incident that the whole case was about,

4   that Mr. Spencer was convicted of.  So, that number is

5   automatically generated right after the drug transaction takes

6   place.

7           This is not filled out until the drugs are being sent

8   over to the State Police Lab.  So, the drug transaction took

9   place on March 20th of 2013.  This is filled out by someone at

10  the Boston evidence unit, the drug depository --

11          THE COURT:  Which is part of the Boston Police?

12          MS. YOUNG:  It is.  And the person who filled this

13  out, if you look at the date here (indicating), the evidence

14  showed at your trial of Mr. Spencer and all of the other

15  evidence shows that the date that this person erroneously

16  wrote down as the date of incident -- 5/26/2013 is the date

17  Mr. Spencer was arrested.  You look at the incident reports

18  and the testimony at trial, he was arrested at 4:17 a.m.

19  Whoever filled this form out just pulled up the wrong report

20  and wrote down the wrong date and time.  Mr. Spencer was

21  arrested on that date.  He was not arrested with drugs.  Mr.

22  Morrison was not arrested on that date.  The date that the

23  drug transaction that Mr. Spencer was involved in was March

24  20th of 2013.

25          We do have a series of simple clerical errors.  The

1    person who filled this out wrote the wrong date on it.  All of

2    the numbers, however, are correct and they match with

3    everything else in the case.

4           THE COURT:  But you know errors like that raise

5    doubts.

6           MS. YOUNG:  They do.

7           THE COURT:  And that's the issue.  That's the issue

8    for the defendant and that's the issue that the defendant was

9    not able to fully develop at the trial because he didn't know

10   about it.

11          MS. YOUNG:  Well -- but --

12          THE COURT:  I think.

13          MS. YOUNG:  No, but, your Honor, that's where I'm

14   objecting to what you're saying.  He did know about it.  All

15   of these documents were turned over to the defendant long

16   before trial, before the first trial.  The only thing that's

17   new is that Ms. Rimkus told us that she kept notes and that's

18   that case conversation log that is Exhibit 2 of the

19   government.  That's the only thing that had not been turned

20   over before.

21          THE DEFENDANT:  I object.

22          MS. YOUNG:  The original certificate, the SP-295, and

23   the corrected certificate were all there, and you know that

24   because Mr. Butters cross-examined Ms. Rimkus on the original

25   certificate and the corrected one and, in fact, I know your

1    Court order says that they asked for the certificate and that

2    you did not give it because it was not admitted into evidence,

3    but if I could just -- I don't know what the jury issue was

4    because I wasn't in the jury room.  All I know is from your

5    order, it said that they asked for it, but, in fact, Mr.

6    Butters -- and let me just pass this up.  This is -- Mr.

7    Butters introduced this at the trial and it was received into

8    evidence.

9               (AUSA Young hands document to the Court.)

10              THE COURT:  What is this?

11              MS. YOUNG:  What that document is, is -- the

12   government's Exhibit 1 is almost the same document.  Ours is

13   signed by Claire Rimkus.  That one was not signed yet.  So,

14   that is an earlier draft of it, but Mr. Butters introduced

15   that as a defense exhibit and you admitted it into evidence at

16   the trial, and that's -- if you look at our -- the response to

17   your Court order that we filed on Monday, that document -- I'm

18   trying to remember whether we attached it or not, but Claire

19   Rimkus' testimony about that document is in the cross-

20   examination and that is an attachment to the government's

21   response to your Court order, and the -- just so you know, the

22   updated certificate, the corrected certificate, was turned

23   over to Mr. Spencer and Mr. Butters on April 4 -- excuse me --

24   April 9th of 2014, but the SP-295 that you're talking about

25   and the original drug certificate were all turned over in

1    December, on December 3rd of 2013, and when Mr. Wortmann

2    turned over the corrected certificate on April 9th of 2014, he

3    wrote to Mr. Butters and to Mr. Spencer:  "This is an updated

4    certificate" -- excuse me -- "certification from the State

5    Police Lab that corrected a clerical error regarding the date

6    of the underlying purchase."  Also, it --

7            THE COURT:  Are these documents that you're now

8    referring to in evidence before me in this hearing?

9            THE DEFENDANT:  No.

10           MS. YOUNG:  No.  This is just Mr. Wortmann's note,

11   and he asked -- and he never received a call about it.  He

12   asked, "If you have any questions, please call me," but the

13   underlying documents themselves -- just the note that I read

14   you is not in evidence.  The underlying documents, the SP-295

15   is not in evidence, but it was turned over long before that,

16   and the original certificate was and, as you can see, the

17   corrected certificate says, "corrected certificate supersedes

18   the September one."  And what Mr. Rimkus did, what she just

19   testified about, is she put in italics the date of incident so

20   it was clear that that's what was corrected.  Nothing else is

21   in italics, just that.

22           So, the only issue here is whether it would have been

23   better for Mr. Wortmann to have put on evidence that he knew

24   was not correct, because if he had left the certificate the

25   way it was, it had the incorrect date.  That was not a date on

1   which those drugs were seized.

2          So, the evidence was not suppressed.  I don't see how

3   it's favorable to the defendant and, most of all, it is not --

4   did not prejudice him in any way.  It's not material,

5   especially given that Mr. Butters cross-examined Ms. Rimkus

6   about this specific issue.  The only thing that did not come

7   out at trial was, in fact, that it was Mr. Wortmann who made

8   the phone call.  That's all.  But the change in the

9   certificate was definitely something that was aired at trial,

10  but also had been known to the defendant and his standby

11  counsel for more than a year before this.

12          THE COURT:  Okay.  Anything?

13          THE DEFENDANT:  Your Honor --

14          MR. BUTTERS:  Well, may I say anything?  Do you mind

15  if I say something first?

16          THE COURT:  No, he doesn't mind.  You go right ahead.

17          MR. BUTTERS:  Thank you, your Honor.

18          The only thing that I would say about that is

19  everything that Ms. Young says factually is true.  You know,

20  I'm not disputing that, but what really might have made a

21  difference with the jury when this came up is, had I known,

22  you know, that Mr. Wortmann called Ms. Rimkus and said, Gee,

23  you have the wrong date here, I mean, that might have created

24  more doubt because there was clearly an issue, as you know, in

25  the jury's mind about the chain of custody and, you know, that

1    may well have made a difference to them.

2         THE COURT:  He said everything you wanted to say,

3    right?

4         THE DEFENDANT:  The question -- yes, basically.

5         THE COURT:  Yes or no.

6         THE DEFENDANT:  No.  Your Honor, there's a question--

7         THE COURT:  Don't muck it up.

8         THE DEFENDANT:  No, I'm not.

9         THE COURT:  Oh, yes, you are.

10        THE DEFENDANT:  It's still -- the incident date on

11   this paper, when it came, it came -- whoever submitted it,

12   your Honor, they came with this paper (indicating) in their

13   hand, on with this which has a correct date allegedly to come

14   up with this date.  Something happened between March and

15   September that this number, or something, got reassigned to

16   something else.

17        I mean, we can claim the arrest date.  We can claim

18   anything we want, but they hadn't provided how many -- how

19   many -- was it -- walk/buys were done in May.  We don't know

20   if something else was assigned this number, but whoever went

21   to the state lab, they had this, if this was a true date of

22   this sample, if this was the right sample, your Honor.

23        The only thing I'm saying is the chain of custody and

24   Wortmann's call, Mr. Wortmann's call, and now we find out that

25   she had notes.  Now, I mean, it seems like every time we go

1    into this, we're getting more information and more information

2    that we didn't have at trial.

3         THE COURT:  Okay.  Thank you.  I will take the

4    papers, and I thank you all.

5         MR. BUTTERS:  Thank you, your Honor.

6         MS. YOUNG:  Thank you, your Honor.

7         THE COURT:  Court is in recess until after July 4th.

8         THE DEFENDANT:  After July 4th?  I was hoping to be

9    out for the 4th.

10         (Adjourned, 3:04 p.m.)

11

12

13

14

15                    C E R T I F I C A T E

16         I, Catherine A. Handel, Official Court Reporter of the

17    United States District Court, do hereby certify that the

18    foregoing transcript, from Page 1 to Page 51, constitutes to the

19    best of my skill and ability a true and accurate transcription of

20    my stenotype notes taken in the matter of Criminal Action No.

21    13-10196-RWZ, United States of America versus Barry Spencer.

22

23

     June 19, 2016        /s/Catherine A. Handel
24    Date                Catherine A. Handel, RPR-CM, CRR

25